UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

ANTHONY FASULO and GAUTAM DESAI,

                                  Plaintiffs,       Civil Action No. __ cv _____ (___)

      v.

                                              **COMPLAINT**

XTRADE DIGITAL ASSETS INC.,
XTRADE DIGITAL HOLDINGS,
ALEXANDER KRAVETS,                                    **with**
SERGII GULKO, and
JON GIACOBBE                                        **JURY DEMAND**

                                              **ECF CASE**

                                  Defendants.

-------------------------------------------------------------x

## COMPLAINT

Plaintiffs Anthony Fasulo and Gautam Desai, through their attorney, Zeev Kirsh, make this Complaint for violations of Sections 10(b), 20(a), and 21(d) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5; and Sections 5, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and for common law fraud under New York Law, and allege as follows based upon personal knowledge with respect to their own ats, and upon information and belief as to all other allegations.

## NATURE OF THE ACTION

1.      In or around 2017, Defendants presented an investment offering to Plaintiffs involving the purchase of "tokens," by means of various cryptocurrencies, for use by the general public as a way to access an online trading "platform" (the "Offering").

2.      The investors would purchase the tokens in bulk, at a substantial discount to the intended public issuance price , and resell them at that issuance price or better.

3.      In their advertising and information documents, Defendants claimed that SEC registration was not required for the Offering, since the tokens were for use in the platform, not for trading themselves.

4.      However, this was not true.  The Offering was in the nature of a security interest and should have been registered.

5.      In addition, Defendants materially changed the terms of the Offering, as originally outlined in the advertising and information documents, at a time after Plaintiff investors had already made their investment payments on the basis of the original representations.

6.      This material change was in two parts: first, Defendants' abandonment of the online trading platform and market-making function for which the tokens would be used; and second, the decision to use cash for the remaining aspects of the trading platform.

7.      This was not only fraudulent in itself, it also meant that without any secondary purpose, the tokens were now nothing but securities and were required to be registered.

8.      Finally, right from the beginning, in a direct attempt to circumvent U.S. securities laws, Defendants refused to execute investment contracts with U.S. investors until a foreign national could be found whose name could be substituted on the contract.

9.      As a result of all of this, Plaintiffs are entitled to rescission of the investment contracts and damages.

**THE PARTIES**

10.     Plaintiff Anthony Fasulo ("Fasulo") is a U.S. Citizen domiciled in New York State.

11.     Plaintiff Gautam Desai ("Desai") is a U.S. citizen domiciled in California.

12.     Defendant Xtrade Digital Assets, Inc. ("XDA") is a Delaware corporation, #6512084, registered in August of 2017, with its principal place of business at 55 Broad Street, Suite 2810, NY NY 10004.

13.     Defendant Xtrade Digital Holdings ("XDH") is a Cayman Exempt Entity with its principal place of business in New York at 55 Broad Street, Suite 2810, NY NY 10004.

14.     Defendant Alexander Kravets ("Kravets") is a resident of New York and is the CEO of XDA.  Upon information and belief, Kravets has been involved in the brokerage business for at least ten years and had admittedly managed the operations of a brokerage firm.

15.     Defendant Sergii Gulko ("Gulko") is a Ukranian national and a resident of New York and is CTO of XDA.

16.     Defendant John Giacobbe is a resident of New York and is the COO of XDA.

**JURISDICTION AND VENUE**

17.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); Section 22 of the Securities Act (15 U.S.C. § 77v); and Section 27 of the Exchange Act (15 U.S.C. §§ 78u(e) and 78aa), because Plaintiffs allege violations of

Sections 10 and 20 of the Exchange Act, Rule 10-b5, and Sections 5, 12, and 15 of the Securities Act.

18.     This Court has supplemental jurisdiction over Plaintiffs' New York law fraud claim pursuant to 28 U.S.C. § 1367(a), because the fraud claim is so related to Plaintiffs' claims under the Exchange Act and Securities Act that it forms part of the same case or controversy.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 78v and 78aa, because Defendants are found, and/or reside, and/or are inhabitants of, or transact business within this District. Venue is also proper in this District because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## **FACTS**

20.     Upon information and belief, Xtrade Digital Assets Inc. ("XDA") is a Delaware registered shell company owned by Kravet and operated by Kravets out of it New York City Offices.

21.     Upon information and belief, Xtrade Digital Holdings ("XDH" ) is a Cayman Exempted shell company set up, for the purpose of selling Convertible SAFT (simple agreement for future tokens) contract investments in cryptocurrency, known as "Xtrade" tokens (the "Tokens"), as well as direct issuance of the Tokens themselves.

22.     XDA did not issue a formal offering.  Rather, it publicized its business plan in a series of five "whitepapers," and other marketing materials, from October 1st, 2017 through March 8th, 2018 (together, the "Whitepapers"), which were distributed through social media.

23.     XDH is never mentioned in the Whitepapers.

24.     The initial versions of the Whitepapers explained that XDA's ultimate mission and the purpose of the Offering was to help cryptocurrency traders access multiple cryptocurrency exchanges more quickly, cheaply and knowledgeably than the traders could do on their own.  XDA would do this through the "Xtrade Platform" (the "Platform"), basically a computer program, with a "market-making" function.

25.     Users would purchase Tokens and use the Tokens to gain access to the Platform.

26.     This Token exchange was a central feature of the XDA Offering.

27.     Defendants travelled internationally to promote XDA and raise funds.  XDA also used social media, particularly a platform called Telegram, to advertise and raise funds. Potential investors could post questions on Telegram, which someone from the company would answer.

28.     Potential investors were sent a SAFT investment contract with payment instructions.  The SAFT alleged that the Offering was registered by XDH under regulation 506(d) as an exempted security.  XDH was also the SAFT signing entity.

**The Offering to the Plaintiffs**

29.     In early January 2018, each of the Plaintiffs received emails from Defendant Kravets informing them of the Offering and the opportunity to invest in the Xtrade Tokens.

30.     Kravets described the opportunity as an investment and represented that in exchange for their investment, Plaintiffs would receive Tokens, which they could then resell to the general public of unaccredited investors.

31.     Kravets sent each Plaintiff the first version of the Whitepapers, which described the Tokens, their functionality, and the general business model of XDA.

**Fasulo**

32.     On January 17, 2018, Kravets sent Fasulo two SAFTs (simple agreement for furture tokens) to sign and return with payment.  Fasulo and Kravets both executed both SAFTs.

33.     The larger SAFT, although paid in bitcoin, was worth $1,159,995.10 U.S. Dollars.

34.      The smaller contract, in the amount of $75,000 U.S. Dollars, was wired by Fasulo per Defendant Gulko's instructions.

35.     The wire instructions were to an account for XDH, not XDA.  However, upon information and belief, XDH lacked its own independent bank accounts and used those of XDA, and still does.  Therefore, the funds of XDH and XDA were commingled.

36.     Fasulo's total investment sum for both SAFTs was valued at $1,234,995.

37.     In March 2018, upon personal request by Kravets, Fasulo located a foreign national, Saeed Aldarmaki, of the United Arab Emirates, to be a substitute, as required by Defendants.  Aldarmaki signed a SAFT contract for 90 bitcoin, the same amount as Fasulo.

38.     On May 1st, 2018, Aldarmaki received $100,000 worth of Tokens in return for his service of signing the SAFT document as a foreign signer on Fasulo's behalf.

39.     Aldermaki himself never contributed any funds to Defendants.

**Desai**

40.     On or about January 2018, Kravets, sent Desai contracts to sign and return with payment, which Desai did.

41.     On March 31, 2018, Mark Friedler, an "advisor" to XDA, emailed Desai, with a copy to Kravets.  The gist of the email was that in order to invest, Desai needed to find a foreign national whose name could be substituted on the SAFT.

42.     Desai could not find a foreign national to substitute for him, and his SAFT was never executed by any Defendant.

43.     Nevertheless, on or about May 23, 2018, Kravets confirmed to Desai that his investment value was confirmed for bitcoin yielding an investment of $1,207,043,20.

**The Offering**

44.     On or about February 20, 2018, XDA announced, via Telegram, the end of the their "private pre-sale" period and the beginning of their "public-presale" period.

45.     During this time, XDA renewed their solicitations to the general public.

46.     On or about March 31, 2018, XDA announced that the public pre-sale of tokens was over.  It also announced that it was cancelling its plans to hold a public "crowd-sale" to the unaccredited public.

47.     XDA claimed to have raised approximately $31.5 million dollars.

48.     At all times from November 2017 through March 31, 2018 and following through to the present moment, in all communications with Plaintiffs and marketing materials to them and to the general public, Defendants maintained that the Tokens did not constitute securities for legal purposes under U.S. law, that they could be sold to the general public and that they were exempt from SEC registration.

49.     On or about April and May 2018, XDA electronically distributed Tokens to all the Plaintiff investors (among others) by providing an online "wallet" address through which the investors could take possession and control of the Tokens.

50.     However, in contradiction to the Whitepapers, the Tokens did not provide access to a functioning Platform.

51.     It was not that the Tokens didn't function.  It was that the Xtrade Platform simply did not exist and thus the tokens had no purpose to be issued, other than speculation.  Upon information and belief, as of the filing of this action, the Xtrade Platform still does not exist.

52.     Defendants failed to implement the Platform, even though that was the basis of the Offering and the purpose of investing in the Tokens.

**The Whitepapers**

53.     The various versions of the Whitepapers list the three individual defendants as officers of XDA.  It also lists numerous "advisors" who, upon information and belief, helped XDA find investors, and who, as unregistered brokers, may have received commissions for doing so.

54.     Each of the versions of the Whitepapers issued after October 2017 stated that XDA had obtained a "qualified opinion" that the Tokens were not to be considered securities and did not need to be registered.

55.     However, the Whitepapers do not discuss any requirements or exemptions of XDA or any affiliate, or any principal thereof, to register as a broker-dealer, to become a member of any national securities association, such as the Financial Industry Regulatory

Authority ("FINRA") or to register as a national securities exchange or an alternative trading system.

56.     Since the Whitepapers do not discuss these requirements or exemptions, it also does not discuss any of the potential legal and compliance costs associated with such registrations.

57.     Besides insisting that the Tokens are not securities that require registration, the only thing the Whitepapers discuss is the use of the Platform (which is the reason to invest in the Tokens to begin with) as a "market maker" for XDA's customers.

58.     Later that summer, Gulko communicated to investors and potential investors that XDA simply no longer had any intention of offering the market making service, for the use of which one would need to purchase Tokens, the whole reason Plaintiffs invested.


**XDA's Material Misrepresentations and Omissions**

59.     In addition to the Whitepapers, Defendants also engaged in regular electronic updates with investors and potential investors throughout the Offering process and after, as Tokens continue to be issued, both to investors and to individuals who received them as "bounty" for achieving promotional goals on social media platforms.

60.     Initially, the Whitepapers stated that it would employ legal and compliance teams to ensure regulatory compliance and proactively engage with regulators.

61.     This never happened.

62.     Second, from October 2017 through March 2018, the Whitepaper changed numerous times, specifically regarding the rollout of the Xtrade Platform, but also in regard to the composition of the business, its goals, and the timelines for meeting those goals.

63.     The Whitepaper also claims that XDA has partners, in particular the Chicago Mercantile Exchange ("CME"), but when asked, Defendants never produced any documentation of these alleged partners.

64.     In addition, prior to the time of Plaintiffs' actual investments, XDA posted youtube videos "demonstrating" that there was a fully functioning and working prototype of the Xtrade Platform.

65.     However, the videos show nothing more than numbers on a screen. There is no proof of a prototype existing.

66.     In fact, anything to do with the Platform has been cloaked in secrecy since the very beginning of the Offering.  Defendants refused to allow any investors to use the prototype, although they communicated that they would be providing a beta prototype to select participants. Such Secrecy regards to how Xtrade distributed plaintiff's funds to third parties such as Mydicewallet.com as evidence by an expert report that tracked the digital footprints of Xtrade's digital currency transactions (Exhibit A).

67.     Upon information and belief, no beta was ever launched.

68.     Next, Defendants did not adequately represent the necessity of SEC registration for this offering, or that the "market-making" function of the Xtrade Platform might also require broker-dealer registration for anyone who uses it.

69.     Apparently, Defendants invented the Platform simply to lure investors.  Once they got the investors, they discarded or changed the platform beyond recognition, claiming publicly that its use would be a "conflict of interest" with the cryptocurrency markets.

70.     By March of 2018, it seemed that Defendants were revising the Whitepaper on an almost daily basis, drastically altering it from the Offering as originally outlined, and upon which Plaintiffs (and other investors) originally relied in making their investment decisions.

71.     When Plaintiffs invested, in January and February of 2018, the Whitepaper included the market-making function of the Xtrade Platform.  When that function was abandoned, and thus the reason for purchasing the Tokens, no refund was given (or offered).

72.     Once Defendants withdrew the market-making function of the Xtrade Platform from the Offering the quality of the Offering changed.  It became nothing more than an investment in an undetermined business with a continuously changing and speculative business/revenue model.

73.     Then, upon information and belief, Defendants, in August 2018, actively participated in helping to list the Xtrade tokens on two unregistered offshore exchanges known as Idex and Coinsuper. The token ticker symbol is "XTRD"

74.      The token, which had been advertised for issuance at 10 cents, and which had a contractual value of 10 cents as prescribed in the SAFT contract, began trading on these exchanges at under 1 penny in price and plummeted to to less than  $1/10^{th}$ of 1 penny with no significant volume.

75.     Defendants their advisors and employees are, upon information and belief, known to have sold or allowed to be sold their tokens, or tokens under their control, unto these exchanges, thereby exacerbating damages to the Plaintiffs investment.

76.     The token value is so low, Xtrade is no longer even theoretically able to generate sufficient revenue from the accepting the token in exchange for use of its potential future trading platform.

77.    Not only is the token worthless, but the result is that Xtrade must now look to accept cash directly in return for access to its platform, thus the entire business model of Xtrade is significantly altered from its originally marketed revenue generation model which is circumscribed in the Offering. This model is one which was based on exclusively accepting XTRD tokens for platform access and not cash or USD or any other means of access.

78.    Therefor, Defendants caused this drop in value and destruction of the Plaintiffs investment, rendering the investment to become worthless.

79.    Once Defendants helped or allowed their tokens to be listed for secondary trading on an unregistered offshore exchange, without already having completed a working platform, they confirmed clearly to Plaintiffs that the tokens were meant only for speculation purposes rather than for "utility" purposes.

80.    Thus, those similarly situation to the Plaintiffs, who purchased Tokens, as outlined in the original Whitepaper, for resale to the general public, now had useless Tokens on their hands that were and continue to trade for speculative purposes only.

81.    In effect, XDA was undermining its own investors by destroying the value of its tokens.

82.    Neither the SAFT nor the Whitepapers never mentioned *this* risk. Indeed, no investor would ever had invested into the project with a requirement to accept the risk that Defendant would knowingly render their own offered business model worthless.

83.    There are other misrepresentations.  For example, Defendants made misrepresentations about Defendant Kravets' background.  The Whitepaper stated that Kravet had successfully launched certain deals, which it turned out was simply was not true.

84.     However, the fundamental and basic misrepresentation of XDA was that there was certainty by January 2018 that cryptocurrency tokens such as those Tokens issued by Xtrade Digital Assets, a Startup Company registered in Delaware, did not and could not constitute securities.  Upon information and belief, Defendants, who claimed in the Whitepapers to have extensive brokerage experience, should have been completely aware that precisely the opposite was true, that there was no uncertainty that Xtrade Tokens were securities.

85.     Additionally, Defendants refuse to disclose to investors how investor funds have been used in the past or are currently being used. Upon information and belief, XDA continues to have no revenue of any kind.

86.     Finally, Xtrade has dissipated its funds to the point where it may no longer be a viable business. Upon information and belief, Xtrade has dissipated over $28 million of the original amount of over $31 million dollars raised as of April 1st, 2018, to less than $3 million dollars as of the present day. Xtrade has not accounted for the unexpectedly rapid dissipation of funds to any investors and expert witness investigation (Exhibit A) has been unable to confirm whether or not Xtrade may be, or may have been, trading investors funds on exchanges for attempted proprietary profit generation, masking over its use of investor funds for the purposes of generating hedge fund like profits, rather than using funds for the intended purpose of building a "single point of access" customer trading platform.

87.     In March 2019, Plaintiffs demanded their $2,442,038 investment back.  XDA, through counsel, refused. Rather, it continues to insist that the tokens are not securities, that Defendants have not made any misrepresentations, and that they are entitled to keep the money.

**FIRST COUNT:**

**VIOLATION OF SECTION 5 OF THE SECURITIES ACT:**
**FAILURE TO COMPLY WITH REGULATION D**

88.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

89.     Pursuant to Section 12(a)(1) of the Securities Act of 1933, as amended (the "1933 Act"), any breach of Section 5 gives rise to a strict liability claim for rescission of the full amount of the investment in the unregistered securities.

90.     Regulation D of the Securities Act permits general solicitations in connection with a private placement offering.  Submission of Form D attests to compliance with Regulation D.

91.     On February 13, 2018, Defendants filed a Form D with the SEC (attached hereto as Exhibit B) ("Defendants' Form D").

92.     However, Defendants' Form D is not accurate and thus out of compliance with Regulation D.

93.     First of all, Defendants failed to comply with the express investor protection conditions of Rule 506(c), by failing to verify the accredited investor status of each investor.

94.     Second, Defendants failed to comply with Section 502(d) by failing to exercise reasonable care to assure that the purchasers of the Tokens/securities were not underwriters within the meaning of Section 2(a)(11) of the Securities Act.

95.     In fact, Defendants explicitly enabled underwriting by marketing the Tokens to initial investors as a general public resale investment with a 50% discount to the public issuance

price of ten cents.  Therefore, Defendants should have known that all investors in the Tokens were potential Section 2(a)(11) underwriters.

96. Upon information and belief, Defendant sold to non-american investors tokens, providing them commissions, with the explicit knowledge they would be reselling tokens back into the United States to non-accredited American Investors, violating Regulation S, class three U.S.  issuer requirements that Defendant register such securities in order to be fully integrated with Regulation D issuance under Section 5 requirements for the U.S. registration.

97.    Based on longstanding SEC guidance and interpretations, codified in SEC Compliance & Disclosure 139.01 ("C&D 139.01"), where the issuer can cause the conversion of the offering, the subject of the offering must be registered at the initial time of the offering. To be valid , the underlying securities of the SAFT must be registered. They were not,

98.    Because the Tokens were eventually convertible unilaterally at the option of the issuer, the Offering was required to have been registered.

99.    Therefore, Plaintiffs are entitled to rescission of their investment contracts and the return of their money.


### SECOND COUNT:

### VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
### and RULE 10b-5

100.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

101.    Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities,

knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

102.    Defendants made untrue statements of material fact and omitted necessary material facts in order to obscure the truth about their activities.

103.    Had Plaintiffs been fully informed, as required by law, they would not have thrown away $2,442,038 in the Offering.

104.    Therefore, as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in the Offering.


### THIRD COUNT:

**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT:**
**CONTROL PERSON LIABILITY:**
**AGAINST DEFENDANTS KRAVETS, GULCO, AND GIACOBBE**

105.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

106.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defines "Control Person."

107.    Defendants Krevits, Gulko, and Giacobbe (the "Control Person Defendants") by virtue of their offices, stock ownership, agency, agreements or understandings, specific acts, and for any other reason, were, at the time of the wrongs alleged herein, control persons within the meaning of Section 20(a) of the Exchange Act.

108.    The Control Person Defendants exercised their power and influence in regard to the Offering to cause the material misrepresentations and omissions as described herein.

109.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XDA, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

110.    The Control Person Defendants, separately or together, were direct participants in making, and/or were made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions regarding the Offering.

111.    As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in the Tokens, specifically, the loss of $8,300,000.00.


### FOURTH COUNT:

### VIOLATION OF SECTION 5 AND 12(a)(1) OF THE SECURITIES ACT: UNREGISTERED SECURITIES

112.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

113.    This Count is brought pursuant to sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77b(a)(1).

114.    The Tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

115.    Defendants promoted, offered, and/or sold securities by selling the Tokens.

116.    Defendants are therefore issuers, underwriters, and/or necessary participants of/in the sales of the unregistered Tokens

117.     No Defendant or anyone else filed an SEC registration statement for the Offering, and no registration or exemption therefrom was in effect at the time Plaintiffs made their investment in the Offering.

118.     Defendants used the instrumentalities of interstate commerce in connection with the offer and sale of the Tokens.

## FIFTH COUNT:

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT:
### DEFENDANTS KRAVETS, GULCO, AND GIACOBBE

119.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.     Pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, the Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 15 of the Securities Act.  The Control Person Defendants had the power and influence and exercised the same to cause the unlawful Offering as described herein.

121.     The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XDA, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

122.     The Control Person Defendants, separately or together, have sufficient influence to have caused XDA to submit a registration statement.

123.     The Control Person Defendants, separately or together, jointly participated in, and/or aided and abetted XDA's failure to register the Offering and the Tokens.

124.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff for rescission and/or damages.

**SIXTH COUNT:**

**COMMON LAW FRAUD**

125.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    Defendants authorized and/or made or omitted to make representations concerning the Offering and the Tokens upon which Plaintiffs reasonably relied to their detriment.  These misrepresentations and omissions include,

a.    Failure to comply with U.S. Securities regulations in regard to registering the Offering;

b.    Material changes in the Whitepapers from the business model stated in the original Whitepapers, specifically the alteration the Trading Platform (If it in fact ever existed), but also the composition of the business, its goals, and the timelines for meeting those goals;

c.    Claims of partnership, like with the CME, which were not true;

d.    Undermining the investors by planning to provide access to the Platform for cash, not Tokens;

e.    Deliberately Undermining investors by knowingly listing or allowing to be listed for trade Xtrade tokens on secondary exchanges prior to the existence of a

working and demonstrable Xtrade Platform upon which Xtrade's Platform could be accessed in return for Xtrade tokens.

f.    The fraudulent issuance of the SAFTS as a contractual contrivance for helping sell unregistered securities (The SEC has stated as much in their guidance as per the use of SAFTs to sell unregistered crypto securities to accredited investors: These contracts are void as per fraudulent inducement of contract and per public policy guidance of the SEC);

127.    Defendants' representations and omissions were materially false and misleading when made. These representations and omission were made intentionally or with reckless disregard for the truth.

128.    Defendants made these misrepresentations and omissions to Plaintiff directly with knowledge that Plaintiff would rely on them.

129.    Based up on their superior knowledge and expertise, their incomplete and misleading disclosures, and in light of the fact that Plaintiff did not have access to material facts that were uniquely within Defendants' knowledge (like the plans for the Platform), Defendants had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.

130.    Plaintiffs reasonably and justifiably relied to their detriment on Defendants' misrepresentations and omissions and on Defendants' affirmative duty to provide full, complete, and accurate disclosures to them.

131.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered damages, and Defendants are liable to Plaintiffs in an amount in excess of $2.44 million plus interest.

**SEVENTH COUNT:**

**RESTRAINING ORDER**

132.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

133.    Defendants' need to be prevented from luring any further investors into this or any other fraudulent scheme.

134.    Defendants' must be enjoined from allowing any potential participants to use a current or future planned prototype of the Xtrade platform, without first seeking and obtaining regulatory approval, or a no-action letter from both the SEC and the New York State department of financial services, pertaining to Xtrade controlling persons and/or Xtrade's token holders potential liabilities resulting from trading or facilitating the trading of unregistered securities upon offshore unregistered exchanges using a single point of access platform at the very core of Xtrade's planned business.


**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

1.    Declaring that Defendants offered and sold unregistered securities in violation of federal securities laws;

2.    Declaring that Defendants are liable to Plaintiff under Sections 10(b) and/or 20(a) of the Exchange Act and/or Sections 5, 12(a)(1), and/or 15(a) of the Securities Act;

3.      Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from Plaintiff, or using such funds in any further purchases or transactions;

4.      Requiring an accounting of the funds and assets rightfully belonging to Plaintiffs;

5.      Ordering rescission of the investments made by Plaintiff in the unregistered securities, and/or compensatory damages in an amount in excess of $2.44 million;

6.      Ordering that Defendants cease and desist from seeking further investors.

7.      Ordering that Defendants cease and desist from launching their intended platform until obtaining a no-action letter from the SEC and New York State Department of Finance.

8.      Awarding Plaintiff pre-judgment interest at the statutory rate of 9% pursuant to CPLR §§ 5001 & 5004;

9.      Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and disbursements; and

10.     Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, New York
           April 23, 2019

                                **KIRSH LLC**
                                *Attorneys for Plaintiffs*


                                /s/ Zeev Kirsh
                                By:     Zeev Kirsh, Esq., #4597985
                                        Kirsh LLC

347 West 57th Street 31a,
New York, NY 10019
212-586-7517
zeev@zeev.org

**EXHIBIT A : EXPERT REPORT FROM DIGITAL TRANSACTION TRACKER RICHARD A. SANDERS**



# CipherBlade

## Blockchain Investigation Agency

**Analysis of XTRD ICO**

*Review of raised funds, destination of raised funds, and varied elements of the XTRD ICO practices*

**20190224**

**Background**

The purpose of this report is to conduct a review (primarily centric to blockchain forensics) of the XTRD ICO. In light of public skepticism regarding the use of assets raised by the XTRD team, the services of CipherBlade have been retained to conduct analysis on the blockchain trail and other elements of the XTRD raise.

This report has been generated by the CipherBlade team with direct oversight and majority involvement from Co-Founder/CSO Richard A. Sanders. Richard A. Sanders is a credentialed expert witness in blockchain forensics and cryptocurrency related cybercrime. These credentials, as well as direct contacts at all major exchanges, and daily communication with law enforcement, leverage CipherBlade's efforts to bring bad actors to justice and clean up the blockchain industry. Rich regularly consults with the FBI on criminal matters and has been seen by regulatory agencies, including the SEC, as a subject matter expert.

This report will dissect what information is currently held regarding XTRD's sale. It is publicly known XTRD raised approximately $31M USD in a sale with various phases in which the XTRD team accepted BTC, ETH, and fiat. Serg Gulko has confirmed this figure of raised funds himself, and has further made the claim the XTRD team is "not running wild with the money":



CipherBlade has been provided with two initial BTC addresses and has discovered several ETH addresses, which constitute approximately half of the total raised funds. Since the XTRADE team conducted a large-scale sale which included the use of potentially dozens more addresses, those addresses could be gleaned from various future methodologies, including query of exchanges. However, the portion of funds we are able to analyze is a suitable sample size to determine whether or not there are discrepancies between what the XTRD team promised the public.

*USD figures presented in this document, unless stated otherwise, reflect an average of exchange rate at the time of transaction.*

**Bitcoin Funds Raised**

XTRD received BTC in two BTC wallets, 39d3NnDmMpbRgm8TJtuxYJ2UwUQmL6EX3o and 3LvrxWgVjugJRh6yXwQbqyFeoUjRQXpcKj. Both of these wallets transact into a consolidatory wallet, 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR.



**BTC Wallet 1/Consolidation**

Wallet 39d3NnDmMpbRgm8TJtuxYJ2UwUQmL6EX3o received approximately 76.74 BTC and has sent out the same. This would constitute an approximate value of approximately $900,000 USD at the average time of transacting.

Of these outbound funds, 3 BTC go directly to Bittrex in txhash d89a473b6f41ceff31d1135dac8f3b575ea968f864ce380845a52b21aa8109fa.

Transactions from here get more complex, as for an unexplained reason, the XTRD team opted to use multiple hops to move funds. There are five further outbound transactions, each with a more complex trail.

Under txhash d89a473b6f41ceff31d1135dac8f3b575ea968f864ce380845a52b21aa8109fa, 0.743 BTC is sent to a wallet which subsequently deposits 0.5 BTC to Bittrex. The remaining ~0.243 BTC is sent to a wallet which transacts a larger quantity of funds, which may or may not be a wallet not associated with XTRD. It's possible this was a transaction constituting a payment

for a service, thus entailing this wallet is not owned by XTRD, or numerous other possibilities that entail attribution on this wallet as XTRD owned as questionable.



4 BTC is sent in txhash d3ba87ffb36bcdcb3bc55fdd7949d6121178db7d155b4d3d6aaddc10972b8b14 to wallet 3CWY2p52kPhmgi2foqoTcmyz73MDs8unGf. This wallet received funding from 36u8oyx54P5CKDNi313kq2sejmRaiyhEXL. Funds ultimately go to Bittrex in txhash 776df4ea78823f294ebff6eeacc7bc56a8907fce5a67d1d9c9340ee13a67e023 in total of 5 BTC, which indicates these wallets are part of the same cluster.



4 BTC is sent in txhash d3ba87ffb36bcdcb3bc55fdd7949d6121178db7d155b4d3d6aaddc10972b8b14 to wallet 328hoqRReEFPbd1iTvY28UUTqkFJrGGtuM. This wallet has received and sent nearly 233 BTC throughout it's lifetime. There are no indicators this was an exchange wallet. However, it is not

possible to attribute what the particular 4 BTC in question were used for, considering the 4 BTC constitute a small portion of funds received and sent by this wallet. Despite these factors, determination of the attribution of this wallet address would be possible via querying Bitfinex and CumberlandMining for pertinent user account information. It is most likely this was a service payment.



4.995 BTC is sent to wallet 36u8oyx54P5CKDNi313kq2sejmRaiyhEXL in txhash 3b123ae024190100fbad99f3383fb255739fd974895766f0bbded4d015b80de3. This wallet subsequently sends 2.744 BTC to wallet 3CWY2p52kPhmgi2foqoTcmyz73MDs8unGf, a previously identified change address. 2.25 BTC is sent to Bittrex in the same transaction mentioned in the prior sentence, txhash f9c6ef629d3e828147422f6ebc46c7615ea655ae1cf539c9e3be5c52688f01be.



60 BTC is sent to wallet 12iAXShavBDkg14cScapLmZZTHYcFBDSgs in txhash 3b123ae024190100fbad99f3383fb255739fd974895766f0bbded4d015b80de3. This wallet still holds 0.02 BTC. This wallet address has received approximately 30 BTC from other sources, largely from a KuCoin account (indicating, most likely, a swap of ETH for BTC,) for a total of 90 BTC in the trail that will be followed:

- 0.134 is sent in txhash b67fff1faaa521e675c295310ed0f8b12d5bebba4e2d2e0d4c8cb4b651fdc6e2 to 18dCdpa7atnriaVNkAk433SwMrXDJF8411, and this BTC still sits dormant.
- 90 BTC is transacted in txhash b67fff1faaa521e675c295310ed0f8b12d5bebba4e2d2e0d4c8cb4b651fdc6e2 to wallet 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR. This wallet address has received

approximately 493 BTC and sent 433 BTC throughout history. Based upon dates of transactions, it is CipherBlade's assessment this is a consolidatory wallet of XTRD.

- ○ The amount received by this wallet would constitute the equivalent of approximately $4.5M USD.
- ○ The amount sent by this wallet would constitute the equivalent of approximately $3.5M USD.
- ○ Considering this wallet receives 493.461 BTC, and this is notably higher than the totals of the first two wallets sent here (60 BTC, with an additional 30 of XTRD origin from Wallet 1, and 103.93 BTC from Wallet 2) this still leaves nearly 300 BTC to source-identify.
    - ■ These inbounds come from varied exchanges, including Cubits, for in excess of 51 BTC - most often through intermediary wallets



    - ●
    - ■ Nearly 100 BTC comes from a hop from Anxpro



    - ●
    - ■ Varied other transactions from exchanges such as KuCoin and Binance exist. These were likely to convert other cryptocurrencies (namely, Ethereum) to BTC
    - ■ The inbound transactions from Anxpro and other fiat ramps are likely conversion of fiat investment into BTC, and could be confirmed if queried.
- ○ Only 4.11%, or approximately $145,500 USD, goes directly to an exchange - CEX.io
- ○ 23.49% (101.780 BTC) or $833,600 USD ends up in varied exchanges after several hops. The most prominent exchanges, by percent, are CEX.io, Poloniex, and Bitfinex.
- ○ 42.6% (183.974 BTC) or $1.25M USD indirectly lands in varied wallets where the funds are currently dormant.
- ○ 8.53% (36.961 BTC) or $243,000 USD goes directly to wallets where the funds are currently dormant.



The above graph illustrates the flow of transactions out of the XTRD consolidatory wallet, illustrating flows to black clusters (with exchanges as final destinations) and a grey cluster (indicating a wallet with an outstanding balance.) *Note that this graph is not fully expanded to show all clusters and is intended simply to illustrate methodology behind assessment of the destination of the BTC in question.*

**BTC Wallet 2**

BTC wallet 3LvrxWgVjugJRh6yXwQbqyFeoUjRQXpcKj receives and sends approximately 103.97 BTC throughout its history. This would constitute approximately $1.18M USD received by this wallet at the average time of the transactions.

All transactions, with one exception, outbound from this wallet go through an intermediary wallet listed above, with no direct deposits to exchanges or other wallets of clear attributions.

There is one exception: an outbound transaction of 0.046 BTC. These funds follow a transactional trail that does not mirror a pattern for other fund flow, indicating this was likely a salary or service payment. If it became necessary, attribution of the recipient of these funds could be accomplished by querying exchanges in the related transactional trail, such as Bittrex below:



The BTC wallet in question here transfers complete balance in txhash 85fbde2171b7186b460c145ef447752db59e6d1ba4863c678eb2e839a53510a6 to wallet 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR - a wallet analyzed prior in this report.



Based upon this finding, funds from this wallet can not be added to net totals, as these would be erroneous/redundant reflections.

**ETH Funds Raised**

**ETH Wallet 1**

0xe2a8aedd0463d13c2c8ff3207a2971361455abf4

Received: 3,053.04 ETH
Sent: 2,292.01 ETH
Current balance: 761.02 ETH

At the average time of exchange rates for the inbound transactions, this would constitute $1.8M USD total for the received Ethereum.

There are a couple of small transactions outbound from this wallet, likely salary or service payments, which could be queried for attribution.



2,289 ETH went to 0x8382bd241eb313351f235eeedeac7702fd4e241f in TX 0xa8a6d4987175a6a22958efd0835d6dd26e3b534a2376c3dd19b4a453a998a3d9 on November 19 2018 - a startlingly late transaction. Wallet 0x8382bd241eb313351f235eeedeac7702fd4e241f has received 9309 ETH and timestamps and sources would indicate this is a consolidatory wallet of XTRD.

## ETH Wallet 2 (Consolidatory)

0x8382bd241eb313351f235eeedeac7702fd4e241f

This wallet received 9,309.00 ETH from Wallets 1 and 3 in November 2018. This wallet has a dormant balance of 2.94 ETH. Since the majority of funds in this wallet come from other wallets, USD equivalents will be calculated in those pertinent wallets.

This wallet has the appearance of an exchange deposit wallet for a certain type of internal exchange organisation. Blockchain forensics tools indicate that 65.5% of the funds in this wallet were indirectly sent to Gemini, which leads CipherBlade to believe that this wallet is most likely a deposit wallet of Gemini itself. However, there is no indication these transactions were for the purpose of funding SPA, particularly based upon the time these transactions took place (SPA funding would most likely have taken place prior, or continued to be secured in cold storage.)

## ETH Wallet 3

0xcafa41d9bf0908bf24388dd551312d320d1f1b4d

This is another sale wallet.

Received 11,625.90 ETH
Sent out 10,572.87 ETH
Current balance: 1,052.94 ETH

At the average time of exchange rates for the inbound transactions, this would constitute $7.9M USD total for the received ethereum.

The majority of this wallet is liquidated late 2018, shown on this balance over time graph:



An extremely small portion (35.47 ETH) goes to Bittrex, which may constitute use for the SPA. As this is unconfirmed, and with the continued suspicion regarding XTRD, querying of the Bittrex account would confirm or deny this purpose.

Most alarming is the complex transactional trail this wallet provides, with many outgoing transactions of various sizes over a long period of time. This suggests deliberate obfuscation of the destination of raised funds. However, a high-level overview of final exchange destinations (pruning false positives, such as other exchange addresses) provides some startling revelations:



32.5% of these traced funds eventually land in Gemini, 15.89% land in Binance, and various other exchanges are represented. As mentioned above, these funds may constitute use for the SPA; however, contingent with the variety of exchanges, it is CipherBlade's assessment that if these exchanges were queried, personal accounts would be revealed - not SPA storage nor XTRD business accounts. A very disturbing finding is in excess of $650,000 going directly to Mydicewallet.com (see Wallet 4 below), a largely unknown exchange with almost no volume according to Coinmarketcap. It is unlikely that any business would use this venue for SPA-directed funds.

## ETH Wallet 4

0xf8c809c48d02035a0afaf5532088142f92f1484f

This is a deposit wallet of XTRD's account at the Triple Dice Exchange (mydicewallet.com). The attribution to XTRD comes from a deposit of 1,406 ETH from Wallet 3 in 0xb6f4ae9c7b8fbf138630dee88fe870cbd7f581ae9246543f912d84eda8275bcd (July).

Additionally, we find deposits of 529.69 ETH, 167.75 ETH and 9.99 ETH from 0x75e7f640bf6968b6f32c47a3cd82c3c2c9dcae68 in

0xe536fac43b2e56717eaa2550b4c83d8577fd141c4a51dc66fb01289700da8663, 0xd445492f5c9252860f6859311a03bf4d5141367dcf7f7506aaf2f7a08889b711, and 0xb5c463d3c6c98d3d45e877515627cd572f7000f0879876d484a32af8a2bcc738. In light of the number and density of transactions, that is clearly an exchange hot wallet. These three withdrawals amount to $325,719.91 based on the value of ETH at the time of transaction.

## XTRD Tokens

As per the whitepaper, XTRD promised the following Token Allocation:

- 50% Token Generation Event
  - Review if 50% of total supply was distributed
    - This would include all phases of sale
- 29% XTRD Reserve
  - Review what these tokens may have been used for thus far; demand transparency, imply possibility of use by the team. A core use was to be able to provide liquidity for XTRD, so a substantial portion should be allocated to that - even if a percent was not explicitly stated (and why wasn't it already broken in to its own percentile?)
- 10% Team
  - Initially a 180 day vesting period
    - Does not specify if 100% lockup or phased
    - Had an extension
- 10% Advisor pool
  - "Will be issued to current and future advisors"
  - Does not mention any lockup period
    - Red flag, but something that perhaps should have been seen by investors before the fact
      - Could still find investors that dumped when claiming to HODL
- 1% Bounty

| Rank | Address | Quantity | Percentage |
|------|---------|----------|------------|
| 1 | 0x233d572db5df00f6a37f14db37c7e0a877b221fe | 255,382,933.1 | 26.8130% |
| 2 | 0xa136b56fa180f4ea557a5b9e42e05660b9b8f618 | 95,245,768.8 | 10.0000% |

The above indicates two wallets which may fit the criteria for two categories: XTRD Reserve and Team.

The first wallet (0x233d572db5df00f6a37f14db37c7e0a877b221fe) holds only 26.8130% of XTRD tokens, not 29%, indicating a bit over 2% of the XTRD reserve has been utilized for the purposes of incentivizing partnerships between XTRD and cryptocurrency exchanges. Since XTRD has not secured any substantial exchange partnerships, this is alarming. XTRD's announced exchange partnerships include Beaxy (an unlaunched exchange which ran an ICO itself) and LGO Markets (allegedly for support of the ecosystem and "white glove support for XTRD clients.")

There are multiple alarming elements of the first wallet address and the use of the XTRD tokens thus far. First - no public financial transparency has been shared about the use of these tokens. Considering that at ICO pricing, 2% of the XTRD tokens would be valued at approximately $1.9M USD, the fact that Beaxy, a non-functioning exchange may have received a large sum of money is alarming in and of itself - let alone an exchange which also ran an ICO and should have adequate funding. There may be associated legal considerations with ICOs exchanging tokens with each other for services.

With regards to LGO Markets, the XTRD whitepaper claims one of the most important components would be "Robust, US based technical support." While one could fairly argue that multiple Use of Funds categories (namely, Operations and Tech Acquisition) could be used for this purpose, it is equally fair to state it would be acceptable for XTRD to utilize XTRD tokens instead of raised funds to fulfill this purpose. However, the question raised here is that without a working platform, and no subsequent tech support to provide, why would any XTRD tokens be furnished to LGO Markets? Considering it is almost certain these tokens were not subject to any legal lockup (and certain they were not locked in a smart contract,) if LGO Markets received XTRD tokens, they received them purely for the short-term credibility of XTRD and this large sum of XTRD tokens were sold, which was one of numerous factors in the decline of the XTRD exchange rate. This was one of numerous decisions that weren't quite public facing and certainly were to the harm of XTRD investors.

The most alarming aspect of the XTRD Reserve wallet is the quantity of transactions, none of which have been included in a transparency report:

| TxHash | Age | From | To | Quantity |
|---|---|---|---|---|
| 0xdd7c31e6c43b36f... | 142 days 21 hrs ago | 0x233d572db5df00f... OUT | 0xa6bc725ba62008... | 29,079 |
| 0x2b6320e7e6087c... | 142 days 21 hrs ago | 0x233d572db5df00f... OUT | 0xa6bc725ba62008... | 29,079 |
| 0x9a48d4c90df6c6... | 159 days 2 hrs ago | 0x233d572db5df00f... OUT | 0xa6bc725ba62008... | 25,000 |
| 0xf403aae2b8cd82c... | 184 days 2 hrs ago | 0x233d572db5df00f... OUT | 0x3c546b3775c2ab... | 2,329,373 |
| 0xece8420fbdbf6d9... | 213 days 16 hrs ago | 0x233d572db5df00f... OUT | 0xc1da1d47f5454b0... | 47,622.85 |
| 0x38877ea8d52735f... | 238 days 18 hrs ago | 0x233d572db5df00f... OUT | 0xfbaf098bd23f1475... | 500,000 |
| 0xd6a9ec20b1edefc... | 241 days 16 hrs ago | 0x233d572db5df00f... OUT | 0x21e41eb26cc9e2... | 200 |
| 0xad64930f0f5f5ec8... | 246 days 3 hrs ago | 0x233d572db5df00f... OUT | 0x49bb03d63d6bf5... | 6,035,216.1 |
| 0xef63ef68638316c... | 267 days 13 hrs ago | 0x233d572db5df00f... OUT | 0xe56bff75a1cb08... | 4,762,288.44 |
| 0xf8e47dc76aea5a7... | 274 days 13 hrs ago | 0x233d572db5df00f... OUT | 0xccd13cca8bd046... | 952,357.69 |
| 0xceef73ebef48267... | 274 days 14 hrs ago | 0x233d572db5df00f... OUT | 0xccd13cca8bd046... | 100 |
| 0xaa5d5da2a5abea... | 274 days 14 hrs ago | 0x233d572db5df00f... OUT | 0x69c4be3a75bda9... | 801,118.76 |
| 0x2b3d9eca05fa7c3... | 280 days 1 hr ago | 0x233d572db5df00f... OUT | 0xee8bb077f10cee9... | 999,900 |
| 0xfd35d64c72a3822... | 280 days 2 hrs ago | 0x233d572db5df00f... OUT | 0xee8bb077f10cee9... | 100 |
| 0xe207cbe95b28d1... | 282 days 23 hrs ago | 0x233d572db5df00f... OUT | 0x3be0484ca94c24... | 194.310 |
| 0x5314a2f1449d213... | 287 days 23 hrs ago | 0x233d572db5df00f... OUT | 0xfifea1f0eecdf373... | 1,182,720 |
| 0x407532614588d1... | 294 days 23 hrs ago | 0x233d572db5df00f... OUT | 0x9d418c76524797... | 735,799 |
| 0x958b6d9f8c14ada... | 295 days 3 hrs ago | 0x233d572db5df00f... OUT | 0xc763085ee9441a... | 727,747 |

Perhaps most alarming is that a significant portion of the XTRD tokens mentioned above have been liquidated, further cementing that not only were these tokens not put to intelligent business use, but they were a direct contribution for the collapse in XTRD exchange rate.



An additional observation when conducting forensics on the above wallet is that prior to liquidating, these XTRD tokens are divided into smaller chunks and subsequent wallets - a common tactic in laundering. Whomever received these XTRD tokens knew there was an element of shady nature to these deals and had an interest in obscuring attribution. In the best case, these XTRD tokens were used for poor business choices (which could be Beaxly and LGO Markets, or could include other unannounced dealings,) or, in a more malicious case,

these transfers might implicate members of the XTRD team in misuse of the XTRD Reserve. Considering that nearly 7% of the XTRD reserve is inexplicably already used, this is extremely alarming.

The XTRD team claims that team tokens would be subject to a 180 day lock in their whitepaper. The XTRD team later decided to change this to a "one year" lockup - it was publicly unclear if this is to mean an extension from 180 days to 365 days or an additional year for 545 days, however, it is believed the total lockup is 365 days. Extending the lockup period of tokens that have rapidly depreciated in value, as well as which hold little promise for the future, are a common tactic of "soft exit" ICOs, especially ICOs which have lacked transparency on what has gone on behind closed doors with raised funds and "reserve token" use. In essence, a project like XTRD can profit substantially not just on premise of the raised funds, but via their "token reserve" - negating the need for team token vesting to substantially cut into their personal profit. The second largest holding wallet for XTRD (0xa136b56fa180f4ea557a5b9e42e05660b9b8f618) holds 10% of the XTRD supply, and this wallet has been publicly attributed as the XTRD team's locked tokens. As per the code on their contract, these tokens are set to unlock on May 4th, 2019.

As per the XTRD whitepaper, 10% of XTRD tokens would be allocated to the Advisor pool. Many projects subject advisors to a token vesting period, and XTRD did not elect to do so. As such, unless documents signed between XTRD and their advisors state otherwise, advisors would be permitted to liquidate their XTRD tokens upon receipt. However, an XTRD team member had stated otherwise, which has certainly misled several investors:



Not subjecting advisors to a vesting period is considered poor practice since many advisors will have little to no involvement in a project after the tokens are received, and this appears to be the case with XTRD's advisors; they've had extremely minimal public involvement in the project over the past year. There is no public transparency from XTRD about how much each specific advisor was compensated, nor how much (if any) of the Advisor pool XTRD is still available. It's almost certain that if XTRD was asked for such information in a transparent report, it would not be provided. It's equally likely that the XTRD advisors would not disclose how much XTRD they received, or if they've liquidated it - although the stark likelihood is that most, if not all, of the Advisor pool XTRD has been spent and liquidated. It's quite likely that any minimal involvement XTRD advisors over the past year has included issuing a public sentiment of "HODL"ing XTRD

tokens, despite the fact they themselves have not done so. It's a certainty these advisors promoted the ICO with the direct intent of dumping their tokens shortly upon the receipt of them. Both of the aforementioned points fall under purview of law.

There are several wallets which hold significant sums of XTRD tokens (4.75%, 4.1%, 3.4%, 3.1%, 2.6%, etc) - which may constitute some advisor wallets, however, some of those percentiles are abnormally high and would indicate a high level of negligence in compensating advisors such high percentiles given a 10% total pool. Historically, advisors compensated at such high figures without vesting periods liquidate. Regardless, with zero transparency from the XTRD team, we're left to speculate - but left to speculate with that, regardless of which theory is accurate, it's not a positive situation.

The XTRD team allocated 1% of the XTRD supply to an aggressive bounty campaign. 1% of supply for a bounty campaign is not abnormal, and there seems to be a decent amount of transparency in the XTRD team's distribution of these bounty awards: to be expected, considering a low-cost, high-reward effort. However, the 1% of XTRD in a "lifetime bounty wallet" held in 0x7A81c5392Ad80749190042a0C1d53AAC277A2542 is at a peculiarly low level, indicating rather poor planning for an ongoing bounty campaign promised to the community.

The XTRD team published a synopsis of their ICO on Medium, which applies some level of transparency on the initial generation of tokens - a level of transparency that was a "one and done." This post indicates several datapoints for further consideration, such as that 33.6M XTRD bonus tokens are locked for six months - which has not been transparently proven to be factual for all investors. It is known that some investors received closed-door preferential treatment by the XTRD team, which they won't even deny, in regards to bonus percentiles. It wouldn't be unlikely for one to propose the XTRD team provided preferential treatment to some investors with vesting periods - or a lack thereof.

One additional item to consider is that the XTRD team has claimed that "some bonuses are subject to lockup" in their Telegram chat.



some bonus tokens - 6 months lockup    12:06 AM

Multiple investors allege they received even higher bonuses:





The XTRD team has denied the claim of a 150% bonus, however, confirms a 100% bonus:



The lack of transparency in bonuses offered is absolutely unacceptable, as investors were led to believe bonus percentiles publicly announced by the XTRD team were to be taken as the truth. Higher percentile bonuses must be disclosed to the public, as these are core considerations in investment in an ICO. The after-the-fact revelation of these bonuses, as well as the practice of offering secret higher bonus, is a common tactic of cash-grab ICOs seeking to secure as much money as possible in their raise, ultimately at the expense of their investors.

### MIscellaneous Observations

There are several observations that are not inherently connected to blockchain forensics or tokenomics that are worth mentioning in this report. These observations are often indicative of a shady or "soft exit" ICO in the worst case, or in a less malicious case, these observations are indicative of a team that simply "got in over their heads" and didn't quite know what they were signing themselves up for with conducting a raise and running a business. The former often entails outright embezzlement or other serious crime. The latter often results in gross mismanagement, misuse of investor funds, or other items of serious repercussion to investors.

**Serg Gulko** 1/29/19

## At this point, we have 6 entities that ready to sign up as a paying clients

It is quite common for ICOs, particularly ICOs that are losing or have lost traction, to make vague announcements about the items they are possibly legally permitted to be vague about. It is commonly known that Serg would not be able to say, for example, "we might get listed on Binance next week" - however, providing continual vague claims, such as the one listed above, has been a norm of the XTRD team.

It is common XTRD community (largely comprised of investors) sentiment that the XTRD team has significantly decreased their time commitment to this project. There are numerous data points that could back this, including social media activity:



While social media activity is by no means an indicator of project development, it is extremely common for the soft-exit or malicious ICOs of the 2017/18 hype bandwagon to have aggressive social media campaigns during their raise, and subsequently dwindle such activity from there. The same descent in activity is reflected in the XTRD Telegram group.

The XTRD team has consistently failed to deliver on their promised timelines. Before even delving into their whitepaper, it is worth mentioning that this is observable on numerous social media platforms:



The above screenshot from YouTube was taken in February of 2019, indicating that this XTRD team member made a promise that should be fulfilled by the end of Q1 2019.

Serg Gulko claims to work "10-12 hours per day, 6 days a week" in an AMA. In the same AMA, Serg claims the dev team in Ukraine works a typical "9-5" arrangement. As per Serg there are "several guys" in the Ukraine office, with an additional four engineers working remotely. Given the amount of developers that are allegedly working full-time on this project, it is highly unlikely that the project would not have a working product by now - and more likely the claim of these developers working full-time on XTRD is falsified. Serg claims there are four further employees not in an engineering role - which is also questionable, considering the sharp decline in XTRD activity observable on varied social media platforms, lack of business development, or any other non-tech traction. This datapoint alone (and there are numerous others) would constitute a violation of investor confidence and potentially result in XTRD being classifiable as a security, not a utility token, since XTRD has not demonstrated good faith in providing utility.



The XTRADE roadmap, as per their whitepaper, is shown above. As is widely publicly known, this roadmap has not been followed.



**Serg Gulko** admin

1. Not really sure that we will provide you any addresses and names of the clients without their permissions.

2. Timeline is changed as we said many times

3. WP - yes, we have plans to update it to reflect new dates

Serg claims there are "plans" to update the whitepaper to reflect new dates. Given four non-engineering employees, and the fact that such an update requires extremely minimal work, it is extremely alarming this update has not taken place. Historically, the reason such an update would not take place is due to the fact the executive suite of an ICO lack confidence in their team's capability to deliver - often due to misuse of their raised funds and becoming rapidly broke.

The CEO of XTRD, Alex Kravets, advised for HybridBlock. HybridBlock is a project ripe with allegations itself, which can not be disclosed in this report contingent with client and data privacy regulation, until authorities and regulators deem appropriate. However, if/when these allegations are public, the alarming nature of Alex working with HybridBlock as an advisor, considering the potential allegations against XTRD, will be revealed. It is understood Alex has severed his relationship with HybridBlock for an unknown reason. It is a common practice for shadier and/or naive ICO founders to conduct practices such as investing in each other's projects with their investor's funds, which is one of a few malicious/negligent possibilities in this situation.

**Core Analysis**

Use of Funds



| 70% | 15% | 5% | 5% | 5% |
|-----|-----|-----|-----|-----|
| 70% Balance Sheet for SPA | 15% Platform Developments and Operations | 5% Legal and Compliance | 5% Sales and Marketing | 5% Tech Acquisition |

The statistics of the sample size we have demonstrate under a third of the funds we've tracked go to cryptocurrency exchanges with clear attribution to XTRD wallets. There is no way to identify whether or not these funds are for SPA use without taking further steps, however, this is not within alignment of XTRD's promised Use of Funds. If an analysis of 50% of the assets of XTRD are this damning, it does not paint a rosy picture for the other 50% - and this 50% alone would still render it mathematically highly unlikely, if not impossible, for XTRD to have followed their promised Use of Funds.

A significant portion of funds we've traced (nearly one half) are dormant. There is the possibility that these funds are (at least in-part) intended for SPA use, however, under this hypothetical, the XTRD team has burned through the remainder of their promised allocation in other categories - indicating mismanagement. There are multiple, more malicious, possibilities of why these funds would be dormant. Regardless - there are ample funds to refund investors that wish to be refunded *and* achieve development of what XTRD promised to deliver, if managed responsibly.

Put simply, without a lack of transparency from the XTRD team, their community and investors are left in the dark as to what happened with their money after certain points in the blockchain. The XTRD team would almost certainly not provide a transparency report including items such as other receiving addresses and by-line expenses, since this would indicate numerous mismanagements. However, upon query of exchanges and following continued financial trails, this would be revealed - likely with fatally catastrophic results to XTRD, as this would draw in the ire of not just disenfranchised investors, but regulators.

Based upon the numerous datapoints in this report, which constitute a small constituent of what could be a far larger report, it is the strong and firm recommendation of CipherBlade that XTRD refund investors upon request. Investors have extensive moral and legal reason to request this refund, and statistical likelihood, let alone common sense, indicate what realities would be discovered if numerous entities were subpoenad. It would be within XTRD's best interests to conduct these refunds if the XTRD team's claims of developing a product are sincere, since a

failure to refund investors would result in, in the best/non-malicious case, an expensive legal battle - and in what CipherBlade views as the more likely reality, revelations of XTRD activity that would constitute regulatory consequence.

Should XTRD decline to refund investors, CipherBlade has volunteered their services to affected parties. Richard A. Sanders served as an expert witness in a case in which the opposing party was represented by Silver Miller, a "cryptocurrency giant law firm" - and one Declaration caused this "cryptocurrency giant law firm" to cower in fear, dropping the case. CipherBlade is equipped to provide legal counsel, law enforcement, and regulators with the pertinent information needed to rapidly obtain information from exchanges, facilitated via direct and expedited connection.

Inversely, CipherBlade offers their participation to XTRD in mediation of this matter. If XTRD demonstrates, in good faith, a commitment to make right with their investors via refund, CipherBlade is able and willing to establish framework and facilitation of this undertaking.

This concludes CipherBlade's analysis of XTRD's funds, tokenomics, and sale.

EXHIBIT B FORM D XTRADE DIGITAL HOLDINGS SAFT CONTRACT

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number) | Previous Names [X] None | Entity Type

0001730733

Name of Issuer
XTRADE Digital Holdings

Jurisdiction of Incorporation/Organization
CAYMAN ISLANDS

Year of Incorporation/Organization
- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2017
- [ ] Yet to Be Formed

Entity Type
- [X] Corporation
- [ ] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
XTRADE Digital Holdings

Street Address 1
3rd Flr, Bayshore Centre, 31 Warwick Dr

Street Address 2
GEORGE TOWN P.O. BOX 2496

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| GRAND CAYMAN | CAYMAN ISLANDS | KY1-1104 | 3457432496 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Hulko | Vitalii | |

Street Address 1
Maykovskogo 30A

Street Address 2
Apt 64

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Kiev | UKRAINE | 0222 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

### 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services

Health Care
- [ ] Biotechnology

- [ ] Retailing

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

☐ Pooled Investment Fund

Is the issuer registered as
an investment company under
the Investment Company
Act of 1940?

☐ Yes              ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☒ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

---

## 5. Issuer Size

Revenue Range              OR          Aggregate Net Asset Value Range

☐ No Revenues                          ☐ No Aggregate Net Asset Value

☐ $1 - $1,000,000                      ☐ $1 - $5,000,000

☐ $1,000,001 -                         ☐ $5,000,001 - $25,000,000
   $5,000,000

☐ $5,000,001 -                         ☐ $25,000,001 - $50,000,000
   $25,000,000

☐ $25,000,001 -                        ☐ $50,000,001 - $100,000,000
   $100,000,000

☐ Over $100,000,000                    ☐ Over $100,000,000

☒ Decline to Disclose                  ☐ Decline to Disclose

☐ Not Applicable                       ☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))        ☐ Investment Company Act Section 3(c)

☐ Rule 504 (b)(1)(i)                    ☐ Section 3(c)(1)        ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(ii)                   ☐ Section 3(c)(2)        ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(iii)                  ☐ Section 3(c)(3)        ☐ Section 3(c)(11)

☐ Rule 506(b)                           ☐ Section 3(c)(4)        ☐ Section 3(c)(12)

☒ Rule 506(c)                           ☐ Section 3(c)(5)        ☐ Section 3(c)(13)

☐ Securities Act Section 4(a)(5)        ☐ Section 3(c)(6)

☐ Section 3(c)(6)      ☐ Section 3(c)(14)

☐ Section 3(c)(7)

---

**7. Type of Filing**

☒ New Notice    Date of First Sale 2018-01-20   ☐ First Sale Yet to Occur
☐ Amendment

---

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   ☐ Yes ☒ No

---

**9. Type(s) of Securities Offered (select all that apply)**

☐ Equity                               ☐ Pooled Investment Fund Interests

☐ Debt                                   ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security   ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option, Warrant   ☒ Other (describe)
or Other Right to Acquire Security

                                                        Simple Agreement for Future Tokens (SAFT)

---

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction,           ☐ Yes ☒ No
such as a merger, acquisition or exchange offer?

Clarification of Response (if Necessary):

---

**11. Minimum Investment**

Minimum investment accepted from any outside investor $1,000 USD

---

**12. Sales Compensation**

Recipient                                  Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None            (Associated) Broker or Dealer CRD        ☒ None
                                             Number

Street Address 1                               Street Address 2

City                                        State/Province/Country                 ZIP/Postal
                                                                        Code

State(s) of Solicitation (select all that       ☐ All
apply)                               States     ☐ Foreign/non-US
Check "All States" or check individual
States

---

**13. Offering and Sales Amounts**

Total Offering Amount      $45,000,000 USD   or   ☐ Indefinite

Total Amount Sold           $3,000,000 USD

Total Remaining to be Sold   $42,000,000 USD   or   ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    6

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☒ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| XTRADE Digital Holdings | Vitalii Hulko | Vitalii Hulko | Director | 2018-02-13 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

\* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.