UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------  x
ANTHONY FASULO and GAUTAM DESAI              No. 19-cv-3741 (KPC/KHP)

                              Plaintiffs,

        v.                                   SECOND AMENDED
                                             COMPLAINT
XTRADE DIGITAL ASSETS INC.,
XTRADE DIGITAL HOLDINGS,
ALEXANDER KRAVETS,
SERGII GULKO, and                            JURY TRIAL DEMANDED
JON GIACOBBE
                              Defendants.
-------------------------------------------------------  x
```

## SECOND AMENDED COMPLAINT

Plaintiffs Anthony Fasulo and Gautam Desai, through their attorney, Zeev Kirsh, make this Complaint for violations of Sections 10(b), 20(a), and 21(d) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5; and Sections 5, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and for common law fraud under New York law, and allege as follows based upon personal knowledge with respect to their own accounts, and upon information and belief as to all other allegations.

## NATURE OF THE ACTION

1.      In October 2017, aiming to capitalize on a burgeoning market for cryptocurrency offerings, Xtrade and its officers presented an investment offering to the general public, including the Plaintiffs, involving the purchase of "tokens," which could be purchased by cash or by means of various cryptocurrencies.

1

2.      The tokens were marketed by Defendants (the "Offering") as a way the general public could access an online trading "platform" that they planned to build.

3.      The pitch was that investors would purchase the tokens (the "Xtrade Tokens") at a substantial discount to an intended public issuance price, and be able to resell them at that issuance price or better.  Defendants claimed that this for-profit issuance did not exclude the ability to use the tokens as on the Defendants future platform as marketed in their Offering.

4.      In their advertising and information documents, Defendants claimed that their token would not be a security, since the tokens were being sold for use and access to the platform by the general public at large, and not for speculative trading alone.  In essence, Defendants claimed that they were offering a "utility token," a type of consumptive good, rather than a security that would require compliance with all SEC regulations.

5.      The Defendants' claim that their offering was a utility token instead of a security hinged on an opinion letter, allegedly written by a lawyer, that provided them legal comfort as to the legal status of the tokens as non-financial securities that could be offered to the public without any requirement for securities registration.

6.      The Opinion Letter was referenced throughout the entire period of the offering, is still relied upon by the Defendants who claim their offering does not require registration.  The marketing materials of the Defendant stated:

> XTRADE Digital Assets, Inc. has obtained a qualified legal opinion concurring that XTRD tokens are not to be considered "securities" under applicable U.S. securities laws given their failure to meet all prongs of the Howey Test: In what has become known as the "Howey Test", the U.S. Supreme Court specified that an investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person (i) invests his/her money in a (ii) common enterprise and is led to (iii) expect profits (iv) solely from the efforts of the promoter or third party (i.e. "efforts of others"). All four of the above elements must be met

for a contract to be considered a security within the meaning of the
Securities Act.

7.      The Defendants have refused to publish the opinion letter, however.  And for
good reason.  The unpublished "opinion letter" could not possibly be sustained in light of the
facts:  the Xtrade token is undoubtedly a security under the Supreme Court's venerable "Howey
test" (originating from *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293
(1946)), as has been repeatedly established in similar decisions involving token offerings.  The
opinion letter was thus a deception, intentionally or recklessly devised as a legal fiction for the
purposes of perpetuating the illusion that the sale of tokens was anything other than a securities
offering.

8.      The Xtrade Tokens should have been, and still must be, registered.  The
Defendants knew or reasonably should have known this to be the case and still deny that the
tokens comprise securities, despite the plain and unquestionable law that has developed in this
area.

9.      In November 2017, Defendants incorporated a Cayman Entity, with the sole
purpose of using it to enter contracts with the Defendants and the general public using purchase
agreements that Defendants called "Simple Agreements for Future Tokens" or "SAFTs." The
SAFTs entitled purchasers to the future delivery of the Xtrade token that they purchased when
they entered into the agreements.

10.     In January 2018, Plaintiffs signed these SAFTs to purchase tokens.  Plaintiffs did
not receive their tokens until May 2018.

11.     Apparently realizing that their offering of tokens was a unregistered securities
offering that violated federal securities laws, the Defendants then attempted to novate and re-
execute investment contracts with the U.S. citizen plaintiffs, by attempting to find foreign

nationals that could be substituted on the contracts, which might (Defendants apparently

believed) have the effect of circumventing the requirements of Regulation D.  In one plaintiff's

case, Defendants issued tokens to a foreign national.

12.     But this case is about more than just a violation of the registration requirements of

the Securities Act of 1933.  This case is also about fraud.

13.     Xtrade's original marketing materials proclaimed that Xtrade would be an online

trading platform and market-making function, in which the tokens could be used to provide

functionality in the system.  This marketing pitch was always a fantasy:  the SEC had repeatedly

cautioned that tokens like the Xtrade token were likely to be securities; that offering such

securities for trading would require registration; and that similar online trading platforms were

potentially unlawful.  The Defendants knew at the time that they were selling a fantasy.  But they

pretended that it would all be legal, saying that they had a legal opinion that their token was not a

security, and that they would be in compliance with all regulations (which Xtrade now disclaims

as "puffery").  Xtrade even said they would be partnering with the Chicago Mercantile Exchange

("CME"), a well-known and reputable trading platform.

14.     In March 2018, in the wake of increasing public pressure from the SEC about

unregistered cryptocurrency broker-dealers, the Defendants could no longer keep up the ruse.

Xtrade announced that they would materially change the terms of the Offering – after Plaintiff

investors had already made their investment payments on the basis of the original

representations.

15.     This material change was to abandon the online trading platform and market-

making function for which the tokens would be used in its entirety.  In other words, Defendants

sold tokens (really, unregistered securities) on the basis that those tokens would have some

functionality in an on-line trading platform.  But in truth, Defendants knew all along that they could never run an online trading platform, and the tokens would never have any functionality.

16.     Subsequently, the Defendants continued to solicit and successfully raise funds from other similarly situated Plaintiffs through March 2018.  But then – again likely because of the SEC's public pressure on unregistered cryptocurrency offerings – Xtrade cancelled their planned sale of tokens to the general U.S. public on April 1, 2018.

17.     In May 2018, Defendants issued the unregistered tokens to the Plaintiffs.  But, having cancelled the planned public sale that was the linchpin of Defendants' offering pitch (namely, that the planned sale would increase demand for the tokens, thus increasing their value), the value of Defendants' tokens had collapsed.

18.     Even worse, though, between June and August 2018, Defendants continued to offer tokens to the general public by listing them for trade on two non-U.S. based token trading exchanges, where their tokens could be bought and sold by the general public.

19.     The Defendants knowingly listed their tokens for trade, despite the fact that they could never have any utility on the Defendants' platform, which by that point had been abandoned.  The very same tokens that Defendants originally claimed would have use within their system were now being offered nakedly as a security, without even a "utility token" label as a fig leaf.

20.     Once Defendants' abandonment of their business plans was made public, the general public dumped the securities, whose value had predictably and immediately crashed to less than 1% of the price for which Defendants purchased the tokens, less than eight months prior.

21.     Defendants' fraudulent actions and omissions led to the obliteration of the value of Xtrade securities.  Defendants were not some innocent bystander in the cryptocurrency market collapse of late 2018.  The collapse in the value of Defendants' security token was not just occasioned by a wider public turn against cryptocurrency values.  It was occasioned by a public abandonment of the core business model that Defendants always knew was impossible.

22.     Indeed, while Xtrade claims to be a victim of the cryptocurrency industry's bubble bursting, many industry observers blame fraudulent cryptocurrency projects for driving that downturn in the first place.  Xtrade is not a victim of the collapse of the cryptocurrency market.  It is one of the perpetrators.

23.     Plaintiffs remain in possession of the Xtrade Tokens and have demanded the defendants refund the investment back to them as early as March 2019 and Defendants refuse to refund to Plaintiffs the amounts invested in return for the tokens.

24.     As a result, Plaintiffs are entitled to rescission of the investment contracts, and damages for fraud.

## THE PARTIES

25.     Plaintiff Anthony Fasulo ("Fasulo") is a U.S. Citizen domiciled in New York State.

26.     Plaintiff Gautam Desai ("Desai") is a U.S. citizen domiciled in California.

27.     Defendant Xtrade Digital Assets, Inc. ("XDA") is a Delaware corporation, #6512084, registered in August of 2017, with its principal place of business at 55 Broad Street, Suite 2810, NY NY 10004.

28.     Defendant Xtrade Digital Holdings ("XDH") is a Cayman Exempt Entity with its principal place of business in New York at 55 Broad Street, Suite 2810, NY NY 10004.  Upon information and belief, ("XDH") is a Cayman exempted shell company registered in November 2017, for the purpose of conducting financial transactions on behalf of Xtrade Digital Assets. (This Complaint refers to XDA and XDH collectively as "Xtrade").

29.     Defendant Alexander Kravets ("Kravets") is a resident of New York and is the CEO of Xtrade. Upon information and belief, Kravets has been involved in the brokerage business for at least ten years and had admittedly managed the operations of a brokerage firm.

30.     In the Whitepapers, Kravets is described:  "Background in high frequency and proprietary day trading for over 12 years – started career as a successful proprietary equity trader and subsequently managed operations at Genesis Securities, a broker/dealer and clearing firm that provided direct market access (DMA) and co-location services.  Successfully launched Sogotrade, a retail investing platform for over 100,000 clients. Highly experienced in entrepreneurship, trading platforms, market structure, execution networks, algorithmic trading, execution systems, market data, operations, and sales. Has held Series 7, 55, 63, and 24 securities licenses."

31.     Defendant Sergii Gulko ("Gulko") is a Ukranian national and a resident of New York and is CTO of Xtrade.

32.     In the Whitepapers, Gulko is described:  "Sergei Gulko founded Axon Software, which has spent over 11 years developing high frequency algorithmic models for hedge funds and broker/dealers in the US equity and Forex markets – expert in colocation services, market data, execution, analytics.  Highly versed in FIX and other proprietary protocols, market data

handlers, deployment and control of advanced hardware infrastructure systems specializing in low latency and network security."

33.     Defendant John Giacobbe ("Giacobbe") is a resident of New York and is the COO of Xtrade.

34.     In the Whitepapers, Giacobbe is described:  "6 years in finance, Goldman Sachs and JP Morgan – Equity Derivatives, Structured Products, Market Liquidity, Senior Bank Debt, executed institutional client orders. Fox Business News weekly contributor and panelist on Money with Melissa Francis.  Active entrepreneur, operated multiple businesses ranging from Subway franchises to FlyCleaners to Fencing in the Schools."

35.     Accordingly, each of the three individual defendants has extensive experience in business.  Kravets has a securities trading background, and has held securities licenses. Giacobbe worked in finance at major investment banks.  Gulko founded a software company for high frequency algorithmic trading.

36.     All are listed as co-founders and officers of XTrade, which thus held them out to have control over the corporate defendants.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 (federal question); Section 22 of the Securities Act (15 U.S.C. § 77v); and Section 27 of the Exchange Act (15 U.S.C. §§ 78u(e) and 78aa), because Plaintiffs allege violations of Sections 10 and 20 of the Exchange Act, Rule 10-b5, and Sections 5, 12, and 15 of the Securities Act.

38.     This Court has supplemental jurisdiction over Plaintiffs' New York law fraud claim pursuant to 28 U.S.C. § 1367(a), because the fraud claim is so related to Plaintiffs' claims under the Exchange Act and Securities Act that it forms part of the same case or controversy.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 78v and 78aa, because Defendants are found, and/or reside, and/or are inhabitants of, or transact business within this District.  Venue is also proper in this District because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## FACTUAL ALLEGATIONS

I.     **Blockchain Technology and Initial Coin Offerings**

40.     Upon information and belief, Xtrade Digital Assets Inc. ("XDA") is a Delaware registered shell company owned by Kravet and operated by Kravets out of it New York City Offices, registered in August 2017, the same week that Xtrd.io, the website used by the Defendants to market and communicate with the public and, upon information.

41.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information, and so on.

42.     To date, most "blockchains" are used to record transactions involving virtual currencies, e.g., bitcoin (BTC) and Ether (ETH).  However, a "blockchain" could be used to record all types of information. For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

43.     An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration – most commonly in the form of established virtual currencies typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

44.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain. Similar to stockholders in an IPO, holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

**II.     The SEC's View of Cryptocurrency Tokens, and the Rise of SAFTs**

45.     The SEC raised alarms early about cryptocurrency, warning of Ponzi schemes involving virtual currencies in July 2013, and cautioning investors about bitcoin and other virtual currency investments in May 2014.  Nevertheless, companies like Xtrade continued to offer cryptocurrency into the general marketplace.

46.     On July 25, 2017, the SEC issued a landmark investigative report concluding that the tokens of a company called "The DAO" were securities under the "Howey Test," and thus

they should have been registered with the SEC.  The SEC followed that analysis with an August

28, 2017 investor alert about public companies making ICO-related claims, including "pump-

and-dump" and market manipulation schemes.  The SEC also issued trading suspensions against

certain issuers for making claims regarding their ICOs.  And on December 11, 2017, SEC

Chairman Jay Clayton released a statement saying, in part, that "By and large, the structures of

initial coin offerings that I have seen promoted involve the offer and sale of securities and

directly implicate the securities registration requirements and other investor protection provisions

of our federal securities laws."

47.    Following these announcements, the industry was on notice that token offerings

would likely be considered securities offerings.

48.    One branch of the industry responded with a model called a "SAFT," or Simple

Agreement for Future Tokens.  The idea was to offer an investment contract (which would

undeniably be considered a security, subject to the full range of SEC regulations), in which an

investor would receive documentation indicating that, in the event a cryptocurrency product or

token is created, the investor will receive that token.

49.    Under the original SAFT white paper (authored by securities lawyers with

cryptocurrency experience, and available at https://saftproject.com/static/SAFT-Project-

Whitepaper.pdf), "the SAFT obligates investors to immediately fund the developers. In

exchange, the developers use the funds to develop a genuinely functional network, with

genuinely functional utility tokens, and then deliver those tokens to the investors once functional.

The investors may then resell the tokens to the public, presumably for a profit, and so may the

developers."

50.     In that model, however, "[t]he resulting tokens, however, are already functional, and need not be securities ...."  Xtrade's model was different:  its tokens were never functional, because it had long abandoned any pretense of building the functional system that was the basis for the Offering.

51.     Thus, the Xtrade token may have been originally intended, in part, to have some utility.  Even then, the tokens bore all the characteristics of a security:  they represented an investment of money in a common enterprise, and purchasers would be led to expect profits solely from the efforts of Xtrade.  But by the time Defendants received their tokens in May 2018, they had no utility whatsoever.  There was no system in which they could possibly be used, at that time, or ever.  They were nothing more than an equity investment in Xtrade:  a classic security.

## III.    Xtrade Digital Assets, Inc. ("XDA") and Xtrade Digital Holdings ("XDH")

52.     Upon information and belief, Xtrade Digital Assets Inc. ("XDA") is a Delaware registered shell company owned by Kravets and operated by Kravets out of offices in New York City.

53.     Upon information and belief, Xtrade Digital Holdings ("XDH" ) is a Cayman Exempted shell company set up for the purpose of selling the SAFT (simple agreement for future tokens) contract investments in cryptocurrency, known as "Xtrade" tokens (the "Tokens"), as well as direct issuance of the Tokens themselves.  XDH was never mentioned in the Whitepapers.

54.     For all relevant purposes, XDH is a shell operating on behalf of XDA.  All bank accounts possessed by Xtrade are in the name of XDA.  Alex Kravets, the CEO of Xtrade,

communicated on behalf of Xtrade from "Alex@xtrade.io" in all relevant communications regarding solicitation and signing of contractual documents pertaining the XDH.  This same email was used from before November 2017 through the present for executive contact and communication for all of XDA's business, employees and listed the same single address in New York, as the operating address.

## IV.     The Xtrade Whitepapers and the Promise of a Digital Trading System

55.     XDA publicized its business plan in a series of five "whitepapers," and other marketing materials, from October 1, 2017 through March 8, 2018 (together, the "Whitepapers"), which were distributed through social media and upon its website Xtrd.io.

56.     The various versions of the Whitepapers list the three individual Defendants as officers of XDA.  It also lists numerous "advisors" who, upon information and belief, helped XDA find investors, and who received commissions for doing so.  (Upon information and belief, those advisors were not registered as brokers, and thus were in violation of SEC and FINRA rules and regulations pertaining to securities brokerage – which Defendants knew full well, and nevertheless aided and abetted these violations.)

57.     The first whitepaper was published before Xtrade Digital Holdings was incorporated, and the last was published subsequent to its incorporation and to the Plaintiffs purchase of Xtrade Tokens through the SAFT in mid to late January 2018.

### *The promise of a digital trading system*

58.     The initial versions of the Whitepapers explained that XDA's ultimate mission, and the purpose of the Offering, was to help cryptocurrency traders access multiple cryptocurrency exchanges more quickly, cheaply, and knowledgeably than the traders could do

on their own.  XDA stated that it would do this through the "Xtrade Platform" (the "Platform"),

basically a computer program, with a "market-making" function.

59.     Xtrade promised in its Whitepapers to use 70% of the funds it would raise for

maintaining balance sheet deposit accounts at multiple exchanges.  In Xtrade's October and

January and March Whitepapers (p. 10), Xtrade stated that large portions of investor funds would

be used to

> "Make markets in multiple crypto currencies to minimize spreads and
> increase liquidity for market participants".  In the "Use of Funds" Section
> (at p. 33), Xtrade stated:  "70% - Balance Sheet….Xtrade will need to
> allocate funds across inventory accounts in a spectrum of crypto
> exchanges.  This will be vital to ensuring speedy cross-execution for client
> orders and ensuring there is enough net capital to facilitate daily trades in
> between cross-exchange position and currency sweeps – and to provide
> clients peace of mind regarding Xtrade's net capitalization.  Accordingly,
> most of the funds raised from the token sale will be used to maintain this
> balance sheet for trading capital.  The balance sheet will also serve to
> mitigate counterparty risk for clients while trading with multiple
> exchanges facilitated by just one trusted account."

60.     In both the October and January Whitepapers (at p. 34), in a section labeled

"Revenue Generation Model," Xtrade states:

> "Given Xtrade's balance sheet and a presence at multiple cryptocurrency
> exchanges, Xtrade anticipates acting in a market-making capacity across
> numerous crypto currency pairs in different markets.  Market making
> involves maintaining a continuous bid and ask quote within a pre-defined
> spread for a trading pair, and then buying and selling simultaneously by
> taking the other side of buy and sell orders that enter the system.  Given
> the 24x7 nature of cryptocurrency markets and Xtrade's principals'
> experience in algorithmic trading strategies, we anticipate market making
> activity to serve as a continuous and sizeable revenue stream.  By acting as
> a market maker, Xtrade's balance sheet will serve to stabilize sharp
> fluctuations in price caused by a lack of liquidity.  If competition develops
> for the inside quote among other prospective market making entities, this
> will only serve to increase the stability and execution quality in
> cryptocurrency markets and therefore benefit the community as a whole
> by catalyzing maturation of and growing confidence in the crypto trading
> space."

61.     The Whitepapers emphasized the essential use of the Platform as a "market maker" for XDA's customers.  The Whitepaper represents the entire existence of the Xtrade business model and the Xtrade Tokens underlying this model, as being provided by and operated by Xtrade Digital Assets.

62.     But the entire model was fictitious.  It was impossible at the time, and Xtrade was later forced to abandon it (likely in order to avoid SEC scrutiny).

63.     The Whitepapers never disclosed that Xtrade would certainly have to register with FINRA as a broker-dealer to operate its stated business. The Whitepapers also never disclosed that in order to allow its core "market-making" functions, Xtrade would have to become a national securities exchange or an alternative trading system ("ATS").

64.     Since the Whitepapers do not discuss these requirements or exemptions, they also do not discuss any of the potential legal and compliance costs associated with such registrations – let alone the fact that, at that point, not a single entity had been granted a license to become a national securities exchange or an ATS by the SEC, or even granted a broker-dealer license for cryptocurrency trading by FINRA.

65.     These omissions are critical, and Plaintiffs would not have invested if all of this material information had been disclosed.

66.     In short, the Whitepapers advertised a core business model that the Defendants knew, at the time, was then impossible, and would be unlikely for the foreseeable future.   The SEC had been clear in offering its guidance that token offerings were securities offerings, and because the cryptocurrencies that Xtrade advertised it would have available for trade on its system were thus securities, all requirements under federal securities law would have to be met.

67.

68.     This language was stripped out of the whitepaper published on March 7, 2018 –
after Plaintiffs invested.  Subsequent to this change of language, Sergii Gulko CTO publicly
announced that Xtrade would not be providing market making services.

69.     Defendant Gulko later communicated to investors and potential investors that
XDA simply no longer had any intention of offering the "market making" service, for the use of
which, one would need to purchase Xtrade Tokens.  The reason Plaintiffs purchased a SAFT
contract which resulted in the Plaintiff being issued Xtrade Tokens, is that Xtrade aggressively
marketed to the public their project as one providing substantial market making services.  Very
simply, Plaintiffs relied on those representations, which Defendants knew at the time they were
made were illusory.

70.     Xtrade dressed up its business plans in its Whitepapers as "forward-looking" –
Xtrade "anticipates market making activity," etc.  But Defendants cannot hide behind a
"forward-looking language" shield.  Defendants knew at the time that they could not possibly be
market makers.  Defendants knew, at the time, that this business model was a regulatory non-
starter.  It was impossible at the time these statements were made.

***The promise of a token issuance that complied with regulations***

71.     XTrade's March 7, 2018 Whitepaper stated, in a section entitled "Tokenomics":

-   "most of the XTRD token revenue will be used to increase the
    inventory of other cryptocurrencies that are in demand by our
    customers";

-   "XTRD tokens are not designed for speculation. In summary, XTRD
    tokens are not securities."

- "XTRD Digital Assets, Inc has obtained a qualified legal opinion concurring that XTRD tokens are not to be considered "securities" under applicable U.S. securities laws given their failure to meet all prongs of the Howey Test."

72. Each of the versions of the Whitepapers issued after October 2017 stated that XDA had obtained a "qualified opinion" letter that the Tokens were not to be considered securities and did not need to be registered.

73. That "qualified legal opinion" was never made public. But the assurances Xtrade provided in that Whitepaper were false: the Xtrade token was a security, as later evidenced by (1) Xtrade's abandonment of its business model in which the tokens could possibly have any utility, and (2) Xtrade's direct sales of those security tokens on trading markets.

74. Further, the Whitepapers do not discuss any requirements or exemptions of XDA or any affiliate, or any principal thereof.

75. XTrade's March 7, 2018 Whitepaper also stated that the Xtrade Tokens would be issued pursuant to a SAFT (a Simple Agreement for Future Tokens), which was:

> "modeled after the Simple Agreement for Future Equity, or SAFE, which originated out of Y-Combinator, and when used properly is fully compliant with the Securities Act of 1933 and Regulation D promulgated thereunder. As the SEC has confirmed that the federal securities laws apply to token sales per its' [sic] recent SEC investigative report on DAO Tokens, XTRD is taking a proactive approach to the XTRD token sale by properly utilizing the SAFT and ensuring that the risks which come with early stage investment opportunities are made clear to those accredited individuals or institutions that participate."

76. This statement was also materially misleading. The SEC has never "blessed" use of a SAFT. And as the SEC did indeed confirm that federal securities laws may apply to token sales, XTrade's use of a SAFT did not provide some magic way around federal securities laws. The tokens that XTrade later issued were indeed securities. But the language of XTrade's

Whitepapers was specifically designed to assure potential investors that the offering would comply with applicable regulations, when XTrade knew – at the time – that it would not.

***Other misrepresentations***

77.     The Whitepapers contained further misrepresentations.  Initially, the Whitepapers stated that it would employ legal and compliance teams to ensure regulatory compliance.  This was a key feature upon which Plaintiffs relied – due to the legal uncertainties surround cryptocurrency offerings, it was important that Defendants would retain competent legal counsel to advise it in a manner that would avoid a company-ending SEC investigation.  Upon information and belief, Xtrade did retain legal counsel.  However, Xtrade was unable (or unwilling) to cure its faulty disclosures about ensuring regulatory compliance, which had misled Plaintiffs (and undoubtedly others).  Xtrade was not, in fact, ensuring regulatory compliance, allowing its token to be traded on secondary markets at a time that the Defendants knew it would be treated as a security, not a "utility token."

78.     Xtrade now claims that its representation that it would employ legal and compliance teams to ensure regulatory compliance and proactively engage with regulators" was "puffery."  Dkt# 23 at p. 4.  Given Xtrade's other disclosures about legal uncertainties in the cryptocurrency markets, it was hardly "puffery" to represent that it would ensure regulatory compliance.  It was a statement upon which investors such as Plaintiffs were entitled to rely.  As it happens, however, that statement was false.

79.     The Whitepapers also claimed that XDA had partners, in particular the Chicago Mercantile Exchange ("CME").  A true partnership with the CME, a well-established and well-respected trading platform organization, was a significant draw for investors in a start-up

cryptocurrency trading platform.  However, Defendants never produced any further documentation of these alleged partners.  In truth, there was never any partnership with the CME.  That, too, was a misrepresentation, which Defendants knew at the time.

## V.    The Xtrade SAFT

80.    Potential investors were sent a SAFT investment contract with payment instructions. The SAFT alleged that the Offering was made by XDH under Regulation 506(d) as an exempted security.  Xtrade Digital Holdings filed a form D as part of attempting to satisfy the conditions for an exemption as per its sale of SAFT contracts to the general public.

81.    The SAFT contains no references to Xtrade's actual business plans.  It refers to a whitepaper as Exhibit A, but that exhibit was blank.  It also includes investor representations that the Plaintiff has read the Whitepaper(s) that were issued by the company.  That said, the SAFT specifically disclaims any oral or written representations or warranties made by Kravets or by Xtrade, inclusive of the whitepaper contents as to Xtrade's business model.

82.    In effect, the SAFT was a blank check contract, void of any substance regarding the business plans of the company, allowing investors to invest into a Cayman entity that would fund the operations and marketing of a U.S. based company.  This setup served a purpose: circumventing U.S. investor laws and protections for the Xtrade token, which was a security.

83.    The SAFT was signed by Alex Kravets on behalf of XDH.

84.    While XDH signed SAFT contracts on behalf of Xtrade, XDH's name appeared nowhere on any materials otherwise provided by the company during the period in question. Vitally Hulko, the director of Xtrade Digital Holdings listed on the Regulation D exemption form that was filed with the SEC for SAFTs, was not listed on any of the marketing materials,

such as the whitepaper for Xtrade Digital Assets, nor was he ever mentioned by Xtrade

executives in any marketing materials or social media communications.  (All other directors'

faces, names, and biographies were listed on the Xtrade whitepapers and marketing materials.)

Furthermore, Hulko's signature on the Form D registration papers for Xtrade SAFT contracts,

lists a signature date of February 13, 2018, weeks after both Defendants's SAFTs were signed

and payment for the SAFT were delivered by Plaintiffs to Xtrade.

85.     The SAFTs contained "cautionary language."  But to say the risk disclosures

made in the SAFTs were inadequate is extreme understatement.

86.     While the SAFTs disclosed that development of the platform was in "early

stages," and there was "no guarantee that the Company will obtain sufficient funding to fully

develop the Platform," the SAFTs did not disclose that the Defendants knew at the time that,

regardless of whether Xtrade could "obtain sufficient funding," the platform was simply not

compliant with federal securities laws.

87.     The SAFT disclosed that the regulatory status of tokens, cryptocurrency offerings,

and cryptocurrency exchanges was currently "unclear or unsettled in many jurisdictions," and

that it was "difficult to predict how or whether regulatory agencies may apply existing regulation

with respect to such technology and its applications, including the Platform and the Tokens."

88.     In truth, however, it was quite clear, at the time, how the SEC viewed the

regulatory status of tokens, cryptocurrency offerings, and cryptocurrency exchanges.  The tokens

were securities; the offering of tokens was a securities offering; and cryptocurrency exchanges

would be required to be registered broker-dealers and national securities exchanges or ATSs.  It

was also quite clear at the time that not a single U.S. cryptocurrency exchange had been granted any such a license.

89.     Thus, this disclosure was deliberately misleading.  It was not "difficult to predict" the regulatory climate at the time.  It was quite predictable how the SEC would view cryptocurrency offerings.  The SEC had literally told the market, repeatedly, how it viewed cryptocurrency offerings.  By this time, the SEC had sued a series of cryptocurrency offerors, and made repeated public statements that it would view such offerings as securities offerings. Xtrade simply pretended that there was uncertainty, when there was none.  And the individual defendants, having represented that they had long experience in the brokerage business (including relevant securities licensures), knew full well that this "disclosure" of "uncertainty" was false.

90.     Further, Defendants' gossamer mask of a "disclosure" failed to disclose:  what they expected would change to allow the business model to exist; what were the expected timeframes that investors (who were ostensibly buying tokens that would have a utility within this business model) would have to wait; what were the costs of getting to that point; what were the regulatory risks of not achieving those registrations; what were the regulatory risks of proceeding down that path if such registrations were not accomplished; and what was the likely impact to the value of the security Defendants were offering if all of their hopes and dreams did not pan out.

## VI.     The Offerings to the Plaintiffs and the Public

91.     In early January 2018, each of the Plaintiffs received emails from Defendant Kravets informing them of the Offering and the opportunity to invest in the Xtrade Tokens. The

emails included copies of a "whitepaper" to which Plaintiffs were referred to for marketing purposes.

92.     Kravets described the opportunity as an investment and represented that in exchange for their investment, Plaintiffs would receive Tokens, which they could then resell to the general public of unaccredited investors.

93.     Kravets sent each Plaintiff the first version of the Whitepapers, which described the Tokens, their functionality, and the general business model of XDA.

**A.      The Offering to Fasulo**

94.     On January 17, 2018, Kravets sent Fasulo two SAFTs to sign and return with payment.  Fasulo and Kravets both executed both SAFTs.  The SAFT with Fasulo was unedited by Fasulo.  The SAFT contains no reference to Xtrade's claimed business practices other than the practice of selling Xtrade Tokens to investors.  Nevertheless, Fasulo signed the SAFT in reliance on the many promises Xtrade had made in its Whitepapers and other public materials regarding its business.

95.     The larger SAFT was paid in bitcoin, worth (at the time) US$1,159,995.10.

96.     The smaller contract, in the amount of US$75,000, was wired by Fasulo per Defendant Gulko's instructions.

97.     The wire instructions were to an account for XDH, not XDA. However, upon information and belief, XDH lacked its own independent bank accounts and used those of XDA, and still does.  Therefore, the funds of XDH and XDA were commingled.

98.     Fasulo's total investment sum for both SAFTs was valued at US$1,234,990.

99.     In March 2018, Kravets requested Fasulo to locate a foreign national to be a substitute investor.  While puzzled by the request, Fasulo did as required by Defendants.  Saeed Aldarmaki, of the United Arab Emirates, signed a SAFT contract for 90 bitcoin, the same amount as Fasulo.  On May 1, 2018, Aldarmaki received $100,000 worth of Xtrade Tokens in return for his service of signing the SAFT document as a foreign signer on Fasulo's behalf.

100.    Aldermaki himself never contributed any funds to Defendants.

**B.     The Offering to Desai**

101.    On or about January 2018, Kravets, sent Desai contracts to sign and return with payment, which Desai did.  Similar to the Fasulo SAFTs, the SAFT with Desai was unedited by Desai.  The SAFT contains no reference to Xtrade's claimed business practices other than the practice of selling Xtrade Tokens to investors.  Nevertheless, Desai signed the SAFT in reliance on the many promises Xtrade had made in its Whitepapers and other public materials regarding its business.

102.    On March 31, 2018, Mark Friedler, an "advisor" to XDA, emailed Desai, with a copy to Kravets. The gist of the email was that in order to invest, Desai needed to find a foreign national whose name could be substituted on the SAFT.

103.    Desai could not find a foreign national to substitute for him, and his SAFT was never executed by any Defendant.

104.    Nevertheless, on or about May 23, 2018, Kravets confirmed to Desai that his investment value was confirmed for bitcoin yielding an investment of $1,207,043.20.

C.    __The Later Public Offering__

105.    On or about February 20, 2018, XDA announced, via Telegram, the end of their "private pre-sale" period and the beginning of their "public-presale" period.

106.    During this time, XDA renewed their solicitations to the general public.

107.    On or about March 31, 2018, XDA announced that the public pre-sale of tokens was over.  It also announced that it was cancelling its plans to hold a public "crowd-sale" to the unaccredited public.

108.    Defendants have engaged in a continuous offering of their Xtrade Tokens to the public by virtue of multiple acts continuing at least as late as August 2018.  Xtrade executives Alex Kravets and Sergii Gulko have travelled the world as late as fall 2018 looking to solicit more investment into Xtrade Tokens from other investors.

109.    Defendants openly and aggressively pushed a marketing program through August 2018, where participants would get paid new Xtrade Tokens in return for promoting the company's marketing efforts. These tokens comprised a new issuance of the company to outsiders who could then turn around and hope to sell these tokens to outside purchasers, once the token's 'lockup' period had lapsed.  Xtrade openly admits to issuing these marketing and promotional Xtrade token 'bounty' programs through August 2018, when new bounty tokens were issued as rewards to successful promoters.

110.    Xtrade, upon information and belief, actively participated in listing their token on third party exchanges for the purposes of encouraging the purchase and sale of tokens, as well as by third party investors who could purchase tokens directly from the company, or indirectly

through these third party exchanges.  Upon information and belief, Xtrade utilized these third

party exchanges to sell its own tokens.

111.    All of the above activity comprises an ongoing continuing issuance of the Xtrade

Tokens.

112.    XDA claimed to have raised approximately $31.5 million dollars.

113.    At all times from November 2017 through March 31, 2018 and following through

to the present moment, in all communications with Plaintiffs and marketing materials to them

and to the general public, Defendants maintained that the Tokens did not constitute securities for

legal purposes under U.S. law, that they could be sold to the general public and that they were

exempt from SEC registration.

114.    On or about May 2018 – less than one year before the original filing of the case –

XDA electronically distributed Tokens to the Plaintiff investors (among others) by providing an

online "wallet" address through which the investors could take possession and control of the

Tokens.

115.    However, in contradiction to the Whitepapers, the Tokens did not provide access

to a functioning Platform.

116.    It was not that the Tokens didn't function.  It was that the Xtrade Platform simply

did not exist.  Thus the tokens had no purpose to be issued, other than speculation.

117.    Upon information and belief, as of the filing of this action, the Xtrade Platform

still does not exist.

118.    Defendants failed to implement the Platform, even though that was the basis of

the Offering and the purpose of investing in the Tokens.

VII.   **XTrade's Violations of Regulation D**

119.   Regulation D of the Securities Act of 1933 permits general solicitations in connection with a private placement offering.  Submission of Form D attests to compliance with Regulation D.

120.   On February 13, 2018, Defendants filed a Form D with the SEC (attached hereto as Exhibit B) ("Defendants' Form D").  However, Defendants' Form D is not accurate and thus does not comply with Regulation D.

121.   First, Defendants failed to comply with the express investor protection conditions of Rule 506(c), by failing to verify the accredited investor status of each investor.

122.   Second, Defendants failed to comply with Section 502(d) by failing to exercise reasonable care to assure that the purchasers of the Tokens/securities were not underwriters within the meaning of Section 2(a)(11) of the Securities Act.  In fact, Defendants explicitly enabled underwriting by marketing the Tokens to initial investors as a general public resale investment with a 50% discount to the public issuance. price of ten cents. Therefore, Defendants should have known that all investors in the Tokens were potential Section 2(a)(11) underwriters.

123.   Third and most importantly, based on longstanding SEC guidance and interpretations codified in SEC Compliance and Disclosure 139.01 ("C&D 139.01"), where the issuer can cause the conversion of the offering, the subject of the offering must be registered at the initial time of the offering.  To be valid, the underlying securities of the SAFT, the Xtrade Tokens must be registered with the SEC.  They were not.  They presently remain unregistered.

124.   The Offering of Xtrade Tokens was, and still is, required to have been registered, because the Tokens were eventually convertible unilaterally at the option of the issuer.

Defendants continue to dispute that their tokens are securities, and continues to hide behind the veil of an evidentiary legal qualified opinion letter that is marketed as existing and being written up for them as Early as November 2018.  The last version of their whitepaper, dated March 2018, continues to be posted prominently on the XTRD.io website, maintaining that Xtrade Tokens are not securities for the purposes of SEC registration as per the legal qualified opinion letter.  The contents and authorship of such letter have never been publicized or disclosed by the defendants other than mention of its creation and possession by the defendants in their numerous updated whitepapers.

125.    Upon information and belief, the defendants own legal counsel at the time as listed on their Whitepaper, Gary Ross, a listed advisor to the company, had authored the letter. The qualified opinion letter comprises nothing more than a thin veil of fictitious legal marketing used to lure in investors into unregistered securities.

126.    Fourth, the SEC has provided clear guidance that cryptocurrency issuance for purposes of speculation and in the absence of a functioning cryptocurrency dependent business revenue stream, cannot be considered anything other than a security.  XTRD lacks a business revenue stream for Xtrade Tokens.  They listed Xtrade Tokens for trade (speculation) on foreign exchanges.  In the wake of clear SEC guidance upon these behaviors, Defendants have refused to declare Xtrade Tokens a security, and they have refused to make a voluntary rescission offer to investors as recommended by the SEC in a bevy of similarly situated cryptocurrency issuance cases.

127.    The Plaintiffs continue to possess Xtrade Tokens and Defendants have refused to return or refund the Plaintiffs investment purchase price in return for the tokens despite Plaintiffs request that defendants do so on multiple occasions.

VIII.    **XDA's Other Material Misrepresentations and Omissions**

128.    In addition to the Whitepapers, Defendants also engaged in regular electronic updates with investors and potential investors throughout the Offering process and after, as Tokens continue to be issued, both to investors and to individuals who received them as "bounty" for achieving promotional goals on social media platforms.

129.    Defendants travelled internationally to promote XDA and raise funds.  XDA also used social media, particularly a platform called Telegram, to advertise and raise funds. Potential investors could post questions on Telegram, which someone from the company would answer.

130.    In addition, prior to the time of Plaintiffs' actual investments, XDA posted youtube videos "demonstrating" that there was a fully functioning and working prototype of the Xtrade Platform.  However, the videos show nothing more than numbers on a screen.  It was a sham.  There is no proof of a prototype existing.

131.    In fact, Defendants refused to allow any investors to use the prototype, although they communicated that they would be providing a beta prototype to select participants.

132.    Upon information and belief, no beta system was ever launched.

133.    Next, Defendants did not adequately represent – in the Whitepapers or anywhere else – the necessity of SEC registration for this offering, or that the "market-making" function of the Xtrade Platform might require broker-dealer registration for anyone who uses it.

134.    Further, the market making function of Xtrade's platform would definitively and unequivocally require Xtrade to register with FINRA as a broker-dealer, and then with the SEC as a national securities exchange or an ATS.  Defendants never disclosed these critical facts – which were well-known to the Defendants at the time.

135.    The facts from which one can infer Defendants' knowledge on this point are simple:  Defendants publicly stated their intention to run a cryptocurrency exchange.  Defendants claimed in the Whitepapers to have extensive brokerage experience, and thus they certainly should have been fully aware that the Xtrade Tokens would be securities; that Xtrade would have to register as a broker-dealer, and as a national securities exchange or ATS – and that no such registration had ever been granted, making it a risky path.

136.    Further, Defendants advertised that they retained legal counsel to advise them, in order to be compliant with the regulations.  And, particularly in the wake of the SEC's various pronouncements on cryptocurrency issues, any competent securities lawyer would also have advised Xtrade that Xtrade would have to register as a broker-dealer, and as a national securities exchange or ATS.

137.    But despite knowing these risks, Defendants failed to disclose any of them, preferring instead to lure investors with the promise of a cryptocurrency trading platform that would be compliant with regulations.

138.    Once Defendants got investors' money, Defendants discarded or changed the platform beyond recognition, claiming publicly that its use would be a "conflict of interest" with the cryptocurrency markets.  By March of 2018, Defendants were frantically revising their

Whitepaper, drastically altering it from the Offering as originally outlined, upon which Plaintiffs (and other investors) originally relied in making their investment decisions.

139.    When Plaintiffs invested in January and February of 2018, the Whitepaper included the market-making function of the Xtrade Platform. When that function was abandoned, and thus the reason for purchasing the Xtrade Tokens was abandoned as well, no refund was given (or offered).

140.    Once Defendants withdrew the market-making function of the Xtrade Platform from the Offering, the quality of the Offering changed.  It became nothing more than an investment in an undetermined business with a continuously changing and speculative business/revenue model.

141.    The public abandonment of Xtrade's original (and only) business model naturally caused a collapse in the value of the Xtrade token, which was (in Xtrade's utility token façade) for use within that system, but really, comprised an equity investment in Xtrade through the SAFT.

142.    There are other misrepresentations still.  For example, the Whitepaper stated that Defendant Kravets had successfully launched or helped launch Sogotrade, a retail investing platform for over 100,000 clients., which it turned out was simply was not true. He never had anything to do with Launching Sogotrade and never worked for Sogotrade. He had only helped his employer, Genesis, become a customer of Sogotrade.

IX.    **XTrade Continues to Offer its Token Publicly, in Violation of Securities Laws**

143.    In August 2018, Defendants actively participated in listing the Xtrade Tokens on two unregistered offshore exchanges known as Idex and Coinsuper.  The token ticker symbol is "XTRD".

144.    The token, which had been advertised for issuance at 10 cents, and which had a contractual value of 10 cents as prescribed in the SAFT contract, began trading on these exchanges at under 1 penny in price.  It quickly plummeted to less than one-tenth of a penny.

145.    Defendants sold or allowed to be sold their tokens, or tokens under their control, on these exchanges, thereby exacerbating damages to the Plaintiffs investment.  Defendants caused this further drop in value and destruction of the Plaintiffs investment, rendering the investment worthless.

146.    Once Defendants helped or allowed their tokens to be listed for secondary trading on an unregistered offshore exchange, without already having completed a working platform, they confirmed clearly to Plaintiffs that the tokens were meant only for speculation purposes rather than for "utility" purposes.  XDA undermined its investors by offering the token to public markets, which – particularly given that Xtrade had abandoned its business model – destroyed any remaining value of its Tokens.

147.    Neither the SAFT nor the Whitepapers ever mentioned the risk that Xtrade might allow its tokens to be listed on these markets.  Indeed, no investor would ever had invested into the project with a requirement to accept the risk that Defendant would knowingly render their own offered business model worthless.

X.     **XTrade Moves Investor Funds Offshore**

148.    Defendants refuse to disclose to investors how investor funds have been used in the past or are currently being used.  Upon information and belief, XDA continues to have no revenue of any kind and continues to hold investors' funds in the volatile form of bitcoin and other cryptocurrencies instead of in the stable form of U.S. Dollars, thereby creating undue prejudice to the plaintiff, by exposing their investment to fundamental risks having nothing to do with defendants claimed business venture.

149.    Essentially, Defendants are using Plaintiffs funds for purposes of gambling on the value of Bitcoin and other cryptocurrencies, substantially endangering Plaintiffs' funds.

150.    Further, Xtrade has dissipated its funds to the point where it may no longer be a viable business.

151.    Upon information and belief, Xtrade has dissipated over $28 million of the original amount of over $31 million dollars raised as of April 1, 2018.  Xtrade has not accounted for the unexpectedly rapid dissipation of funds.

152.    Expert witness investigation (see Exhibit A hereto) has been unable to confirm whether or not Xtrade may be, or may have been, trading investors funds on exchanges for attempted proprietary profit generation, masking over its use of investor funds for the purposes of generating hedge fund like profits, rather than using funds for the intended purpose of building a "single point of access" customer trading platform.

153.    Indeed, the expert tracked the digital footprints of Xtrade's digital currency transactions, found that Xtrade distributed certain investor funds (including Plaintiffs' funds) to third parties such as "Mydicewallet.com," an offshore cryptocurrency exchange whose terms of

service specifically require customers to confirm they are not residing in, nor a citizen of, the United States of America.

154.     In short, XDA continues to insist that the tokens are not securities, that they have not made any misrepresentations, and that they are entitled to keep their investor's money despite the collapse of their business.  In the meantime, their false business model promises – which they knew at the time were impossible – have collapsed; they are still holding investors' money; and they are using investor money to speculate in cryptocurrency while investors are left holding the bag.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
**(Against All Defendants)**

155.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

156.     This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants.

157.     Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

158.     Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.    Had Plaintiffs known the truth about the Xtrade investment, they would not have sent money (either fiat or cryptocurrency) to Xtrade.

160.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in Xtrade Tokens.

**COUNT II**

**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Kravets, Gulko, and Giacobbe)**

161.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

162.    This Count is asserted against Defendants Kravets, Gulko, and Giacobbe (the "Control Person Defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

163.    The Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.  The Control Person Defendants had the power and influence and exercised the same to cause the material misrepresentations and omissions in connection with the offer and sale of Xtrade Tokens as described herein.

164.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Xtrade, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

165.    The Control Person Defendants, separately or together, were direct participants in making, and/or were made aware of the circumstances surrounding, the materially false and/or

misleading representations and omissions regarding the offer and sale of Xtrade Tokens to Plaintiffs.

166.    Alex Kravets, CEO of Xtrade, continuously touted his credentials as a decade-long registered broker-dealer who had authority to manage other broker dealers.  Kravetz knew or should have known that Xtrade Tokens should never have been marketed or issued without registration.

167.    As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in Xtrade Tokens.

**COUNT III**

**VIOLATIONS OF SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT**
**(Against All Defendants)**

168.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

169.    This Count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(a)(1), against all Defendants.

170.    Federal securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities. This information allows investors to make informed judgments about whether to purchase a company's securities.

171.    Xtrade Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

172.    Defendants promoted, offered, and/or sold securities by selling Xtrade Tokens.

173.    Defendants are issuers, underwriters, and/or necessary participants of/in the sales of Xtrade Tokens.

174.     No Defendant or other person filed with the SEC a registration statement for the offer and sale of Xtrade Tokens, no registration was in effect at the time Plaintiffs made his investment in Xtrade Tokens, and no exemption to the registration requirement was available.

175.     Defendants used the instrumentalities of interstate commerce in connection with the offer and sale of Xtrade Tokens.

176.     By engaging in the conduct described above, Xtrade offered and sold securities without a registration statement in effect and without an exemption from registration.

177.     Investors who bought Xtrade tokens through the offering and component sales made an investment of money in a common enterprise with Xtrade and with each other, and reasonably would have been led to expect profits derived from the entrepreneurial and managerial efforts of Xtrade and its agents.

178.     Xtrade filed a Form D with the SEC with respect to the Xtrade Tokens offered and sold via the SAFTs.  However, those offers and sales were not exempt from registration under Regulation D, which was promulgated under the Securities Act.  The exemption does not apply because the offer and sale of Xtrade Tokens via Xtrade's SAFTs was part of a single offering of Xtrade Tokens to the general public, or, in the alternative, was integrated with the offering of Xtrade Tokens, and neither the totality of the offering nor the non-SAFT portion of it was limited to accredited investors.  In addition, Xtrade did not exercise reasonable care to assure that the purchasers of Xtrade via the SAFTs were not statutory underwriters of Xtrade within the meaning of Section 2(a)(11) of the Securities Act.

179.     As a result of the conduct described above, Defendants violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it

shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

180.    Also as a result of the conduct described above, Defendants violated Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

181.    Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person, "shall be liable … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

182.    Each of the individual Defendants constitute "offer[or]s" or "seller[s]" under Section 12 of the Securities Act, and are thus all liable for selling unregistered securities in connection with Xtrade Tokens.

183.    Xtrade created and maintained the Xtrade Tokens, and profited handsomely from investments.

184.    Defendants still own the tokens, and have offered to tender them to Xtrade in exchange for a full rescission of the value of the investment.  Xtrade has declined.

185.    As such, all Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiffs for rescission and/or compensatory damages.

## COUNT IV

## VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against Kravets, Gulko, and Giacobbe)

186.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

187.    This Count is asserted against the Control Person Defendants under Section 15 of the Securities Act, 15 U.S.C. § 77o.

188.    The Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 15 of the Securities Act.  The Control Person Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Xtrade Tokens as described herein.

189.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Xtrade, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

190.    The Control Person Defendants, separately or together, have sufficient influence to have caused Xtrade to submit a registration statement.

191.    The Control Person Defendants, separately or together, jointly participated in, and/or aided and abetted, Xtrade's failure to register the Xtrade Tokens.

192.    Alex Kravets, CEO of Xtrade, continuously touted his credentials as a decade-long registered broker-dealer who had authority to manage other broker dealers.  Kravetz knew or should have known that Xtrade Tokens should never have been marketed or issued without registration.

193.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs for rescission and/or damages suffered.

## COUNT V

## COMMON LAW FRAUD
### (Against all Defendants)

194.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

195.    This Count is asserted against all Defendants.

196.    Defendants authorized and/or made representations concerning the investment opportunity into Xtrade Tokens.

197.    The misrepresentations and omissions alleged herein include:

   a.  Material changes in the Whitepapers from the business model stated in the original Whitepapers, specifically the alteration of the Trading Platform (if it in fact ever existed), but also the composition of the business, its goals, and the timelines for meeting those goals;

    b.   Failure to disclose all the risks associated with Xtrade's business model, and indeed providing false comfort by making statements indicating that it would be in regulatory compliance, when it knew at the time that it could not be;

    c.   Claims of partnership, like with the CME, which were not true;

    d.   Deliberately undermining the investors by planning to provide access to the Platform for cash, not Tokens;

    e.   Deliberately undermining investors by knowingly listing or allowing to be listed for trade Xtrade Tokens on secondary exchanges, prior to the existence of a working and demonstrable Xtrade Platform upon which Xtrade's Platform could be accessed in return for Xtrade Tokens;

    f.   The fraudulent issuance of the SAFTs as a contractual contrivance for helping sell unregistered securities; and

    g.   Failure to comply with U.S. securities regulations in regard to registering the Offering.

198.    Defendants' representations and omissions were materially false and misleading when made.  These representations and omission were made intentionally or with reckless disregard for the truth.

199.    Defendants made these misrepresentations and omissions to Plaintiffs directly with knowledge that Plaintiffs would rely on them.

200.    Based up on their superior knowledge and expertise, their incomplete and misleading disclosures, and in light of the fact that Plaintiffs did not have access to material facts

that were uniquely within Defendants' knowledge, Defendants had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.

201.   Plaintiffs reasonably and justifiably relied to his detriment on Defendants' misrepresentations and omissions and on Defendants' affirmative duty to provide full, complete, and accurate disclosures to them.

202.   Defendants' misrepresentations and omissions induced Plaintiffs to purchase Xtrade Tokens, which they would not have done had they known the truth.

203.   As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered damages.

204.   Because Defendants' conduct affected the public generally, and was gross and highly morally culpable, Plaintiffs also are entitled to punitive damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A.   Declaring that Defendants offered and sold unregistered securities in violation of federal securities laws;

B.   Declaring that Defendants are liable to Plaintiff under Sections 10(b) and/or 20(a) of the Exchange Act and/or Sections 5, 12(a)(1), and/or 15(a) of the Securities Act;

C.   Requiring an accounting of the funds and assets rightfully belonging to Plaintiffs;

D.   Ordering rescission of the investments made by Plaintiff in the unregistered securities, and/or compensatory damages in an amount in excess of US$2,442,038;

E.   Awarding Plaintiff pre-judgment interest;

F.   Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and disbursements; and

G.    Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, New York
　　　July12, 2019

**KIRSH LLC**
*Attorneys for Plaintiffs*



　　　　　/s/ Zeev Kirsh
By:    Zeev Kirsh, Esq., #4597985
　　　Kirsh LLC
　　　347 West 57th Street 31a,
　　　New York, NY 10019
　　　212-586-7517
　　　zeev@zeev.org

**EXHIBIT A : EXPERT REPORT FROM DIGITAL TRANSACTION TRACKER RICHARD A. SANDERS**

**Analysis of XTRD ICO**

*Review of raised funds, destination of raised funds, and varied elements of the XTRD
ICO practices*

**20190224**

**Background**

The purpose of this report is to conduct a review (primarily centric to blockchain forensics) of the XTRD ICO. In light of public skepticism regarding the use of assets raised by the XTRD team, the services of CipherBlade have been retained to conduct analysis on the blockchain trail and other elements of the XTRD raise.

This report has been generated by the CipherBlade team with direct oversight and majority involvement from Co-Founder/CSO Richard A. Sanders. Richard A. Sanders is a credentialed expert witness in blockchain forensics and cryptocurrency related cybercrime. These credentials, as well as direct contacts at all major exchanges, and daily communication with law enforcement, leverage CipherBlade's efforts to bring bad actors to justice and clean up the blockchain industry. Rich regularly consults with the FBI on criminal matters and has been seen by regulatory agencies, including the SEC, as a subject matter expert.

This report will dissect what information is currently held regarding XTRD's sale. It is publicly known XTRD raised approximately $31M USD in a sale with various phases in which the XTRD team accepted BTC, ETH, and fiat. Serg Gulko has confirmed this figure of raised funds himself, and has further made the claim the XTRD team is "not running wild with the money":



CipherBlade has been provided with two initial BTC addresses and has discovered several ETH addresses, which constitute approximately half of the total raised funds. Since the XTRADE team conducted a large-scale sale which included the use of potentially dozens more addresses, those addresses could be gleaned from various future methodologies, including query of exchanges. However, the portion of funds we are able to analyze is a suitable sample size to determine whether or not there are discrepancies between what the XTRD team promised the public.

*USD figures presented in this document, unless stated otherwise, reflect an average of exchange rate at the time of transaction.*

**Bitcoin Funds Raised**

XTRD received BTC in two BTC wallets, 39d3NnDmMpbRgm8TJtuxYJ2UwUQmL6EX3o and 3LvrxWgVjugJRh6yXwQbqyFeoUjRQXpcKj. Both of these wallets transact into a consolidatory wallet, 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR.



**BTC Wallet 1/Consolidation**

Wallet 39d3NnDmMpbRgm8TJtuxYJ2UwUQmL6EX3o received approximately 76.74 BTC and has sent out the same. This would constitute an approximate value of approximately $900,000 USD at the average time of transacting.

Of these outbound funds, 3 BTC go directly to Bittrex in txhash d89a473b6f41ceff31d1135dac8f3b575ea968f864ce380845a52b21aa8109fa.

Transactions from here get more complex, as for an unexplained reason, the XTRD team opted to use multiple hops to move funds. There are five further outbound transactions, each with a more complex trail.

Under txhash d89a473b6f41ceff31d1135dac8f3b575ea968f864ce380845a52b21aa8109fa, 0.743 BTC is sent to a wallet which subsequently deposits 0.5 BTC to Bittrex. The remaining ~0.243 BTC is sent to a wallet which transacts a larger quantity of funds, which may or may not be a wallet not associated with XTRD. It's possible this was a transaction constituting a payment

for a service, thus entailing this wallet is not owned by XTRD, or numerous other possibilities that entail attribution on this wallet as XTRD owned as questionable.



4 BTC is sent in txhash d3ba87ffb36bcdcb3bc55fdd7949d6121178db7d155b4d3d6aaddc10972b8b14 to wallet 3CWY2p52kPhmgi2foqoTcmyz73MDs8unGf. This wallet received funding from 36u8oyx54P5CKDNi313kq2sejmRaiyhEXL. Funds ultimately go to Bittrex in txhash 776df4ea78823f294ebff6eeacc7bc56a8907fce5a67d1d9c9340ee13a67e023 in total of 5 BTC, which indicates these wallets are part of the same cluster.



4 BTC is sent in txhash d3ba87ffb36bcdcb3bc55fdd7949d6121178db7d155b4d3d6aaddc10972b8b14 to wallet 328hoqRReEFPbd1iTvY28UUTqkFJrGGtuM. This wallet has received and sent nearly 233 BTC throughout it's lifetime. There are no indicators this was an exchange wallet. However, it is not

possible to attribute what the particular 4 BTC in question were used for, considering the 4 BTC constitute a small portion of funds received and sent by this wallet. Despite these factors, determination of the attribution of this wallet address would be possible via querying Bitfinex and CumberlandMining for pertinent user account information. It is most likely this was a service payment.



4.995 BTC is sent to wallet 36u8oyx54P5CKDNi313kq2sejmRaiyhEXL in txhash 3b123ae024190100fbad99f3383fb255739fd974895766f0bbded4d015b80de3. This wallet subsequently sends 2.744 BTC to wallet 3CWY2p52kPhmgi2foqoTcmyz73MDs8unGf, a previously identified change address. 2.25 BTC is sent to Bittrex in the same transaction mentioned in the prior sentence, txhash f9c6ef629d3e828147422f6ebc46c7615ea655ae1cf539c9e3be5c52688f01be.



60 BTC is sent to wallet 12iAXShavBDkg14cScapLmZZTHYcFBDSgs in txhash 3b123ae024190100fbad99f3383fb255739fd974895766f0bbded4d015b80de3. This wallet still holds 0.02 BTC. This wallet address has received approximately 30 BTC from other sources, largely from a KuCoin account (indicating, most likely, a swap of ETH for BTC,) for a total of 90 BTC in the trail that will be followed:

1. 0.134 is sent in txhash b67fff1faaa521e675c295310ed0f8b12d5bebba4e2d2e0d4c8cb4b651fdc6e2 to 18dCdpa7atnriaVNkAk433SwMrXDJF8411, and this BTC still sits dormant.

2. 90 BTC is transacted in txhash b67fff1faaa521e675c295310ed0f8b12d5bebba4e2d2e0d4c8cb4b651fdc6e2 to wallet 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR. This wallet address has received

approximately 493 BTC and sent 433 BTC throughout history. Based upon dates of transactions, it is CipherBlade's assessment this is a consolidatory wallet of XTRD.

1. The amount received by this wallet would constitute the equivalent of approximately $4.5M USD.
2. The amount sent by this wallet would constitute the equivalent of approximately $3.5M USD.
3. Considering this wallet receives 493.461 BTC, and this is notably higher than the totals of the first two wallets sent here (60 BTC, with an additional 30 of XTRD origin from Wallet 1, and 103.93 BTC from Wallet 2) this still leaves nearly 300 BTC to source-identify.
   1. These inbounds come from varied exchanges, including Cubits, for in excess of 51 BTC - most often through intermediary wallets



   1.
   2. Nearly 100 BTC comes from a hop from Anxpro



   ●
   1. Varied other transactions from exchanges such as KuCoin and Binance exist. These were likely to convert other cryptocurrencies (namely, Ethereum) to BTC
   2. The inbound transactions from Anxpro and other fiat ramps are likely conversion of fiat investment into BTC, and could be confirmed if queried.
4. Only 4.11%, or approximately $145,500 USD, goes directly to an exchange - CEX.io
5. 23.49% (101.780 BTC) or $833,600 USD ends up in varied exchanges after several hops. The most prominent exchanges, by percent, are CEX.io, Poloniex, and Bitfinex.
6. 42.6% (183.974 BTC) or $1.25M USD indirectly lands in varied wallets where the funds are currently dormant.
7. 8.53% (36.961 BTC) or $243,000 USD goes directly to wallets where the funds are currently dormant.



The above graph illustrates the flow of transactions out of the XTRD consolidatory wallet, illustrating flows to black clusters (with exchanges as final destinations) and a grey cluster (indicating a wallet with an outstanding balance.) *Note that this graph is not fully expanded to show all clusters and is intended simply to illustrate methodology behind assessment of the destination of the BTC in question.*

**BTC Wallet 2**

BTC wallet 3LvrxWgVjugJRh6yXwQbqyFeoUjRQXpcKj receives and sends approximately 103.97 BTC throughout its history. This would constitute approximately $1.18M USD received by this wallet at the average time of the transactions.

All transactions, with one exception, outbound from this wallet go through an intermediary wallet listed above, with no direct deposits to exchanges or other wallets of clear attributions.

There is one exception: an outbound transaction of 0.046 BTC. These funds follow a transactional trail that does not mirror a pattern for other fund flow, indicating this was likely a salary or service payment. If it became necessary, attribution of the recipient of these funds could be accomplished by querying exchanges in the related transactional trail, such as Bittrex below:



The BTC wallet in question here transfers complete balance in txhash 85fbde2171b7186b460c145ef447752db59e6d1ba4863c678eb2e839a53510a6 to wallet 3Ms8kMncr25R7puL8e7zbbhj5crL535GZR - a wallet analyzed prior in this report.



Based upon this finding, funds from this wallet can not be added to net totals, as these would be erroneous/redundant reflections.

**ETH Funds Raised**

**ETH Wallet 1**

0xe2a8aedd0463d13c2c8ff3207a2971361455abf4

Received: 3,053.04 ETH
Sent: 2,292.01 ETH
Current balance: 761.02 ETH

At the average time of exchange rates for the inbound transactions, this would constitute $1.8M USD total for the received Ethereum.

There are a couple of small transactions outbound from this wallet, likely salary or service payments, which could be queried for attribution.



2,289 ETH went to 0x8382bd241eb313351f235eeedeac7702fd4e241f in TX 0xa8a6d4987175a6a22958efd0835d6dd26e3b534a2376c3dd19b4a453a998a3d9 on November 19 2018 - a startlingly late transaction. Wallet 0x8382bd241eb313351f235eeedeac7702fd4e241f has received 9309 ETH and timestamps and sources would indicate this is a consolidatory wallet of XTRD.

## ETH Wallet 2 (Consolidatory)

0x8382bd241eb313351f235eeedeac7702fd4e241f

This wallet received 9,309.00 ETH from Wallets 1 and 3 in November 2018. This wallet has a dormant balance of 2.94 ETH. Since the majority of funds in this wallet come from other wallets, USD equivalents will be calculated in those pertinent wallets.

This wallet has the appearance of an exchange deposit wallet for a certain type of internal exchange organisation. Blockchain forensics tools indicate that 65.5% of the funds in this wallet were indirectly sent to Gemini, which leads CipherBlade to believe that this wallet is most likely a deposit wallet of Gemini itself. However, there is no indication these transactions were for the purpose of funding SPA, particularly based upon the time these transactions took place (SPA funding would most likely have taken place prior, or continued to be secured in cold storage.)

## ETH Wallet 3

0xcafa41d9bf0908bf24388dd551312d320d1f1b4d

This is another sale wallet.

Received 11,625.90 ETH
Sent out 10,572.87 ETH
Current balance: 1,052.94 ETH

At the average time of exchange rates for the inbound transactions, this would constitute $7.9M USD total for the received ethereum.

The majority of this wallet is liquidated late 2018, shown on this balance over time graph:



An extremely small portion (35.47 ETH) goes to Bittrex, which may constitute use for the SPA. As this is unconfirmed, and with the continued suspicion regarding XTRD, querying of the Bittrex account would confirm or deny this purpose.

Most alarming is the complex transactional trail this wallet provides, with many outgoing transactions of various sizes over a long period of time. This suggests deliberate obfuscation of the destination of raised funds. However, a high-level overview of final exchange destinations (pruning false positives, such as other exchange addresses) provides some startling revelations:



32.5% of these traced funds eventually land in Gemini, 15.89% land in Binance, and various other exchanges are represented. As mentioned above, these funds may constitute use for the SPA; however, contingent with the variety of exchanges, it is CipherBlade's assessment that if these exchanges were queried, personal accounts would be revealed - not SPA storage nor XTRD business accounts. A very disturbing finding is in excess of $650,000 going directly to Mydicewallet.com (see Wallet 4 below), a largely unknown exchange with almost no volume according to Coinmarketcap. It is unlikely that any business would use this venue for SPA-directed funds.

## ETH Wallet 4

0xf8c809c48d02035a0afaf5532088142f92f1484f

This is a deposit wallet of XTRD's account at the Triple Dice Exchange (mydicewallet.com). The attribution to XTRD comes from a deposit of 1,406 ETH from Wallet 3 in 0xb6f4ae9c7b8fbf138630dee88fe870cbd7f581ae9246543f912d84eda8275bcd (July).

Additionally, we find deposits of 529.69 ETH, 167.75 ETH and 9.99 ETH from 0x75e7f640bf6968b6f32c47a3cd82c3c2c9dcae68 in

0xe536fac43b2e56717eaa2550b4c83d8577fd141c4a51dc66fb01289700da8663, 0xd445492f5c9252860f6859311a03bf4d5141367dcf7f7506aaf2f7a08889b711, and 0xb5c463d3c6c98d3d45e877515627cd572f7000f0879876d484a32af8a2bcc738. In light of the number and density of transactions, that is clearly an exchange hot wallet. These three withdrawals amount to $325,719.91 based on the value of ETH at the time of transaction.

## XTRD Tokens

As per the whitepaper, XTRD promised the following Token Allocation:

1. 50% Token Generation Event
    1. Review if 50% of total supply was distributed
        1. This would include all phases of sale
2. 29% XTRD Reserve
    1. Review what these tokens may have been used for thus far; demand transparency, imply possibility of use by the team. A core use was to be able to provide liquidity for XTRD, so a substantial portion should be allocated to that - even if a percent was not explicitly stated (and why wasn't it already broken in to its own percentile?)
3. 10% Team
    1. Initially a 180 day vesting period
        1. Does not specify if 100% lockup or phased
        2. Had an extension
4. 10% Advisor pool
    1. "Will be issued to current and future advisors"
    2. Does not mention any lockup period
        1. Red flag, but something that perhaps should have been seen by investors before the fact
            1. Could still find investors that dumped when claiming to HODL
5. 1% Bounty

| Rank | Address | Quantity | Percentage |
|------|---------|----------|------------|
| 1 | 0x233d572db5df00f6a37f14db37c7e0a877b221fe | 255,382,933.1 | 26.8130% |
| 2 | 0xa136b56fa180f4ea557a5b9e42e05660b9b8f618 | 95,245,768.8 | 10.0000% |

The above indicates two wallets which may fit the criteria for two categories: XTRD Reserve and Team.

The first wallet (0x233d572db5df00f6a37f14db37c7e0a877b221fe) holds only 26.8130% of XTRD tokens, not 29%, indicating a bit over 2% of the XTRD reserve has been utilized for the purposes of incentivizing partnerships between XTRD and cryptocurrency exchanges. Since XTRD has not secured any substantial exchange partnerships, this is alarming. XTRD's announced exchange partnerships include Beaxy (an unlaunched exchange which ran an ICO itself) and LGO Markets (allegedly for support of the ecosystem and "white glove support for XTRD clients.")

There are multiple alarming elements of the first wallet address and the use of the XTRD tokens thus far. First - no public financial transparency has been shared about the use of these tokens. Considering that at ICO pricing, 2% of the XTRD tokens would be valued at approximately $1.9M USD, the fact that Beaxy, a non-functioning exchange may have received a large sum of money is alarming in and of itself - let alone an exchange which also ran an ICO and should have adequate funding. There may be associated legal considerations with ICOs exchanging tokens with each other for services.

With regards to LGO Markets, the XTRD whitepaper claims one of the most important components would be "Robust, US based technical support." While one could fairly argue that multiple Use of Funds categories (namely, Operations and Tech Acquisition) could be used for this purpose, it is equally fair to state it would be acceptable for XTRD to utilize XTRD tokens instead of raised funds to fulfill this purpose. However, the question raised here is that without a working platform, and no subsequent tech support to provide, why would any XTRD tokens be furnished to LGO Markets? Considering it is almost certain these tokens were not subject to any legal lockup (and certain they were not locked in a smart contract,) if LGO Markets received XTRD tokens, they received them purely for the short-term credibility of XTRD and this large sum of XTRD tokens were sold, which was one of numerous factors in the decline of the XTRD exchange rate. This was one of numerous decisions that weren't quite public facing and certainly were to the harm of XTRD investors.

The most alarming aspect of the XTRD Reserve wallet is the quantity of transactions, none of which have been included in a transparency report:

| TxHash | Age | From | | To | Quantity |
|---|---|---|---|---|---|
| 0xdd7c31e6c43b36f... | 142 days 21 hrs ago | 0x233d572db5df00f... | OUT | 0xa6bc725ba62008... | 29,079 |
| 0x2b8328e7e6087c... | 142 days 21 hrs ago | 0x233d572db5df00f... | OUT | 0xa6bc725ba62008... | 29,079 |
| 0x9a48d4c90d16c6... | 159 days 2 hrs ago | 0x233d572db5df00f... | OUT | 0xa6bc725ba62008... | 25,000 |
| 0xf403aae2b8cd82c... | 184 days 2 hrs ago | 0x233d572db5df00f... | OUT | 0x3c546b3775c2ab... | 2,329,373 |
| 0xece8420fbdbf8d9... | 213 days 16 hrs ago | 0x233d572db5df00f... | OUT | 0xc1da1d47f648400... | 47,622.85 |
| 0x38877ea8d52735f... | 238 days 18 hrs ago | 0x233d572db5df00f... | OUT | 0xfbaf09bd23f1475... | 500,000 |
| 0xd6a9ec20b1edefc... | 241 days 16 hrs ago | 0x233d572db5df00f... | OUT | 0x21e41ab26cc9e2... | 200 |
| 0xadf64930f0f5f5ec8... | 246 days 3 hrs ago | 0x233d572db5df00f... | OUT | 0x49fbb03d63d6bf5... | 6,035,216.1 |
| 0xeff3ef68638310c... | 267 days 13 hrs ago | 0x233d572db5df00f... | OUT | 0xbe55bff75a1cb08... | 4,762,288.44 |
| 0xf8e47dc76aea5a7... | 274 days 13 hrs ago | 0x233d572db5df00f... | OUT | 0xccd13cca8bd046... | 952,357.69 |
| 0xceef73ebef46267... | 274 days 14 hrs ago | 0x233d572db5df00f... | OUT | 0xccd13cca8bd046... | 100 |
| 0xaa5d6da2a5abea... | 274 days 14 hrs ago | 0x233d572db5df00f... | OUT | 0x69c4be3a75bda9... | 801,118.76 |
| 0x2b3c3deca05fa7c3... | 280 days 1 hr ago | 0x233d572db5df00f... | OUT | 0xee8b077f10cee9... | 999,900 |
| 0xfd35d64c72a3822... | 280 days 2 hrs ago | 0x233d572db5df00f... | OUT | 0xee8bb077f10cee5... | 100 |
| 0xe207cbe95b28d1... | 282 days 23 hrs ago | 0x233d572db5df00f... | OUT | 0x3ba0484ca94c24... | 194,310 |
| 0x5314a2f1449d213... | 287 days 23 hrs ago | 0x233d572db5df00f... | OUT | 0x6f4ea170eecdf373... | 1,182,720 |
| 0x40753261458d1... | 294 days 23 hrs ago | 0x233d572db5df00f... | OUT | 0x9d418c76524797... | 735,799 |
| 0x958b6d9f8c14ada... | 295 days 3 hrs ago | 0x233d572db5df00f... | OUT | 0xc763085ee9441a... | 727,747 |

Perhaps most alarming is that a significant portion of the XTRD tokens mentioned above have been liquidated, further cementing that not only were these tokens not put to intelligent business use, but they were a direct contribution for the collapse in XTRD exchange rate.



An additional observation when conducting forensics on the above wallet is that prior to liquidating, these XTRD tokens are divided into smaller chunks and subsequent wallets - a common tactic in laundering. Whomever received these XTRD tokens knew there was an element of shady nature to these deals and had an interest in obscuring attribution. In the best case, these XTRD tokens were used for poor business choices (which could be Beaxly and LGO Markets, or could include other unannounced dealings,) or, in a more malicious case,

these transfers might implicate members of the XTRD team in misuse of the XTRD Reserve. Considering that nearly 7% of the XTRD reserve is inexplicably already used, this is extremely alarming.

The XTRD team claims that team tokens would be subject to a 180 day lock in their whitepaper. The XTRD team later decided to change this to a "one year" lockup - it was publicly unclear if this is to mean an extension from 180 days to 365 days or an additional year for 545 days, however, it is believed the total lockup is 365 days. Extending the lockup period of tokens that have rapidly depreciated in value, as well as which hold little promise for the future, are a common tactic of "soft exit" ICOs, especially ICOs which have lacked transparency on what has gone on behind closed doors with raised funds and "reserve token" use. In essence, a project like XTRD can profit substantially not just on premise of the raised funds, but via their "token reserve" - negating the need for team token vesting to substantially cut into their personal profit. The second largest holding wallet for XTRD (0xa136b56fa180f4ea557a5b9e42e05660b9b8f618) holds 10% of the XTRD supply, and this wallet has been publicly attributed as the XTRD team's locked tokens. As per the ~~code on their contract,~~ these tokens are set to unlock on May 4th, 2019.

As per the XTRD whitepaper, 10% of XTRD tokens would be allocated to the Advisor pool. Many projects subject advisors to a token vesting period, and XTRD did not elect to do so. As such, unless documents signed between XTRD and their advisors state otherwise, advisors would be permitted to liquidate their XTRD tokens upon receipt. However, an XTRD team member had stated otherwise, which has certainly misled several investors:



Not subjecting advisors to a vesting period is considered poor practice since many advisors will have little to no involvement in a project after the tokens are received, and this appears to be the case with XTRD's advisors; they've had extremely minimal public involvement in the project over the past year. There is no public transparency from XTRD about how much each specific advisor was compensated, nor how much (if any) of the Advisor pool XTRD is still available. It's almost certain that if XTRD was asked for such information in a transparent report, it would not be provided. It's equally likely that the XTRD advisors would not disclose how much XTRD they received, or if they've liquidated it - although the stark likelihood is that most, if not all, of the Advisor pool XTRD has been spent and liquidated. It's quite likely that any minimal involvement XTRD advisors over the past year has included issuing a public sentiment of "HODL"ing XTRD

tokens, despite the fact they themselves have not done so. It's a certainty these advisors promoted the ICO with the direct intent of dumping their tokens shortly upon the receipt of them. Both of the aforementioned points fall under purview of law.

There are several wallets which hold significant sums of XTRD tokens (4.75%, 4.1%, 3.4%, 3.1%, 2.6%, etc) - which may constitute some advisor wallets, however, some of those percentiles are abnormally high and would indicate a high level of negligence in compensating advisors such high percentiles given a 10% total pool. Historically, advisors compensated at such high figures without vesting periods liquidate. Regardless, with zero transparency from the XTRD team, we're left to speculate - but left to speculate with that, regardless of which theory is accurate, it's not a positive situation.

The XTRD team allocated 1% of the XTRD supply to an aggressive bounty campaign. 1% of supply for a bounty campaign is not abnormal, and there seems to be a decent amount of transparency in the XTRD team's distribution of these bounty awards: to be expected, considering a low-cost, high-reward effort. However, the 1% of XTRD in a "lifetime bounty wallet" held in 0x7A81c5392Ad80749190042a0C1d53AAC277A2542 is at a peculiarly low level, indicating rather poor planning for an ongoing bounty campaign promised to the community.

The XTRD team published a synopsis of their ICO on Medium, which applies some level of transparency on the initial generation of tokens - a level of transparency that was a "one and done." This post indicates several datapoints for further consideration, such as that 33.6M XTRD bonus tokens are locked for six months - which has not been transparently proven to be factual for all investors. It is known that some investors received closed-door preferential treatment by the XTRD team, which they won't even deny, in regards to bonus percentiles. It wouldn't be unlikely for one to propose the XTRD team provided preferential treatment to some investors with vesting periods - or a lack thereof.

One additional item to consider is that the XTRD team has claimed that "some bonuses are subject to lockup" in their Telegram chat.



Multiple investors allege they received even higher bonuses:





The XTRD team has denied the claim of a 150% bonus, however, confirms a 100% bonus:



The lack of transparency in bonuses offered is absolutely unacceptable, as investors were led to believe bonus percentiles publicly announced by the XTRD team were to be taken as the truth. Higher percentile bonuses must be disclosed to the public, as these are core considerations in investment in an ICO. The after-the-fact revelation of these bonuses, as well as the practice of offering secret higher bonus, is a common tactic of cash-grab ICOs seeking to secure as much money as possible in their raise, ultimately at the expense of their investors.

### MIscellaneous Observations

There are several observations that are not inherently connected to blockchain forensics or tokenomics that are worth mentioning in this report. These observations are often indicative of a shady or "soft exit" ICO in the worst case, or in a less malicious case, these observations are indicative of a team that simply "got in over their heads" and didn't quite know what they were signing themselves up for with conducting a raise and running a business. The former often entails outright embezzlement or other serious crime. The latter often results in gross mismanagement, misuse of investor funds, or other items of serious repercussion to investors.

**Serg Gulko** 1/29/19

## At this point, we have 6 entities that ready to sign up as a paying clients

It is quite common for ICOs, particularly ICOs that are losing or have lost traction, to make vague announcements about the items they are possibly legally permitted to be vague about. It is commonly known that Serg would not be able to say, for example, "we might get listed on Binance next week" - however, providing continual vague claims, such as the one listed above, has been a norm of the XTRD team.

It is common XTRD community (largely comprised of investors) sentiment that the XTRD team has significantly decreased their time commitment to this project. There are numerous data points that could back this, including social media activity:



While social media activity is by no means an indicator of project development, it is extremely common for the soft-exit or malicious ICOs of the 2017/18 hype bandwagon to have aggressive social media campaigns during their raise, and subsequently dwindle such activity from there. The same descent in activity is reflected in the XTRD Telegram group.

The XTRD team has consistently failed to deliver on their promised timelines. Before even delving into their whitepaper, it is worth mentioning that this is observable on numerous social media platforms:



The above screenshot from YouTube was taken in February of 2019, indicating that this XTRD team member made a promise that should be fulfilled by the end of Q1 2019.

Serg Gulko claims to work "10-12 hours per day, 6 days a week" in an AMA. In the same AMA, Serg claims the dev team in Ukraine works a typical "9-5" arrangement. As per Serg there are "several guys" in the Ukraine office, with an additional four engineers working remotely. Given the amount of developers that are allegedly working full-time on this project, it is highly unlikely that the project would not have a working product by now - and more likely the claim of these developers working full-time on XTRD is falsified. Serg claims there are four further employees not in an engineering role - which is also questionable, considering the sharp decline in XTRD activity observable on varied social media platforms, lack of business development, or any other non-tech traction. This datapoint alone (and there are numerous others) would constitute a violation of investor confidence and potentially result in XTRD being classifiable as a security, not a utility token, since XTRD has not demonstrated good faith in providing utility.



The XTRADE roadmap, as per their whitepaper, is shown above. As is widely publicly known, this roadmap has not been followed.



**Serg Gulko** admin
1. Not really sure that we will provide you any addresses and names of the clients without their permissions.

2. Timeline is changed as we said many times

3. WP - yes, we have plans to update it to reflect new dates

Serg claims there are "plans" to update the whitepaper to reflect new dates. Given four non-engineering employees, and the fact that such an update requires extremely minimal work, it is extremely alarming this update has not taken place. Historically, the reason such an update would not take place is due to the fact the executive suite of an ICO lack confidence in their team's capability to deliver - often due to misuse of their raised funds and becoming rapidly broke.

The CEO of XTRD, Alex Kravets, advised for HybridBlock. HybridBlock is a project ripe with allegations itself, which can not be disclosed in this report contingent with client and data privacy regulation, until authorities and regulators deem appropriate. However, if/when these allegations are public, the alarming nature of Alex working with HybridBlock as an advisor, considering the potential allegations against XTRD, will be revealed. It is understood Alex has severed his relationship with HybridBlock for an unknown reason. It is a common practice for shadier and/or naive ICO founders to conduct practices such as investing in each other's projects with their investor's funds, which is one of a few malicious/negligent possibilities in this situation.

**Core Analysis**

## Use of Funds



| 70% Balance Sheet for SPA | 15% Platform Developments and Operations | 5% Legal and Compliance | 5% Sales and Marketing | 5% Tech Acquisition |

The statistics of the sample size we have demonstrate under a third of the funds we've tracked go to cryptocurrency exchanges with clear attribution to XTRD wallets. There is no way to identify whether or not these funds are for SPA use without taking further steps, however, this is not within alignment of XTRD's promised Use of Funds. If an analysis of 50% of the assets of XTRD are this damning, it does not paint a rosy picture for the other 50% - and this 50% alone would still render it mathematically highly unlikely, if not impossible, for XTRD to have followed their promised Use of Funds.

A significant portion of funds we've traced (nearly one half) are dormant. There is the possibility that these funds are (at least in-part) intended for SPA use, however, under this hypothetical, the XTRD team has burned through the remainder of their promised allocation in other categories - indicating mismanagement. There are multiple, more malicious, possibilities of why these funds would be dormant. Regardless - there are ample funds to refund investors that wish to be refunded *and* achieve development of what XTRD promised to deliver, if managed responsibly.

Put simply, without a lack of transparency from the XTRD team, their community and investors are left in the dark as to what happened with their money after certain points in the blockchain. The XTRD team would almost certainly not provide a transparency report including items such as other receiving addresses and by-line expenses, since this would indicate numerous mismanagements. However, upon query of exchanges and following continued financial trails, this would be revealed - likely with fatally catastrophic results to XTRD, as this would draw in the ire of not just disenfranchised investors, but regulators.

Based upon the numerous datapoints in this report, which constitute a small constituent of what could be a far larger report, it is the strong and firm recommendation of CipherBlade that XTRD refund investors upon request. Investors have extensive moral and legal reason to request this refund, and statistical likelihood, let alone common sense, indicate what realities would be discovered if numerous entities were subpoenad. It would be within XTRD's best interests to conduct these refunds if the XTRD team's claims of developing a product are sincere, since a

failure to refund investors would result in, in the best/non-malicious case, an expensive legal battle - and in what CipherBlade views as the more likely reality, revelations of XTRD activity that would constitute regulatory consequence.

Should XTRD decline to refund investors, CipherBlade has volunteered their services to affected parties. Richard A. Sanders served as an expert witness in a case in which the opposing party was represented by Silver Miller, a "cryptocurrency giant law firm" - and one Declaration caused this "cryptocurrency giant law firm" to cower in fear, dropping the case. CipherBlade is equipped to provide legal counsel, law enforcement, and regulators with the pertinent information needed to rapidly obtain information from exchanges, facilitated via direct and expedited connection.

Inversely, CipherBlade offers their participation to XTRD in mediation of this matter. If XTRD demonstrates, in good faith, a commitment to make right with their investors via refund, CipherBlade is able and willing to establish framework and facilitation of this undertaking.

This concludes CipherBlade's analysis of XTRD's funds, tokenomics, and sale.

EXHIBIT B FORM D XTRADE DIGITAL HOLDINGS SAFT CONTRACT

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
**FORM D**

### Notice of Exempt Offering of Securities

| OMB APPROVAL |
|---|
| OMB Number: 3235-0076 |
| Estimated average burden hours per response: 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

0001730733

Name of Issuer

XTRADE Digital Holdings

Jurisdiction of Incorporation/Organization

CAYMAN ISLANDS

Year of Incorporation/Organization

[ ] Over Five Years Ago
[1.] Within Last Five Years (Specify Year) 2017
[ ] Yet to Be Formed

Previous Names [X] None

Entity Type

[X] Corporation
[ ] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

XTRADE Digital Holdings

| Street Address 1 | Street Address 2 |
|---|---|
| 3rd Flr, Bayshore Centre, 31 Warwick Dr | GEORGE TOWN P.O. BOX 2496 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| GRAND CAYMAN | CAYMAN ISLANDS | KY1-1104 | 3457432496 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Hulko | Vitalii | |

| Street Address 1 | Street Address 2 |
|---|---|
| Maykovskogo 30A | Apt 64 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Kiev | UKRAINE | 0222 |

Relationship: [ ] Executive Officer  [X] Director  [ ] Promoter

Clarification of Response (if Necessary):

---

### 4. Industry Group

[ ] Agriculture
Banking & Financial Services

Health Care
[ ] Biotechnology

[ ] Retailing
[ ]

68

https://www.sec.gov/Archives/edgar/data/1073431/000107343117000051/exhibit991summary.html

- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

- [ ] Yes   - [ ] No

- [ ] Other Banking & Financial Services
- [ ] Business Services

Energy

- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

- [ ] Manufacturing

Real Estate

- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

- [ ] Restaurants

Technology

- [ ] Computers
- [ ] Telecommunications
- [x] Other Technology

Travel

- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

- [ ] Other

## 5. Issuer Size

Revenue Range          OR

- [ ] No Revenues
- [ ] $1 - $1,000,000
- [ ] $1,000,001 - $5,000,000
- [ ] $5,000,001 - $25,000,000
- [ ] $25,000,001 - $100,000,000
- [ ] Over $100,000,000
- [ ] Decline to Disclose
- [ ] Not Applicable

Aggregate Net Asset Value Range

- [ ] No Aggregate Net Asset Value
- [ ] $1 - $5,000,000
- [ ] $5,000,001 - $25,000,000
- [ ] $25,000,001 - $50,000,000
- [ ] $50,000,001 - $100,000,000
- [ ] Over $100,000,000
- [ ] Decline to Disclose
- [ ] Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

- [ ] Rule 504(b)(1) (not (i), (ii) or (iii))
- [ ] Rule 504 (b)(1)(i)
- [ ] Rule 504 (b)(1)(ii)
- [ ] Rule 504 (b)(1)(iii)
- [ ] Rule 506(b)
- [ ] Rule 506(c)
- [ ] Securities Act Section 4(a)(5)

- [ ] Investment Company Act Section 3(c)
- [ ] Section 3(c)(1)
- [ ] Section 3(c)(2)
- [ ] Section 3(c)(3)
- [ ] Section 3(c)(4)
- [ ] Section 3(c)(5)
- [ ] Section 3(c)(9)
- [ ] Section 3(c)(10)
- [ ] Section 3(c)(11)
- [ ] Section 3(c)(12)
- [ ] Section 3(c)(13)

https://www.sec.gov/Archives/edgar/data/1736733/000173673318000004/xslFormDX01/primary_doc.xml

☐ Section 3(c)(6)      ☐ Section 3(c)(14)

☐ Section 3(c)(7)

## 7. Type of Filing

☒ New Notice  Date of First Sale 2018-01-20  ☐ First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?  ☐ Yes ☒ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity                     ☐ Pooled Investment Fund Interests

☐ Debt                      ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security    ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option,    ☐ 1. Other (describe)
Warrant or Other Right to Acquire Security

Simple Agreement for Future Tokens (SAFT)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction,  ☐ Yes ☒ No
such as a merger, acquisition or exchange offer?

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $1,000 USD

## 12. Sales Compensation

Recipient                  Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None    (Associated) Broker or Dealer    ☐ 1. None
                                 CRD Number

Street Address 1               Street Address 2

City                      State/Province/Country         ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States    ☐ All States    ☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount    $45,000,000 USD or ☐ Indefinite

Total Amount Sold        $3,000,000 USD

Total Remaining to be Sold $42,000,000 USD or ☐ Indefinite

Clarification of Response (if Necessary):

SEC FORM D

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited _____ investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:

| 6 |

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

4/3/2019                                                          SEC FORM D

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| XTRADE Digital Holdings | Vitalii Hulko | Vitalii Hulko | Director | 2018-02-13 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

1.   This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.