UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ANTHONY FASULO and GAUTAM DESAI,

                 Plaintiffs,

              Case No. 19-cv-03741 (PKC)

    vs.

XTRADE DIGITAL ASSETS INC., XTRADE DIGITAL
HOLDINGS, ALEXANDER KRAVETS, SERGII
GULKO, and JON GIACOBBE

                 Defendants.
-------------------------------------------------------------------X

## DECLARATION OF ALEXANDER KRAVETS

I, Alexander Kravets, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1.     Attached hereto as Exhibit A is a true and correct copy of the first version of the White Paper, which is referenced in paragraph 93 of the Second Amended Complaint ("SAC").

2.     Attached hereto as Exhibit B is a true and correct copy of the list of Risk Factors appended as an exhibit to the Simple Agreements for Future Tokens ("SAFT") referenced in paragraphs 94 and 101 of the SAC.

3.     Attached hereto as Exhibit C are true and correct copies of SAFTs between Xtrade Digital Holdings ("XDH") and ARIF LLC, signed by Plaintiff Anthony Fasulo, which are referenced in paragraph 94 of the SAC (the "Fasulo SAFTs").

4.     Attached hereto as Exhibits D is an unsigned copy of the SAFT between XDH and Plaintiff Gautam Desai referenced in paragraph 101 of the SAC. (the "Desai SAFT").

5.     Attached hereto as Exhibit E is a true and correct copy of the February 20, 2018, announcement referenced in paragraph 105 of the SAC.

6.    Attached hereto as Exhibit F is a true and correct copy of the April 1, 2018, announcement referenced in paragraph 107 of the SAC.

Dated: New York, New York
        August 22, 2019

By: _____
        Alexander Kravets

# EXHIBIT A

# XTRADE

## WHITEPAPER

Version 1.0
1/1/2018



# Disclaimer

**PLEASE READ THIS DISCLAIMER SECTION CAREFULLY. IF YOU ARE IN ANY DOUBT AS TO THE ACTION YOU SHOULD TAKE, YOU SHOULD CONSULT YOUR LEGAL, FINANCIAL, TAX, OR OTHER PROFESSIONAL ADVISOR(S).**

This white paper is for informational purposes only. The information set forth below and elsewhere in this white paper may not be exhaustive and does not imply any elements of a contractual relationship. While we make every effort to ensure that any material in this white paper is accurate and up to date, such material in no way constitutes the provision of professional advice. XTRADE Digital Assets Inc. does not guarantee, and accepts no legal liability whatsoever arising from or connected to the accuracy, reliability, currency, or completeness of any material contained in this white paper. Any potential XTRD token holders or investors should seek appropriate independent professional advice prior to relying on, or entering into any commitment or transaction based on, material published in this white paper, which material is purely published for reference purposes alone.

XTRD tokens will not be intended to constitute securities in any jurisdiction. This white paper does not constitute a prospectus or offer document of any sort and is not intended to constitute an offer of securities or a solicitation for investment in securities in any jurisdiction. TRD Digital Assets, Inc. does not provide any opinion on any advice to purchase, sell, or otherwise transact with XTRD tokens and the fact of presentation of this white paper shall not form the basis of, or be relied upon in connection with, any contract or investment decision.

Certain information contained in this document constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend" or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those risk disclosures described herein and made available at xtrade.io prior to the beginning of the token sale, actual events or results or the actual performance of the tokens may differ materially from those reflected or contemplated in such forward-looking statements.

# Contents

**04 ABSTRACT**

**05 ISSUES IN THE CRYPTO SPACE**
- Complex Web of Exchanges
- High Fees
- Thin Liquidity

**07 XTRADE SOLUTION**
- Implementation of a Multi Exchange FIX API
- Launching the XTRADE PRO Trading Platform
- S.P.A. (Single Point of Access) Liquidity Aggregation/Cross-Exchange Execution
- XTRD Token

**11 TEAM AND ADVISORS**

**15 XTRADE PROJECT**
- Overview
- XTRADE Private Network
- Latency Reduction
- Colo/Cross-Connect and Datacenter Latency Illustrated
- VPS Location Example

**20 ROADMAP**
- FIX API
- XTRADE Pro
- SPA via Joint Venture

**25 XTRADE TOP LEVEL ARCHITECTURE**
- Market Data Plant
- Order Management System
- Account Management System
- Connectors Pool

**30 XTRADE TOKENOMICS**
- Summary
- XTRD Burning
- XTRD Staking
- Token Legal Considerations

**31 XTRD TOKEN GENERATION**
- SAFT Compliant Presale to Accredited Investors
- Token Generation Event
- Token Sale Terms
- Token Allocation
- Use of Funds

**34 REVENUE GENERATION MODELS**
- Execution Fees
- Market Making
- Xtrade VPS
- Market Data
- Software Licensing
- Credit Sleeve



Version 1.0

# Abstract

As of January 2018, there are over 120 standalone cryptocurrency exchanges, facilitating trading in more than 1000 individual markets. Daily trading volume for cryptocurrencies is now equivalent to 20 billion USD, with a total market cap of over $700 billion. The majority of the trading is concentrated among the top 20 exchanges, denominated in multiple currencies ranging from crypto ones including Bitcoin and Ethereum to sovereign ones such as USD, GBP, JPY, CNY, and KRW, among others. Predictions point to growth toward a $1-2 trillion market capitalization in 2018, and a corresponding 3% average daily trading volume of $50 billion or more.[1]

Asset managers are beginning to see increased demand for cryptocurrency exposure in their portfolios, over 500 active funds are being created to enter the market in 2018, and the regulatory climate is warming.[2] However, the market is nascent, and large spreads are common between exchanges on the same crypto pairs, allowing for ample arbitrage opportunities that don't exist in more efficient markets.

**The inefficiency is a product of cryptocurrency trading markets being highly fractured in terms of execution, account setup, automated access, liquidity, execution speed, pricing, and security.**

XTRADE was created by finance and trading professionals to solve those problems by both improving on and consolidating current trading practices.

### Crypto Exchange by Daily Dollar Volume
Top 40 Worldcoinindex.com 12/10/2017



---

[1] Moas. Ronnie. (2017). Standpoint Research.

[2] Hfalert.com. (July 12th, 2017). Digital Currency Craze Fuels Fund Launches.

# Issues in the Crypto Space

**COMPLEX WEB OF EXCHANGES**

A combination of differing KYC policies, means of funding, interfaces and APIs results in a fragmented patchwork of liquidity for cryptocurrencies. Trading in an automated fashion with full awareness of best pricing and current liquidity necessitates the opening and use of accounts on multiple exchanges, coding to multiple API's, following varying funding and withdrawal procedures. Once those hurdles are cleared, market participants must convert fiat currency to BTC or ETH and then forward the ETH on to an exchange that may not accept fiat, necessitating yet another transaction to convert back to fiat. Major concerns for market participants range from unmitigated slippage[3] and counterparty risk to hacking prevention and liquidity.

**HIGH FEES**

Execution costs are even more of a factor. Typical exchange commissions are in the 0.1% – 0.25% range per transaction (10 to 25 basis points), but the effective fees are much higher when taking into account bid and ask spreads maintained by the exchanges. As most exchanges are unregulated, there is generally no central authority or regulator to examine internal exchange orders that separate proprietary activity from customer activity and ensure fair pricing.

**THIN LIQUIDITY**

A large institutional order, representing a sizable percentage of daily volume can move the market for a product, and related products in an exchange by a factor of 5-10%. That means a single order to buy $1,000,000 worth of bitcoin can cost an extra $50,000-$100,000 per transaction given a lack of liquidity if not managed correctly and executed on only one exchange. By way of comparison, similar trades on FX exchanges barely move markets a fraction of a percent; those price changes cost traders money, and deter investment.

We can simulate slippage using a volume slippage model. Let's say we have an $1,000,000 order, bitcoin is trading at $4,000 at the one exchange, where 25 bitcoin are traded per minute. The model calculates slippage(S) by comparing order volume (Ov) to total volume(Tv).

$$S = 0.1 * \left(\frac{Ov}{Tv}\right)^2$$

The higher percent of the total volume that we order, the higher the slippage. There is only $100,000 of bitcoin available to trade per minute. If want to fill our order quickly in 10 minutes by executing $100,000 worth of bitcoin per minute, that will fill 100% of the volume traded in that time period and create 10% slippage. That will cost $100,000, for an effective fill cost of $1,100,000, or 10% net cost.



---

[3] Slippage is the difference between the price that the trader expects to pay for a trade and the actual price at which the trade is executed.

1/1/2018



# Issues in the Crypto Space

To reduce costs at one exchange, we can try to spread the order out over time. But, since the price of bitcoin can vary significantly throughout the day, simply delaying execution time doesn't solve the price change problem.



FIGURE 1 TIME VS SLIPPAGE COST

Instead, by simultaneously routing an order to multiple exchanges, XTRADE can increase the total volume that trade is executing against in a short period of time and decrease its slippage. This is done by splitting the "parent" order into smaller, "child" orders. If we still want to execute our order in 10 minutes to take advantage of current bitcoin pricing, we can reduce the slippage from 10% to 0.4% by routing our order simultaneously to 5 different exchanges. This will reduce our slippage cost from $100,000 to $4,000, **a 96% cost reduction.**

The execution net cost is now $1,004,000.



FIGURE 2  NUMBER OF EXCHANGES VERSUS SLIPPAGE COST



# XTRADE Solution

**XTRADE IS LAUNCHING THREE SEPARATE PRODUCTS IN SEQUENTIAL STAGES TO SOLVE THE ONGOING PROBLEMS CAUSED BY HAVING SO MANY DISPARATE MARKETS: LOW PER-MARKET LIQUIDITY, UNFAMILIAR INTERFACES THAT LAG BEHIND FINANCIAL INDUSTRY STANDARDS, AND DECENTRALIZED EXECUTION IN CRYPTO**

## STAGE 1 – IMPLEMENTATION OF A MULTI EXCHANGE FIX API

**What is FIX?**
The **Financial Information eXchange** (FIX) protocol was created in 1992 to serve as the "universal" communication language for international financial transactions. Since all order systems are different, there was a strong need to communicate all executions between brokers, exchanges, mutual funds, investment banks, and direct market access participants using a universal format.

FIX is the standard means of communication for trading in global equity markets, and is also heavily used in currencies, bonds, and derivatives. **Every large institutional and professional market participant uses FIX to trade and has been doing so for over 25 years.**

FIX works by defining preset "tags" as value placeholders. Orders are entered by defining variables in the tags – for example the value for "side" of the trade can be a 1 for Buy or 2 for Sell, in Tag 54.

There is currently no universal FIX interface to connect to crypto exchanges – each crypto exchange has its own, though not necessarily proprietary, communication standard. Lack of a standard communication protocol hinders participants' ability to easily access multiple exchanges.

Xtrade will launch a universal low latency FIX based API connecting to all crypto exchanges to make it easy for major institutions, hedge funds, and algorithmic traders to access all cryptocurrency markets by coding to just one FIX application - in one format - with which they are already intimately familiar.

This communications bridge will allow large market participants to easily add multi exchange crypto execution to their existing transaction systems, jumpstarting universal crypto trading adoption among the institutional sector.


Version 1.0

# XTRADE Solution

Here is a FIX table to illustrate basic Xtrade order entry for cryptocurrency pairs:

| TAG | FIELD NAME | COMMENTS | EXAMPLE |
|---|---|---|---|
| 49 | SenderCompID | Unique identifier, assigned to a counterparty | 49=101_411 |
| 56 | TargetCompID | XTRADE server identifier | 56=XTRADE_UAT_ORD |
| 11 | ClOrdID | Unique order ID assigned by client | 11 = 1102 |
| 21 | Handling Instructions | Required field, should always be set to 1(Automatic execution) | 21=1 |
| 55 | Symbol | Pair name to trade | 55 = ETH/USD |
| 40 | Order Type | Order type to trade. Supported values:<br>• Market(1)<br>• Limit(2)<br>• Stop(3) | 40 = 2 |
| 44 | Price | Price for Limit orders that set the price for execution | 44 = 752.79999952 |
| 54 | Side | Order side. Supported values:<br>• BUY(1)<br>• SELL(2) | 54 = 1 |
| 38 | Initial order size | Initial order size | Initial order size |
| 58 | Time in Force | Field, that controls Order lifecycle. Supported values:<br>• Day(0)<br>• Good Till Cancel(1)<br>• Immediate Or Cancel(3)<br>• Fill Or Kill(4) | 58 = 0 |
| 100 | Execution destination | 49 You can explicitly specify the execution destination by providing the name of the supported exchange or utilize SMART routing rules | 100=GEMINI |

Let's say we are entering an order to **Buy 1 ETH for $752.79999952 USD or better on Gemini – a Limit order.** Using the proper values from the table above, the raw FIX order message will look as follows:

                                                                    Gemini      Ether/USD
8=FIX.4.4 9=146 35=D 49=101_411 56=XTRADE_UAT_ORD 11=1102 21=1 100=GEMINI 55=ETH/USD
460=4 54=1 60=752.79999952-14:32:01.601244 38=1 40=2 44=752.79999952 52 15=ETH 59=1 10=059
        **Buy**                              1   **Limit**   $752.79999952

**Figure 3 Raw FIX Message Sample**



# XTRADE Solution

**STAGE 2 – LAUNCHING THE XTRADE PRO TRADING PLATFORM**

Most finance professionals and active traders don't use web based trading platforms to consume market data and trade. Instead, they use robust, secure, standalone, downloadable applications that allow for fast order entry, immediate execution, advanced charting, and custom order types. Those applications provide customer support including feature development tailored to their customers' demands. The most successful of these applications become platforms that are used to manage trading across multiple systems and asset classes.

In the crypto space, such a platform does not yet exist. Currently, there are only web based systems on each exchange that are slow and difficult to use. A few aggregation platforms exist that do feature trading across exchanges, but those aggregators, too, are web based and lack the low latency, security, and functionality that institutional and professional users would demand.

Xtrade will launch Xtrade Pro in 2018 – a highly robust, multi-exchange standalone trading platform for active traders. The platform will include, among other features, advanced consolidated order books, hotkey order entry, and custom order types, with 24x7 uptime.

**STAGE 3 – SPA (SINGLE POINT OF ACCESS) LIQUIDITY AGGREGATION/CROSS-EXCHANGE EXECUTION**

Xtrade creates a single unified point of access to aggregate liquidity across exchanges for traders. This aggregation allows traders to clear at the best possible prices while delivering the lowest possible transaction costs as well as atomic swap capability[4] all with just one client-side account.

**Xtrade SPA** will be facilitated via Joint Venture (JV) partnerships with existing exchanges to minimize the regulatory hurdles as Xtrade will function purely as a technology provider. Exchanges will fulfill the custodial function, while Xtrade will clear balances from its inventory accounts at other exchanges to close the trades made by clients within the JV exchange. Xtrade has already secured a partnership with a major active exchange that facilitates trading in primary currencies and will soon do the same for alternative ERC20 tokens.

Xtrade is focused on becoming the de-facto trusted, US-based technology platform for large financial players to easily execute on crypto. Xtrade will generate revenues via execution fees, market data sales, VPS services, software licensing, and other ancillary income streams. Operational funds for creating the platform and the balance sheet required to execute across multiple exchanges will be raised via a token generation event.

---

[4] Atomic Swaps - the ability to instantly exchange one cryptocurrency for another.



XTRD TOKENS

Trading fees will be collected through the cryptographic economy, facilitated by the XTRD token. XTRD is an ERC20 compliant utility token generated on the Ethereum blockchain and will be used as a means of payment by trading participants for services provided by Xtrade.

XTRD tokens will be created via a token generation event scheduled for Q1 of 2018.

**Staking:**
As XTRD tokens are used to pay for services on the XTRADE trading network, line tokens will be cycled back into the network.

Discounts of 25% on XTRADE services (execution, colocation, market data, software licensing) will be available for token holders in general and discounts of 40% on XTRADE services will be available for token holders who maintain an average monthly stake of at least 50,000 XTRD tokens. Fiat for services will be accepted at no discount to par.

**Xtrade will utilize the funds generated form the token generation event to:**
· Facilitate the creation of the FIX API and Xtrade GUI platforms;
· Maintain a large balance sheet allowing for cross-exchange execution with Xtrade SPA;
· Make markets in multiple crypto currencies to minimize spreads and increase liquidity for market participants;
· Employ legal and compliance teams to ensure regulatory compliance and proactively engage with regulators;
· Onboard sales and marketing teams to develop a client base; and
· Create a venture arm to seed emerging trading technologies in the crypto execution space deemed complementary to Xtrade's mission

1/1/2018

# Team

THE TEAM BEHIND XTRADE IS BASED ON WALL STREET IN NYC AND HAS OVER 30 YEARS OF EXTENSIVE REAL-WORLD EXPERIENCE BUILDING ROBUST, BATTLE TESTED TRADING SYSTEMS IN FX, EQUITIES, DERIVATIVES, AND OTHER INSTRUMENTS. THEY HAVE SPECIALIST KNOWLEDGE IN ALL FACETS OF BROKERAGE SERVICES, EXECUTION, MARKET DATA, TRADING PLATFORMS, CLEARING, SETTLEMENT, COLOCATION, ALGORITHMIC TRADING, AND AUTOMATED TRADING SYSTEMS. XTRADE PRINCIPALS AND ADVISORS OWN CRYPTO EXCHANGES - AND HAVE WORKED IN ACTIVE TRADING FIRMS ALL OVER THE WORLD AS WELL AS LARGE FINANCIAL INSTITUTIONS SUCH AS GOLDMAN SACHS, BARCLAYS, LEHMAN, DEUTSCHE BANK, MORGAN STANLEY, AND JPMORGAN IN TECHNOLOGY, OPERATIONAL, AND SALES ROLES. IN ADDITION, THE TEAM HAS STRONG ENTREPRENEURIAL EXPERIENCE, HAVING LAUNCHED SUCCESSFUL COMPANIES IN INDUSTRIES RANGING FROM FINANCE TO AI BASED VISUAL ANALYTICS.







**ALEXANDER KRAVETS**
**CEO and Co-Founder**

Background in high frequency and proprietary day trading for over 12 years - started career as a successful proprietary equity trader and subsequently managed operations at Genesis Securities, a broker/dealer and clearing firm that provided direct market access (DMA) and co-location services. Successfully launched Sogotrade, a retail investing platform for over 100,000 clients. Highly experienced in entrepreneurship, trading platforms, market structure, execution networks, algorithmic trading, execution systems, market data, operations, and sales. Has held Series 7, 55, 63, and 24 securities licenses.

**SERGII GULKO**
**CTO and Co-Founder**

Sergei Gulko founded Axon Software, which has spent over 11 years developing high frequency algorithmic models for hedge funds and broker/dealers in the US equity and Forex markets - expert in colocation services, market data, execution, analytics.

Highly versed in FIX and other proprietary protocols, market data handlers, deployment and control of advanced hardware infrastructure systems specializing in low latency and network security.

**JON GIACOBBE**
**COO and Co-Founder**

6 years in finance, Goldman Sachs and JP Morgan - Equity Derivatives, Structured Products, Market Liquidity. Senior Bank Debt, executed institutional client orders. Fox Business News weekly contributor and panelist on Money with Melissa Francis. Active entrepreneur, operated multiple businesses ranging from Subway franchises to FlyCleaners to Fencing in the Schools.

# Team







## OLEKSANDR LUTSKEVYCH
Advisor

Oleksandr is a co-founder and CEO at CEX.IO LTD, a successful holding company consisting of CEX.IO Bitcoin Exchange and GHash.IO Mining Pool. Oleksandr is a pioneer in the Bitcoin industry and one of the inventors of cloud mining.

Forming a solid network of various crypto services trusted by over 1.7M user, CEX.IO LTD targets a wide range of audiences, involving them into the world of Bitcoin and creating new possibilities for easy Bitcoin integration to their life and business.

CEX.IO currently facilitates over $1 Billion USD per day in crypto trading volume – is registered as a Money Services Business with FinCen and provides coverage in 99% of countries worldwide, including 24 US states. CEX.IO accepts deposits via crypto, wire, and other methods in USD, GBP, EUR, and RUB. CEX.IO will be the initial exchange JV Partner serving as a custodial base, thereby allowing XTRADE to facilitate the SPA multi-exchange execution solution in 2018.

## LEX SOKOLIN
Advisor

Lex is a futurist and entrepreneur focused on the next generation of financial services. He directs Fintech Strategy at Autonomous Research, a global research firm for the financial sector. Lex is on the Board of Directors and previously was the Chief Operating Officer at AdvisorEngine (formerly Vanare), a digital wealth management technology platform. He was also founder and CEO of NestEgg Wealth, a roboadvisor that pioneered online wealth management in partnership with financial advisors, acquired by AdvisorEngine.

Lex is a contributor of thought leadership to the WSJ, the Economist, CNBC, Reuters, Investopedia, American Banker, ThinkAdvisor, and Investment News, among others. He has spoken on the future of technology and achieving extraordinary growth at conferences for Money2020, LendIt, Techonomy, In|Vest, T3 Enterprise Edition, and the Financial Planning Association.

Prior to NestEgg, Lex held a variety of roles in investment management and banking at Barclays, Lehman Brothers and Deutsche Bank. He holds a JD/MBA from Columbia University and a B.A. in Economics and Law from Amherst College.

## ADDISON HUEGEL
Advisor

Addison is the Managing Partner and Media Director at Elevator Communications, LLC.

He is a new technology communications and marketing specialist with extensive experience building communities around blockchain, B2B, and B2C applications. Over the years he's worked with hundreds of companies, from startups to Fortune 500s. In 2015, he served as a communications consultant to the Ethereum Foundation and DEVCON1, while more recently he worked to help launch Kyber Network.

Before entering into marketing and PR, Addison worked in the field of Condensed Matter Physics and has published a number of scientific, peer-reviewed papers. He also spent two years writing software for the Mars Orbiter program at NASA Ames Research Center. He holds a degree in Physics from University of California, Berkeley.

**EXTRADE**

# Team







### STEVEN M. WASSERMAN
Advisor

Steven M. Wasserman, J.D., is a Asset Manager, Registered Investment Advisor/Principal investor, Futurist. Developer of the SPAC Product. Steven has over 20 years of experience as an advisor to corporations in mergers and acquisitions and financings, as a portfolio manager in investment management, and as a private equity principal in operating businesses. He was formerly a Senior Managing Director at Beige Group, a Senior Managing Director, Investment Committee member, and Co-Founder of the Global Capital Markets Group at Rodman & Co, Co-Chairman and President at Alpha Security Group Corp. He was the Managing Partner of AMT Ventures LLC and AMT Capital Partners LLC. Prior to that, Mr. Wasserman was the Managing Partner at Cardinal Fund. He advised Beatrice, Inc., Comdisco, Inc., (and was the organizer of) Star Maritime Acquisition Corp., now the largest, diversified, ultra modern U.S. listed dry bulk company, Energy Infrastructure Acquisition Corp., and Seanergy Maritime Corp. Mr. Wasserman has also acted as a Financial Advisor in a series of leveraged buy-outs including the Fulcrum Group in their $1.6 billion bid to purchase the semiconductor division of Motorola and to Kescent Acquisition Corp. in its $2 billion bid to purchase Veba Electronics.

### GARY ROSS
Advisor

Gary J. Ross is a partner at Ross & Shulga PLLC, and through longtime clients such as Steemit and InvestFeed has spent several years on the forefront of the cryptocurrency space. Gary focuses his practice on securities law, venture capital and private equity, corporate governance, and general corporate matters. Gary represents private companies (at all stages), angel investors, and venture capital funds. Gary has extensive experience advising as to SEC-registered and exempt capital markets transactions.

Prior to co-founding Ross & Shulga PLLC in 2017, Gary was the founder and managing attorney of Jackson Ross PLLC. From 2009 to 2012, Gary served as a Compliance Analyst in the U.S. Department of the Treasury, where he oversaw contractors and financial agents engaged by Treasury to provide asset management, advisory, and other services relating to the Troubled Asset Relief Program (TARP).

Gary is an adjunct professor at Seton Hall Law School and has been quoted in articles in MarketWatch, Corporate Counsel, The New York Times and the Associated Press.

### JUSTIN WU
Advisor

Justin is an Information Architect & Growth marketer that has worked with companies such as The Wall Street Journal, Samsung, NASA, and Intel. He is also the founder of Growthly, a growth agency that helps companies build a community around their brand.



### TOM OSMAN
Product Growth Consultant & Marketer

Tom is a Product Growth Consultant & Marketer that has built multiple fast-growing startups such as Teachers Register and Love Discounts.com. He is the founder of blockchain & crypto growth agency Blocknauts that works with companies to tokenize and launch through initial coin offerings.

# Team



**SERGEY GRISHKIN**
Developer

DevOps engineer – virtualization, monitoring, server configuration, and security, continues integration and delivery



**IRYNA LEBEDEVA**
Business Analyst

Business analyst, economic and financial models, risks management



**ALEKSEY PEKAR**
Developer

Java/C++ developer with deep understanding of financial markets.



**SERGEY POGORELOVSKY**
Developer

Experienced Java/Perl programmer, TDD evangelist, smart contracts developer



**ALEXANDER LEVAKOV**
Developer

Front-end developer(JavaScript) with solid C++ background. Programmer and web-developer with 12 years experience. Currently, focused on modern JavaScript technologies.



**NIKITA TROPIN**
Developer

Hard-core C++/Perl developer and Solidity enthusiast. Developer of high-performance applications on C++ with deep knowledge of web-development and Linux administration using Perl, FIX protocol and big data specialist. Has created automated trading bots in cryptocurrency markets.



# XTRADE Project

**OVERVIEW**
OUR GOAL IS TO BUILD TRADING INFRASTRUCTURE (SOFTWARE AND HARDWARE) IN THE CRYPTO SPACE AND BECOME ONE OF THE FIRST FULL-SERVICES SHOPS IN THE CRYPTOCURRENCY MARKETS FOR LARGE TRADERS AND FUNDS. WE BELIEVE THAT THE MOST IMPORTANT COMPONENTS ARE:

- A single FIX API for trading across all connected exchanges
- A robust GUI for manual cross execution on all crypto markets
- A large liquidity pool, based on orders books from all connected exchanges
- Best prices and best top of book execution net of fees
- Low transaction fees
- 99.99999% reliability and uptime
- Fast execution
- Parent/child orders on multiple exchanges to minimize individual market impact
- Advanced order types common in the equity and FX trading space
- Establish Xtrade as a premier market-making entity to mitigate spreads and increase liquidity in the cryptocurrency space
- Derivative trading - Xtrade plans to connect to LedgerX (US based, approved by the CFTC) for cryptocurrency options and swaps to offer unified hedging and derivate trading strategies
- Robust, US based technical support
- Reliable and familiar deployment methods for institutions:
    - IPSec as a connectivity option across the Internet
    - cross connection options
    - collocation space or VPS (Virtual Private Servers) that clients can rent from XTRADE
    - UAT/Sandbox environment for testing


**XTRADE PRIVATE NETWORK**
We plan to initially deploy our servers in NY4/LD4 where many of the large US crypto exchanges already have a point of presence.

Our goal is to provide a secure and reliable trading environment. To achieve this, all our core components will be isolated from the public internet. Access to trading servers and market data feeds will be available only inside our private network.

There are several connectivity options that will be available for our clients:

- Cross-connect inside datacenter
- Access over the Internet using IPSec channel. All incoming and outgoing traffic will be encrypted
- Rent a VPS server from us. We will offer a rapid-deployment environment with multiple OS images (like Linux or Windows) to choose from
- Co-location services. Clients will be able to rent 1U or 2U slots to deploy their own servers inside our network.

 **Version 1.0**

# XTRADE Project

## LATENCY REDUCTION

There are several exchanges that already have a point of presence in the NY4 datacenter. By cross-connecting with them, we will significantly reduce network latency.

To improve latency to non-NY4 exchanges, we will build custom routing paths using dedicated internet access technologies (DIA). This way we can be 2x - 10x faster compared to public internet as we will have colocations both on the East and West coasts.



# XTRADE Project

**COLO/CROSS-CONNECT AND DATACENTER LATENCY ILLUSTRATED**
A valuable service will be the co-location of client servers at our data center location
– or the sale of VPS (virtual private server) services. Currently VPS is highly demanded
in the FX markets, as it allows for a quick implementation of a client's API close to
the exchanges to minimize latency in market data and order execution. **In short, a
client "loads" his strategy coded to our FIX API into our server close to the exchange
matching engine.** We anticipate a surging demand for this service in 2018 as crypto
trading becomes more universally accepted.



**Figure 4 Internet vs VPS Latency – lower is faster**

Currently, internet latency for order entry and execution is around **150 ms** over the internet
from a home or office that is not in a datacenter. XTRADE will cut that down by **100x**
through a VPS solution with an average latency of **1.5 ms**, and engage emerging high
frequency traders across the crypto spectrum. Liquidity will in turn deepen, and spreads will
narrow for the benefit of all market participants – resulting in a virtuous cycle of increasing
liquidity and participation in the crypto space.

Utilizing current virtualization technologies, one physical server can be converted to 10-15
servers. Virtual servers will use the same physical network switch connection, which will be
linked to Xtrade's trading platform.

VPS services will serve to popularize our execution services, and execution services will
concurrently serve to popularize VPS services. The presence of this infrastructure allows
us to serve as a "one stop shop" where one can provide all the required services for fully-
featured cryptocurrency trading; namely, connection to all exchanges via one FIX API, low
transaction costs, best price, hosting, and minimization of counterparty risk once the SPA
gateway is developed.

From a technical standpoint, Xtrade will place our market data aggregation machines as
close as possible to exchange colocations, collect data on the spot and relay it in optimal
binary format via a high-speed link to the client's order management module.



Version 1.0

# XTRADE Project

**VPS LOCATION EXAMPLE**
Looking at three major US crypto markets, the Gemini exchange trading infrastructure is in
Virginia; GDAX and Bitfinex are in California.

Ping times from our Kiev office are as follows – a millisecond, or "ms", is 1/1000 of a second:



GEMINI: 130 MS
GDAX: 17.5 MS
BITFINEX: 22 MS

Average ping from Missouri (another colocation we have) looks like this



GEMINI: 32 MS
GDAX: 0.5 MS
BITFINEX: 0.5 MS

# XTRADE Project

Average ping from our colocation at Equinix NY4, major NJ datacenter housing financial networks:



GEMINI: 1.9 MS
GDAX: 1.9 MS
BITFINEX: 1.9 MS

Based on this, we can select an optimal geographic server location for the order management module which will allow for minimal latency both for market data aggregation and order execution – the optimal virtual solution for these 3 exchanges being NY4 if you are trading all 3, Missouri if only GDAX and Bitfinex, and so on.

Xtrade will select the optimal virtual location – or multiple – for all client algorithms depending on their required trading pairs and markets they participate in as well as the preferred equidistant location of their trading logic engine.

CYBERSECURITY
Currently all exchanges have public internet connectivity. Even with 2FA authentication and complex passwords, there is still a constant threat of hacking, ranging from simple password phishing to more sophisticated intrusions such as MITM (man-in-the-middle) attacks where network traffic is intercepted between two parties – or where entire websites are cloned with fake SSL certificates for the express purpose of collecting logon information. A bad actor can gain access to a crypto trading account with an obfuscated IP and simply move all funds to an encrypted, untraceable wallet on the blockchain.

XTRADE will not allow public internet connectivity to the XTRADE Private Network. All market participants will connect via IPSec VPN with hardware based, IP whitelisted, end to end encoded communications for both FIX and XTRADE PRO that encrypt all data packets. All VPS and cross-connects will be on our private network, not accessible to the outside internet.

This is necessary to ensure safety of funds and to abide by cybersecurity compliance protocols already established in the institutional and professional trading space.



Version 1.0

# Roadmap



| Q1 2018 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 |
|---------|---------|---------|---------|---------|
| **1** | **2** | **3** | **4** | **5** |
| Token Generation | FIX API | XTRADE Pro Alpha | XTRADE Pro Beta | Single Point of Access |

**FIX API – Q1 2018**

Currently, most cryptocurrency exchanges offer an http-based REST API/Web socket for execution and market data. Even though these APIs are mostly similar, they are still heavily fragmented, requiring many resources to unify into a single trading application. FIX is widely adopted and much faster.

Therefore, the first step for Xtrade to develop a unified FIX API for market data, order entry, and funds movement. When the FIX API is implemented, Xtrade will not act as a custodian of funds or execute from an inventory account, but will instead facilitate trading for clients who have existing accounts at the most liquid exchanges by utilizing the FIX API to seamlessly place orders across the optimal mix of exchanges on which they have accounts.

We already have a FIX product (built originally for FX and Equity markets) with the capability to:

- Aggregate liquidity across different exchanges
- Manage orders books consistently, in real-time
- Build custom single order books based on an account's unique needs (e.g. I want to see quotes from Exchange A and B but not from C)
- Stream normalized market data to subscribers utilizing the FIX protocol
- Provide single trading interface over the FIX API to all connected exchanges. Right now, we support the following orders types:

  - market and limit, stop and stop limit, trailing stop
  - contingent, multi contingent
  - OCO (one cancels the other) and OTO (one triggers the other)

- Perform SMART routing – the execution engine will automatically choose the best execution path based on previous trading history and current market conditions (liquidity, price, slippage)
- Spread one large order across multiple exchanges
- Perform pre-trade risk management
- Drop copy all executions to clients over a FIX API
- Handle up to 20,000 orders per second

Xtrade anticipates completion of a production multi-market FIX API for crypto execution, market data, and fund movement by Q4 of 2017.

# Roadmap

**XTRADE Pro - Q2 to Q3 2018**
Xtrade is an advanced, multi exchange manual crypto trading platform built by traders, for traders.

Xtrade principals have a combined 30 years of experience developing and administering front end systems for active traders in FX and equity, as well as creating and maintaining the back-end systems required to support front end trading. This involves a combination of extensive knowledge in market data handlers and data feed parsing, low latency execution engines, ticker plants, on-site colocation infrastructure with exchanges, advanced order types, execution reporting, database administration, and other operational requirements as well as implementation of industry best practices.

## CURRENT DIFFICULTIES WITH CRYPTO EXCHANGE GUIS AND SYSTEMS
Most cryptocurrency exchanges have an antiquated, bare bones system that is accessed through a webpage with limited functionality. It's difficult to engage in high speed, multi-exchange execution given the necessity of clicking, scrolling, and typing in updated pricing as the order books continually change. For comparison, most manual high-speed trading systems utilize keyboard shortcuts and programmed functions, as well as initial pricing for order entry automatically pegged to bid/ask or +/- a certain liquidity threshold to cross the inside quote.

The order book representation is also quite antiquated, with little to define individual market participants, incomplete representations of liquidity, and constant "bursts" of executions that come through in the aggregate because the exchange systems are too slow to pass through executions as they occur. This creates a "dam" effect where there is a burst of orders which lag by hundreds of milliseconds, and sometimes whole seconds – a length of time that would be considered unworkable in any other active trading space.

Current crypto exchange systems are not robust enough to handle large traffic and varying order types. As an example, in late August 2017 a large crypto exchange had to disable all advanced order types for two months - including stop losses and trailing stops - to mitigate strain on their platform.

## XTRADE PRO IN DEPTH - FASTEXECUTION, AGGREGATED MARKET DATA, CUSTOMIZABILITY, ADVANCED SCANNERS

### i. Fast Execution
Speed is key. Xtrade will keep all orders resident on our servers and pass executions to exchanges using our FIX API, allowing for faster and more advanced order types that are currently either execute too slowly due to internal network latency or don't exist natively on exchanges, or both. Orders can be routed to one or multiple exchanges to take immediate advantage of price discrepancies and arbitrage opportunities.

If a client wants to place an order to buy 100 ETH/USD, depending on his selected execution strategy, Xtrade will split the order into several pieces and execute them on multiple exchanges. The client can then utilize different order types and Time In Force (FillOrKill, ImmediateOrCancel, GoodTillCancel) commands will work on a custom basis depending on available liquidity.

Advanced order types such as contigent and OCO as well as the usual Stop/Limit/Market will be fully availabe. Xtrade Pro is being constructed for traders, by traders, with traders' feedback being the main driving catalyst for new features and advanced platform functionality.



# Roadmap



**Figure 5 Xtrade Order Book Composition and Market Data Management**

## ii. Aggregated Market Data

Xtrade's advanced FIX API and robust market data handlers combined with collocated hardware at exchange data centers will ensure fast, reliable data delivery to Xtrade Pro clients. Xtrade servers will receive raw market data feeds directly from exchange matching engines and therefore quote packet loss will be minimal once rebroadcast over the Internet, greatly minimizing stale and crossed/locked quotes.

All data quotes for the same currency pairs (BTC/USD or ETH/BTC, for example) will be aggregated to one order book from multiple exchanges. Therefore, the end user will have access to a much more liquid market in a unified fashion across multiple exchanges where he has accounts.

For example, let's assume the volume for the ask price of ETH/USD at a price of $726.75 is as follows:

Gemini: 51.45 ETH @ $726.75
GDAX: 25.71 ETH @ $726.75
Bitfinex: 72.13 ETH @ $726.75

Xtrade can display this as ONE order for 149.28 ETH @ $726.75, or multiple orders broken down by exchange aggregated by price level, similar to ECN structure in the equity markets.

# Roadmap

### iii. Customizability

Xtrade Pro will be fully customizable. All time and sale, watch lists, position data, pending orders, layouts, hotkey settings, and the general look and feel can be modified and saved freely by individual traders based on their own unique trading demands. All layouts can be saved on the cloud, so that trading can seamlessly transition from the office to the beach, and beyond.

The platform will cater primarily to institutional and active traders, but can easily be used by less demanding clientele through simple point and click interfaces and beginner-friendly preset layouts.

### iv. Advanced Scanners

Traders are always on the lookout for opportunities; XTRADE Pro will provide a first look to the most viable and profitable trades. Our scanners will focus on calculating immediate spreads across multiple exchanges for the same currency pairs, spreads net of commission, volumes at different exchanges, "breakout" currencies with new highs and lows, and other proprietary filters.

Charting and studies will integrate all popular indicators, ranging from moving averages and RSI to sector analysis, volume filters and technical indicator scanners. All opportunities can be easily acted upon from the execution windows with advanced global linking and multi-exchange PNL analysis.





# Roadmap

**SPA VIA JV - Q4 2018**
SPA, or Single Point of Access, will allow Xtrade to facilitate execution across multiple exchanges by opening just one account.

SPA will be facilitated via a JV agreement with existing cryptocurrency exchanges. The first exchange to participate as a JV partner with Xtrade is CEX.IO, with over $400 million USD daily volume, 1.2 million active traders and 7 million unique visitors per month.

The JV agreement structure will allow XTRADE to act as a technology provider/execution broker without having to assume the duties of fund custody and the requisite exchange regulatory and compliance overhead. The exchange will take custody of client funds and maintain KYC, while XTRADE will act as the execution venue for the client's orders.

If an order needs to be filled outside the JV exchange, Xtrade will execute that transaction using our inventory account at another exchange and move the position over to the JV exchange where the customer's account is resident. The customer will be debited for the transaction at the JV exchange and settlement will occur there. Xtrade will internalize client orders via the Xtrade Dark Pool – if two orders match, we will not need to go out to other exchanges to fill them, but will instead match the market participants internally.

Xtrade will employ Continuous Net Settlement (CNS) to settle trades. CNS is similar to the National Securities Clearing Corporation (NSCC) settlement system in the sense that there is an automated book entry accounting system in place, except that Xtrade will actually settle the trades much more quickly than T+2 or T+3[5] by continuously sweeping the positions between various exchanges.

**This system will shield market participants from counterparty risk by maintaining multiple accounts across a swath of exchanges.**

Xtrade's centralized order management system will manage all positions for clients with a global position management system, including risk management, PNL and market exposure calculation, mark-to-market performance in real time, master/subaccount allocation, and other advanced features. Holding accounts on multiple exchanges will, in addition to facilitating better price execution, allow traders to specify a wider range of counterparties they wish to trade with. In a sense, this will create a wider range of entities with which each trader may decide to establish a credit-like facility.XTRADE is filing for a patent with the US Patent and Trademark Office for the execution and settlement system logic.

---

[5] In securities markets, trades settle T+3, or 3 days after the transaction takes place (now being shortened by the SEC to 2 days), although customers generally see the positions right away in their accounts as their clearing firm normally holds positions in "street name", or the clearing firm's account.

XTRADE

Version 1.0

# Xtrade Top Level Architecture



- FIX Gateway
- XTRADE Control Center
- Market Data Plant
    - Exchange's normalized books
    - Composite Books
    - Market Data Storage
- Orders Management System
    - Risk Management Module
    - Routing Destination Selector
    - Orders Processor
- Accounts Management System
    - Compliance CRM
    - Platform Configuration Module
- Exchanges
- Liquidity Providers
- Risk Settings
- Connectors Pool
    - Trading Interface
    - Market Data Interface
    - Account Management Interface
    - Health Monitor Component



Version 1.0

# Xtrade Top Level Architecture



| | |
|---|---|
| **FIX Gateway** | Xtrade will perform pre-trade risk checks to avoid general (e.g. not enough money) and custom (like net exposure not more than X%) limit breaches. |
| XTRADE Control Center | High performance FIX 4.x based gateway that will be used for orders entry and market data streaming. |

**Market Data Plant**

| | |
|---|---|
| Exchange's Normalized Books | Web-based management portal to configure trading accounts, liquidity preferences and risk settings. |
| **Composite Books** | Composite books are constructed from normalized exchange books and based on the account's settings and preferences. For example Account A has access to exchanges A, B, and C but prefers to gather liquidity only from A and C. |
| Composite Books (cont.) | Composite books are constructed from normalized exchange books and based on the account's settings and preferences. For example Account A has access to exchanges A, B, and C but prefers to gather liquidity only from A and C. Composite book updates will be stored offline after 2 months and can always can be reconstructed from raw market data. We will distribute composite books over Xtrade's FIX API using MarketData-SnapshotFullRefresh and MarketDataIncrementalUpdate messages. |
| **Market Data Storage** | Offline storage for raw and composite market data. |

# Xtrade Top Level Architecture

### Order Management System



| | |
|---|---|
| **Risk Management Module** | Xtrade will perform pre-trade risk checks to avoid general (e.g. not enough money) and custom (like net exposure not more than X%) limit breaches. |
| **Routing Destination Selector** | This component will build the best possible execution plan if SMART routing is requested.<br><br>RDS can split original order in several components and send it to different exchanges based on the current market conditions like how much liquidity is available, how old the prices are, and on previous execution statistics (how likely exchange can execute certain order types and volumes at what slippage). |
| **Order Processor** | Order Processor is a translator between internal and external orders. It is able to manage single and composite (placed on different exchanges) orders by processing reports from exchanges and sending corresponding messages back to the FIX gateway. |

 **Version 1.0**

# Xtrade Top Level Architecture



**Accounts Management**

| | |
|---|---|
| **Compliance CRM** | Internal CRM to automate KYC-related workflow. |
| **Platform Configuration Module** | Clients will have access to the platform through a web-based management portal and will be able to configure individual trading preferences. |
| **Exchanges** | At FIX API stage, will be used to configure access to exchanges where client has existing accounts. |
| **Liquidity Providers** | Composite books settings with high level of customization. Each instrument will have its own liquidity sources. For example, BTC/USD book can be built using quotes from exchanges A and C, and ETH/USD - from A, B, and D. |
| **Risk Settings** | XTRADE's risk system will perform basic pre-trade tests like funds availability by default. In addition, clients will be able to set their own rules like max daily PNL, net exposure, maximum number of active orders, and so on. |



# Xtrade Top Level Architecture

**Connectors Pool**

**Exchange A**
- Trading Interface
- Market Data Interface
- Account Management Interface

**Exchange B**
- Trading Interface
- Market Data Interface
- Account Management Interface

- Health Monitor Component

Account Management System

Online Management System

Market Data Plant

Cross Connection

Public Internet

Exchange A

Exchange B

Exchange C

| | |
|---|---|
| **Trading Interface** | Component that will translate internal orders-related commands into exchange-specific messages and vice versa (exchange-specific responses into normalized internal responses). |
| **Market Data Interface** | Component that handles all market-data related interactions (subscription, data normalization etc.) with particular exchanges. As opposed to the trading interface, market data interface can be shared across multiple clients accounts. |
| **Account Management Interface** | Will be used mostly for fund-related operations like checking available balance, margin, etc. |
| **Health Monitor Component** | Each of the connector's interfaces will report to the Health Monitor that will track connection status and perform certain actions based on it. For example, a "market data connection to exchange A was lost" message would mean that all composite books should be updated by temporarily removing all orders from the exchange that went down in order to mitigate stuck orders and crossed/locked market data quotes. |



# XTRADE TOKENOMICS

### TOKEN USAGE

XTRADE will generate the XTRD utility tokens via smart contact during the Token Generation Event (TGE) in Q1 of 2018. The XTRD utility token will be utilized on the XTRADE network by market participants to pay for execution, VPS, market data, software licensing, and other fees.

Market participants will be able to purchase XTRD tokens directly from XTRADE's liquidity pool, and may also potentially trade on secondary markets at some point in the future, adding to the total global liquidity pool of XTRD tokens.

The TGE will be preceded by a private institutional sale and a SAFT (Simple Agreement for Future Token) Platform based presale. The XTRD token will be fully ERC20 compliant to ensure that it functions properly on the Ethereum blockchain, similarly to other ERC20 tokens.

### XTRD STAKING

Discounts of 25% on XTRADE services (execution, colocation, market data, software licensing) will be available for token holders in general and discounts of 40% on XTRADE services will be available for token holders who maintain an average monthly stake of at least 50,000 XTRD tokens. Fiat will be accepted at no discount to par. Execution fees will generally be set as a percentage of the gross trade amount, based on a combination of factors such as liquidity, the pair being traded, market conditions at the time of the trade, and so on.

All charges will be marked to market and remain constant, no matter the value of the XTRD token (a $10 charge will be 2 XTRD if $5 each or 0.5 XTRD if $20 each).

### TOKEN LEGAL CONSIDERATIONS

XTRD tokens are ERC20 compliant utility tokens functioning on the Ethereum blockchain. The value of XTRD is derived purely from serving as a medium of payment for services by market participants in the XTRADE trading ecosystem.

XTRD tokens confer no voting rights, profit participation, equity, ownership of intellectual property, revenue sharing, rights to dividends, transfer of ownership upon company sale, control of company assets, or any decision-making ability regarding XTRADE or its' operations. XTRD tokens are not designed for speculation. In summary, XTRD tokens are not securities.

XTRADE Digital Assets, Inc has obtained a qualified legal opinion concurring that XTRD tokens are not to be considered "securities" under applicable U.S. securities laws given their failure to meet all prongs of the Howey Test. [1]

---

[1] In what has become known as the "Howey Test", the U.S. Supreme Court specified that an investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person (i) invests his/her money in a (ii) common enterprise and is led to (iii) expect profits (iv) solely from the efforts of the promoter or third party (i.e. "efforts of others"). All four of the above elements must be met for a contract to be considered a security within the meaning of the Securities Act. .



# XTRD Token Generation

## SAFT COMPLIANT PRESALE TO ACCREDITED INVESTORS

or Simple Agreement for Future Tokens, is an agreement being utilized by Xtrade to allow accredited investors and institutions to participate in a future Token Generation Event. It is a token presale open to accredited investors, or those with an annual income of least $200,000 or net assets of $1,000,0000, exclusive of their primary residence.

The SAFT is modeled after the Simple Agreement for Future Equity, or SAFE, which originated out of Y-Combinator, and when used properly is fully compliant with the Securities Act of 1933 and Regulation D promulgated thereunder. As the SEC has confirmed that the federal securities laws apply to token sales per its' recent SEC investigative report on DAO Tokens, Xtrade is taking a proactive approach to the XTRD token sale by properly utilizing the SAFT and ensuring that the risks which come with early stage investment opportunities are made clear to those accredited individuals or institutions that participate.

## TOKEN GENERATION EVENT

Following the SAFT presale, if necessary, Xtrade will conduct a crowd sale of the XTRD token to accredited investors under Reg D and non-US investors under Reg S. Non-accredited US investors will not be allowed to participate in the Token Generation Event to ensure proactive compliance with current US securities laws and regulations.

## TOKEN SALE TERMS

### XTRD TOKEN GENERATION EVENT (TGE)

Instead of generating a sum of XTRD tokens in a pool prior to the TGE, **XTRADE will generate tokens only as funds arrive.**

For example, if 10 ETH ($10,000 @ $1000/ETH) arrives and generates 100,000 XTRD @ $.10/XTRD during the public sale, XTRADE will generate another 50% of XTRD on that transaction for internal use, or 100,000 XTRD, for a total generation of 200,000 XTRD resulting from the 10 ETH received.

### Timeline – Q1 2018:

Institutional Private Sale → SAFT Platform Accredited Presale → Public Pre-Sale → TGE/Public Sale

Institutional Private sales, SAFT Platform sales, and Public Presale will take place at discounts, tokens will be generated and sent to whitelisted participants at pre-agreed discounts as the TGE occurs.

As funds arrive during the TGE, tokens will be generated continuously until either 1) the hard cap is reached (hard cap amount TBA) or 2) the final sale date is reached (final sale date TBA)

No additional XTRD tokens will ever be created after the final sale date.

### Token Par Value:

$0.10 per token, pegged to USD



# XTRD Token Generation

## Token Allocation



**50% – Token Generation Event**

**29% – XTRADE Reserve**

**10% – Team**

**10% – Advisor pool**

**1% – Bounty**

**Figure 6 Token Allocation**

**50% - Token Generation Event**
Token Generation Event Token Generation Event tokens will be sold via SAFT, followed by a crowd sale if necessary. This will be the primary liquidity pool for XTRD tokens.

**29% - XTRADE Reserve**
These tokens will be held in reserve by Xtrade. Reserve tokens will be allocated to incentivize partnerships between Xtrade and cryptocurrency exchanges, and to provide an additional pool of liquidity for tokens to be purchased by users in the Xtrade ecosystem.

**10% - Team**
Team tokens will be issued to Xtrade's founding team, and will also be subject to a 180-day vesting period from the date of the Token Generation Event.

**10% - Advisor Pool**
Advisor pool tokens will be issued to current and future advisors. Xtrade advisors will consult on all facets of the Xtrade project, such as market structure, cryptocurrency space developments, execution systems, regulations, business development, legal, and other vital matters.

**1% - Bounty**
Bounty tokens held in reserve to incentivize bug bounties for the Xtrade smart contract to find potential bugs related to stealing or locking user funds, stealing the bounty, causing the "buy" function to be uncallable, and other smaller bugs. Bug bounties will also apply to public Github repositories and coding projects/challenges Xtrade will publicly release to the algo trading and crypto community.

# XTRD Token Generation

## Use of Funds



**Figure 7 Use of Funds**

**70% - Balance Sheet for SPA**
In order to facilitate the SPA structure, Xtrade will need to allocate funds across inventory accounts in a spectrum of crypto exchanges. This will be vital to ensuring speedy cross-execution for client orders and ensuring there is enough net capital to facilitate daily trades in between cross-exchange position and currency sweeps – and to provide clients peace of mind regarding Xtrade's net capitalization.

Accordingly, most of the funds raised from the token sale will be used to maintain this balance sheet for trading capital. The balance sheet will also serve to mitigate counterparty risk for clients while trading with multiple exchanges facilitated by just one trusted account.

**15% - Platform Development and Operations**
Funds allocated here will be used for salaries, office space, sub-contractor software development work, travel, and other operational expenses.

**5% - Legal and Compliance**
As the regulatory framework around cryptocurrency coalesces in multiple jurisdictions, Xtrade expects to work hand in hand with regulators and be ahead of the curve in terms of regulatory adherence, rule drafting, necessary registrations, and preemptive legal analysis. These are funds well spent.

**5% - Sales and Marketing**
While the absence of any service comparable the Xtrade is likely to lower the bar for customer acquisition costs, Xtrade will leverage traditional sales techniques as well as the principals' internal network to grow the business quickly through 2018 and beyond. A sales and marketing budget is necessary to further this goal.

**5% - Tech Acquisition**
Harnessing emerging technologies in the crypto execution space is vital to Xtrade's business model. Accordingly, Xtrade will allocate funds towards acquiring promising tech deemed complementary to Xtrade's core mission of delivering robust, innovative technologies and creating a higher standard of service and functionality in the cryptocurrency space".



# Revenue Generation Models

### EXECUTION FEES

Xtrade will charge execution fees for transactions effected via the Xtrade platform. These fees will generally be a percentage of the dollar volume of the trade, in line with prevailing exchange charges. XTRD tokens will be accepted as a means of payment. As economies of scale increase under the SPA model and more volume is done across all exchanges, Xtrade anticipates passing through the savings of low execution fees to our clients. Trade costs will vary depending on several factors, including, but not limited to, trade volume, if the order needs to be rerouted to another exchange or can be filled inside the Xtrade Dark Pool, and complexity of the execution.

### MARKET MAKING

Given Xtrade's balance sheet and a presence at multiple cryptocurrency exchanges, Xtrade anticipates acting in a market-making capacity across numerous crypto currency pairs in different markets. Market making involves maintaining a continuous bid and ask quote within a pre-defined spread for a trading pair, and then buying and selling simultaneously by taking the other side of buy and sell orders that enter the system. Given the 24x7 nature of cryptocurrency markets and Xtrade's principals' experience in algorithmic trading strategies, we anticipate market making activity to serve as a continuous and sizeable revenue stream. By acting as a market maker, Xtrade's balance sheet will serve to stabilize sharp fluctuations in price

caused by a lack of liquidity. If competition develops for the inside quote among other prospective market making entities, this will only serve to increase the stability and execution quality in cryptocurrency markets and therefore benefit the community as a whole by catalyzing maturation of and growing confidence in the crypto trading space.

### XTRADE VPS

VPS, or Virtual Private Server, is a service whereby a client can upload their coded trading strategy to our servers at a datacenter close to cryptocurrency exchanges, and reduce their execution time by a factor of over 100x compared to trading via public internet lines. By leveraging current virtualization technologies, many clients can utilize the same physical server, while managing their strategies securely and remotely.

This service is particularly attractive to hedge funds and institutions who will code to XTRADE's universal FIX spec, as it will eliminate the need, cost, and time investment to establish a point of presence directly at the datacenter. XTRADE VPS is a one stop solution – financial developers will be able to write to our API and co-locate with us for industry leading speed.

VPS services are typically charged on a recurring monthly basis with longer-term agreements and we expect exponential growth in managed services MRR for VPS beginning in 2018.


# Revenue Generation Models

MARKET DATA

Market data is generally free over the internet from multiple crypto exchanges, but the data is 1) slow and 2) not coded to the same universal format. As a result of those two current deficiencies, to internalize multiple market data streams from multiple exchanges, one would need to code to each exchange spec within their own application, and then establish multiple physical locations at multiple data centers to collect this data quickly, for example in a simple latency arbitrage[6] trading application.

XTRADE will obtain market data and build low latency infrastructure so that high frequency and automated trading clients can leverage our existing systems, immediately. In this scenario, with market data feeds being unified and distributed in a low latency application, XTRADE anticipates that the feeds also can be monetized on an MRR basis, as with VPS services.

As crypto markets evolve, market data will begin to be sold as a commodity, like market data at all other exchanges. At that juncture, XTRADE anticipates becoming a licensed data vendor in the space as we will already have an existing client base and hardware infrastructure at all relevant data centers.

XTRADE principals have extensive experience administering market data vendor relationships with NYSE, NASDAQ, CME, OPRA, Direct Edge, BATS, and other market data centers in the US securities space.

Current profits for established latency arbitrage players on US securities markets total in the billions of dollars per year. As crypto markets mature, we will begin to see a movement toward increased liquidity, lower fees, lower

spreads, and an increase in automated trading; i.e. the same characteristics that define the securities latency arbitrage market. XTRADE is perfectly positioned to take advantage of this enormous opportunity by establishing the infrastructure now, ahead of the curve.

SOFTWARE LICENSING

Professional market data and trading platforms such as Bloomberg typically charge a monthly software fee for utilizing the platform, especially if the platform is licensed across a spectrum of users in an organization. Pricing gradients differ based on the functionality and type of user, ranging from free basic versions to high end, heavy duty platforms with all the bells and whistles.

Xtrade anticipates leveraging the professional user adoption of Xtrade FIX and Xtrade Pro with a subscription software model, also on an MRR basis.

CREDIT SLEEVE

Market participants often have credit relationships with other specific counterparties, but not with all. For instance, trader A may only want to trade with traders C and D, but not B and E. Xtrade anticipates performing in a credit sleeve[7] capacity for multi-counterparty and multi-leg cryptocurrency transactions. For example, if trader A has credit with Xtrade, and Xtrade has credit with counterparty B, but A does not have credit with counterparty B, Xtrade can act as a sleeve provider by cross-guaranteeing execution to trader A with counterparty B, in exchange for taking a small percentage of the trade as compensation. Credit sleeves will allow Xtrade to leverage our balance sheet and act as an inter-market mediator to create liquidity in the cryptocurrency space.

---

[6] Latency arbitrage is the practice of trading the same asset, for example BTC/USD, across multiple exchanges to take advantage of different prices. The most important components here are low execution fees to ensure the trade is profitable, and high-speed market data and order entry to allow a market participant to profit from the difference in price before prices converge and the opportunity is eliminated.

[7] A credit sleeve cross guarantees a transaction between two parties who do not have a credit relationship by utilizing a third party which has a credit relationship with both initial parties. .



© XTRADE Digital Assets, Inc. 2017.  All rights reserved.

# EXHIBIT B

**EXHIBIT B**

**RISK FACTORS**

**An investment in a SAFT involves a high degree of risk. You should consider carefully the risks described below, together with all of the other information contained in this document and the White Paper before making an investment decision. By purchasing the right to future Tokens, you expressly acknowledge and assume the following risks:**

*1.*     *The Platform has no operating history.*

The Platform will be newly formed and has no operating history. Each SAFT should be evaluated on the basis that the Company's or any third party's assessment of the prospects of the Platform may not be accurate, and that the Purchaser may not achieve its investment objective. Past performance of the Company, or any similar token or SAFT, is not predictive of future results.

*2.*     *The Company may fail to deploy the Platform.*

Development of the Platform is in its early stages and a production version has yet to be launched. The Company will be relying on the proceeds of its SAFT sale to develop all required software, including, but not limited to the Platform's client software, user interfaces and apps, network infrastructure, and software required for third-party wallets. Additionally, the Company will have to successfully carry out a Network Launch and deploy the Platform, as well as facilitate its growth to a large scale. There is no guarantee that the Company will obtain sufficient funding to fully develop the Platform or that even if fully developed, the Platform will scale following a Network Launch.

**3.**     *There is a Risk of There Being No Network Launch or Dissolution Event.*

No public market currently exists for the Tokens and no assurance can be given that a Network Launch or Dissolution Event with respect to the Company will occur in the near future or at all. In the event a Network Launch does not occur following the Purchaser's entry into this instrument, the Purchaser may not receive any Tokens and the Company may at that time no longer have enough assets to be able to fund a refund of the purchase price. Moreover, any Tokens that the Purchaser does acquire may be virtually worthless, given the lack of a market on which they may be traded. In such circumstances, a Dissolution Event may be the only means by which the Purchaser may generate any returns whatsoever, and given the Company is an early-stage company, the Purchaser would likely recoup only a portion (if any) of its investment as a result of a Dissolution Event.

*4.*     *The SAFTs may not be transferred.*

The terms of the SAFT prohibit transfer of the SAFT. As a result, Purchasers will be required to hold their SAFT until the earlier of the Platform launch and the delivery of all of the Tokens, or the termination of the SAFT pursuant to the provisions set forth therein. Consequently, the Purchaser must be prepared to bear the risk of an investment in the SAFT until the termination of the SAFT pursuant to the terms set forth therein.

**5.     *The Platform may have limited users and competitors.***

It is possible that the Platform will not be used by a large number of individuals, companies and other entities or that there will be limited public interest in the development and operation of the Platform. Such a lack of use or interest could negatively impact the development of the Platform and therefore the potential utility of Tokens.

Further, it is possible that alternative networks could be established for the same or similar purposes as the Platform, and the Platform may be required to compete with such alternative networks, which could negatively impact the Platform and the Tokens.

**6.     *The code underlying the Platform may change.***

The Platform is built on top of the Ethereum blockchain.  In addition to the aforementioned risks regarding development and acceptance of blockchain networks or the price of blockchain assets that may negatively affect the Ethereum network, other changes such as upgrades to Ethereum's blockchain, a "hard fork" in Ethereum, or a change in how transactions are confirmed on the Ethereum blockchain, may have unintended, adverse effects on the Platform. Such a hard fork has already occurred on the Ethereum blockchain with the divergence of "Ethereum Classic" from the new Ethereum protocol developed in the wake of a $3.6 million hack of The DAO, a decentralized autonomous organization using the Ethereum network, in June 2016.  These changes may occur at any time prior to the development of the Platform and may cause delays in development or may completely foreclose the Company's ability to launch the Platform.

**7.     *There are risks associated with the Ethereum protocol.***

Because the Tokens are based on the Ethereum protocol, any malfunction, breakdown or abandonment of the Ethereum protocol may have a material adverse effect on the Platform or Tokens. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the Tokens by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol.

**8.     *There are risks of malicious cyberattacks or exploitable flaws in the underlying code of the Platform.***

The Company will take steps to build, maintain, and secure the infrastructure of the Platform and the Company's users' wallets and will work with experts as required in order to develop and employ best practices for network security; however, despite these measures, the

Platform structural foundation, the open-source protocol, the software application and other interfaces or applications built upon the Platform are still in an early development stage and are unproven, and there can be no assurances that the Platform and the creating, transfer or storage of the Tokens will be uninterrupted or fully secure which may result in a complete loss of the Company's users' Tokens or an unwillingness of the Company's users to access, adopt and utilize the Platform. Further, the Platform may also be the target of malicious attacks seeking to identify and exploit weaknesses in the software or the Platform which may result in the loss or theft of Tokens. In any such event, if the Network Launch does not occur or if the Platform is not widely adopted, Members may lose some or all of their investment.

9.    *The Purchasers may lose access to Tokens due to loss of private key(s).*

A private key, or a combination of private keys, is necessary to control and dispose of Tokens stored in your digital wallet or vault. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing Tokens will result in loss of such Tokens. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet service you use, may be able to misappropriate your Tokens.

10.    *There is a risk of mining attacks.*

As with other decentralized cryptographic tokens based on the Ethereum protocol, Tokens are susceptible to attacks by miners in the course of validating Token transactions on the Ethereum blockchain, including, but not limited, to double-spend attacks, majority mining power attacks, and selfish-mining attacks. Any successful attacks present a risk to the Platform and the Tokens, including, but not limited to, accurate execution and recording of transactions involving the Tokens.

11.    *There is a risk of hacking and security weaknesses.*

Hackers or other malicious groups or organizations may attempt to interfere with the Platform and the Tokens in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, because the Platform is based on open-source software, there is a risk that a third party or a member of the Company team may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Platform, which could negatively affect the Platform and the Tokens.

Many jurisdictions have data protection, security, privacy and other government- and industry-specific requirements, including those that require companies to notify individuals of data security incidents involving certain types of personal data. Security compromises and/or the Company's failure to comply with all applicable requirements could harm the Platform's reputation, erode user confidence in the effectiveness of its security measures, negatively impact its ability to attract new users, or cause existing users to stop using the Platform.

12.    *Tokens will be uninsured.*

Unlike bank accounts or accounts at some other financial institutions, Tokens are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer, such as the Federal Deposit Insurance Corporation, or private insurance arranged by us, to offer recourse to you.

*13.*    ***The Purchasers will have no control over the Company.***

The Purchasers are not and will not be entitled, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything be construed to confer on the Purchasers any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

*14.*    ***The Offering may be subject to registration under the Securities Exchange Act of 1934 (the "Exchange Act") if the Company has assets above $10 million and more than 2,000 purchasers participate in the SAFT offering.***

Companies with total assets above $10 million and more than 2,000 holders of record of its equity securities, or 500 holders of record of its equity securities who are not accredited investors, must register that class of equity securities with the Securities and Exchange Commission (the "**SEC**") under the Exchange Act. With the capital raised from the SAFT offering, the Company may surpass $10 million in assets as it builds out the Platform.

Furthermore, the SAFTs are likely considered a security under U.S. securities law and because there is the possibility that this SAFT offering may surpass 2,000 purchasers, the Company may have more than 2,000 holders of record of its equity securities following the SAFT offering. If these two conditions are met then the Company will have to register this SAFT offering with the SEC, which will be a laborious and expensive process. If such registration takes place, much of the information regarding this SAFT offering will be available to the public.

*15.*    ***Uncertain regulations and enforcement actions present may have an adverse impact on the operation of the Platform and the Tokens.***

The regulatory status of tokens, distributed ledger blockchain technologies, token offerings such as this, cryptocurrencies, and cryptocurrency exchanges currently is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens. It is likewise difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications, including the Platform and the Tokens. Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are a regulated financial instrument that requires

registration or licensing. The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. Failure by the Company, the or certain users of the Platform to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

The regulation of non-currency use of blockchain assets is also uncertain. The CFTC has publicly taken the position that certain blockchain assets are commodities, and the SEC has issued a public report stating federal securities laws require treating some blockchain assets as securities. To the extent that a domestic government or quasi-governmental agency exerts regulatory authority over a blockchain network or asset, the Platform and the Tokens may be materially and adversely affected.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea, and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Platform. Such laws, regulations or directives may conflict with those of the United States or may directly and negatively impact our business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Platform and the adoption and utility of the Tokens.

16. *Taxation of the Tokens is uncertain.*

The tax characterization of the Tokens is uncertain. You must seek your own tax advice in connection with purchasing the Tokens, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

17. *There are risks arising from lack of governance rights.*

Because Tokens confer no governance rights of any kind with respect to the Platform or the Company or its corporate affiliates, all decisions involving the Platform or the Company will be made by the Company at its sole discretion, including, but not limited to, decisions to discontinue the Platform, to create and sell more Tokens for use in the Platform, or to sell or liquidate the Company. These decisions could adversely affect the utility of the Tokens you will hold upon conversion of the SAFT instrument.

18. *The further development and acceptance of blockchain networks, including the Platform, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of blockchain networks and blockchain assets would have an adverse material effect on the successful development and adoption of the Platform and the Tokens.*

The growth of the blockchain industry is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as blockchain networks, include, without limitation:

- Popularity and use of blockchain technologies and blockchain-based tokens;

- Regulation of blockchain assets and of their use;

- Changes in consumer demographics and public tastes and preferences; and

- The availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies or existing traditional networks.

*19.*     ***Token price volatility may have a negative affect on the success of the Platform.***

As relatively new products and technologies, cryptocurrencies and other digital assets based on a computer-generated cryptographic protocol ("***Digital Assets***") have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of demand for Digital Assets is generated by speculators and investors seeking to profit from the short- or long-term holding of such assets. Consequently, Digital Assets—including protocol tokens as well as "app coins"—have been subject to a high degree of price volatility. As usage of the Tokens is expected to be limited to the Platform, the Tokens, like other Digital Assets, may experience speculation and dramatic fluctuations in value, which could negatively affect the success of the Platform.

*20.*     ***Unanticipated Risks.***

Cryptographic tokens such as Tokens are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your purchase, holding and use of Tokens, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit B**.

# EXHIBIT C

## NOTICE TO RESIDENTS OF THE UNITED STATES

THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## NOTICE TO ALL NON-U.S. INVESTORS GENERALLY

NO ACTION HAS BEEN OR WILL BE TAKEN IN ANY JURISDICTION OUTSIDE THE UNITED STATES OF AMERICA THAT WOULD PERMIT AN OFFERING OF THE INTERESTS, OR POSSESSION OR DISTRIBUTION OF OFFERING MATERIAL IN CONNECTION WITH THE ISSUE OF THE INTERESTS, IN ANY COUNTRY OR JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. IT IS THE RESPONSIBILITY OF ANY PERSON WISHING TO PURCHASE THE INTERESTS TO SATISFY HIMSELF, HERSELF, OR ITSELF AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES OF AMERICA IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

**XTRD TOKEN, a product of XTRADE DIGITAL HOLDINGS**

**SAFT**
**(Simple Agreement for Future Tokens)**

THIS CERTIFIES THAT in exchange for the payment by ARIF LLC (the "*Purchaser*") of 90 BTC (the "*Purchase Amount*") on or about 1/17/2017 (the "*Effective Date*"), XTRADE Digital Holdings, a Cayman exempted company (the "*Company*"), hereby issues to the Purchaser the right (the "*Right*") to certain units of XTRD Token (the "*Token*"), subject to the terms set forth below.

The "*Token Price*" means one Token per $0.10 USD.

The "*Bonus Rate*" is fifty percent (50%).

See Section 2 for certain additional defined terms.

1.  *Events*

    (a)  **Network Launch**. On the event of a Network Launch before the expiration or termination of this instrument, the Company will automatically issue to the Purchaser a number

of units of the Token equal to the Token Price multiplied by the Purchase Amount, calculated using the BTC Conversion Rate, divided by the Bonus Rate.

In connection with and prior to the Issuance of Tokens by the Company to the Purchaser pursuant to this Section 1(a):

(i) The Purchaser will execute and deliver to the Company any and all other transaction documents related to this SAFT, including information regarding accredited investor status; and

(ii) The Purchaser will provide to the Company a network address for which to allocate Purchaser's Tokens upon the Network Launch.

(b) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount in USD, at the BTC Conversion Rate, equal to the Purchase Amount multiplied by the Bonus Rate (the "*Discounted Purchase Amount*"), due and payable to the Purchaser immediately prior to, or concurrent with, the consummation of the Dissolution Event, subject to the rights and preferences of the holders of the Company's preferred stock, as set forth in the Company's Certificate of Incorporation, as it may be amended from time to time. If immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Purchaser and all holders of all other SAFTs (the "*Dissolving Purchasers*"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Purchasers of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for distribution, following all distributions to the holders of the Company's preferred stock, will be distributed with equal priority and pro rata among the Dissolving Purchasers in proportion to the Discounted Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(b). Any distributed amounts shall be in U.S. Dollars.

(c) **Termination**. This instrument will expire and terminate upon the earlier of (i) the issuance of Tokens to the Purchaser pursuant to Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b).

2. **Definitions**

"*BTC Conversion Rate*" means the conversion rate of BTC to USD effective on tradeblock.com at 5 p.m. New York City time on the Effective Date.

"*Dissolution Event*" means (i) a voluntary termination of operations of the Company, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency,

2

department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"**Network Launch**" means a *bona fide* transaction or series of transactions, pursuant to which the Company will sell the Tokens to the general public in a publicized product launch.

"**Person**" means individual or legal entity or person, including a government or political subdivision or an agency or instrumentality thereof.

"**Platform**" means the Xtrade Pro Trading Platform. The Tokens will give holders the right to access and utilize the Platform. See **Exhibit A** for a detailed description of the operational and technical aspects of the Platform.

"**SAFT**" means an instrument containing a future right to units of Tokens, similar in form and content to this instrument, purchased by Purchasers for the purpose of funding the development of the Platform.

3. *Company Representations*

(a)  The Company is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when Tokens are to be issued to the Purchaser, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company, or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  To the knowledge of the Company, the performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)   To the knowledge of the Company, no consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; and (ii) any qualifications or filings under applicable securities laws.

(e)   To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

## 4.  *Purchaser Representations*

(a)   The Purchaser has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)   The Purchaser is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Purchaser has been advised that this instrument is a security that has not been registered under the Securities Act, or any state or other country's securities laws and, therefore, cannot be resold unless registered under the Securities Act or applicable state or other country's securities laws or unless an exemption from such registration requirements is available. The Purchaser is purchasing this security instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

(c)   The Purchaser enters into this SAFT with the predominant expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of the Company and its employees to develop and market the Platform and the Network Launch and related sale of the Tokens.

(d)   The Purchaser has read and understands the white paper attached as **Exhibit A** (the *"White Paper"*) and the risk factors attached as **Exhibit B** to this instrument. The Purchaser is aware of Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire this SAFT. The Purchaser understands that the Tokens involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Platform will not function as intended; (ii) the Platform and Network Launch will not be completed; (iii) the Platform will fail to attract sufficient interest from key stakeholders; and (iv) the

Company and/or the Platform may be subject to investigation and punitive actions from Governmental Authorities. The Purchaser understands and expressly accepts that the Tokens will be created and delivered to the Purchaser (at the sole risk of the Purchaser) on an "AS IS" basis. See **Exhibit B** for additional risk factors. The Purchaser understands and expressly accepts that the Purchaser has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

5. *Miscellaneous*

(a) This instrument sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral or written, between them. This instrument is one of a series of similar instruments entered into by the Company from time to time. Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the holders of a majority, in the aggregate, of the Purchase Amounts paid to the Company with respect to all SAFTs outstanding at the time of such amendment, waiver or modification.

(b) Any notice required or permitted by this instrument will be deemed sufficient when sent by email to the relevant email address listed on the signature page, or as subsequently modified by written notice received by the appropriate party.

(c) The Purchaser is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

(d) Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however,* that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Purchaser to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Purchaser, including, without limitation, any general partner, managing member, officer or director of the Purchaser, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Purchaser; and *provided, further,* that the Company may assign this instrument in whole, without the consent of the Purchaser, in connection with a reincorporation to change the Company's domicile.

5

(e)  In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

6

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**XTRADE DIGITAL** HOLDINGS

By: _____
Name: Alexander Kravets
Title: Director
Email: alex@xtrade.io

**ARIF LLC:**

By: _____, President
Name: Anthony Fasulo Prosad
Title: President
Email: Afasulo170yahoo.com

7

**EXHIBIT A**

**WHITE PAPER**

**EXHIBIT B**

**RISK FACTORS**

An investment in a SAFT involves a high degree of risk. You should consider carefully the risks described below, together with all of the other information contained in this document and the White Paper before making an investment decision. By purchasing the right to future Tokens, you expressly acknowledge and assume the following risks:

1.      *The Platform has no operating history.*

        The Platform will be newly formed and has no operating history. Each SAFT should be evaluated on the basis that the Company's or any third party's assessment of the prospects of the Platform may not be accurate, and that the Purchaser may not achieve its investment objective. Past performance of the Company, or any similar token or SAFT, is not predictive of future results.

2.      *The Company may fail to deploy the Platform.*

        Development of the Platform is in its early stages and a production version has yet to be launched. The Company will be relying on the proceeds of its SAFT sale to develop all required software, including, but not limited to the Platform's client software, user interfaces and apps, network infrastructure, and software required for third-party wallets. Additionally, the Company will have to successfully carry out a Network Launch and deploy the Platform, as well as facilitate its growth to a large scale. There is no guarantee that the Company will obtain sufficient funding to fully develop the Platform or that even if fully developed, the Platform will scale following a Network Launch.

3.      *There is a Risk of There Being No Network Launch or Dissolution Event.*

        No public market currently exists for the Tokens and no assurance can be given that a Network Launch or Dissolution Event with respect to the Company will occur in the near future or at all. In the event a Network Launch does not occur following the Purchaser's entry into this instrument, the Purchaser may not receive any Tokens and the Company may at that time no longer have enough assets to be able to fund a refund of the purchase price. Moreover, any Tokens that the Purchaser does acquire may be virtually worthless, given the lack of a market on which they may be traded. In such circumstances, a Dissolution Event may be the only means by which the Purchaser may generate any returns whatsoever, and given the Company is an early-stage company, the Purchaser would likely recoup only a portion (if any) of its investment as a result of a Dissolution Event.

4.      *The SAFTs may not be transferred.*

The terms of the SAFT prohibit transfer of the SAFT. As a result, Purchasers will be required to hold their SAFT until the earlier of the Platform launch and the delivery of all of the Tokens, or the termination of the SAFT pursuant to the provisions set forth therein. Consequently, the Purchaser must be prepared to bear the risk of an investment in the SAFT until the termination of the SAFT pursuant to the terms set forth therein.

5.    *The Platform may have limited users and competitors.*

It is possible that the Platform will not be used by a large number of individuals, companies and other entities or that there will be limited public interest in the development and operation of the Platform. Such a lack of use or interest could negatively impact the development of the Platform and therefore the potential utility of Tokens.

Further, it is possible that alternative networks could be established for the same or similar purposes as the Platform, and the Platform may be required to compete with such alternative networks, which could negatively impact the Platform and the Tokens.

6.    *The code underlying the Platform may change.*

The Platform is built on top of the Ethereum blockchain. In addition to the aforementioned risks regarding development and acceptance of blockchain networks or the price of blockchain assets that may negatively affect the Ethereum network, other changes such as upgrades to Ethereum's blockchain, a "hard fork" in Ethereum, or a change in how transactions are confirmed on the Ethereum blockchain, may have unintended, adverse effects on the Platform. Such a hard fork has already occurred on the Ethereum blockchain with the divergence of "Ethereum Classic" from the new Ethereum protocol developed in the wake of a $3.6 million hack of The DAO, a decentralized autonomous organization using the Ethereum network, in June 2016.  These changes may occur at any time prior to the development of the Platform and may cause delays in development or may completely foreclose the Company's ability to launch the Platform.

7.    *There are risks associated with the Ethereum protocol.*

Because the Tokens are based on the Ethereum protocol, any malfunction, breakdown or abandonment of the Ethereum protocol may have a material adverse effect on the Platform or Tokens. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the Tokens by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol.

8.    *There are risks of malicious cyberattacks or exploitable flaws in the underlying code of the Platform.*

The Company will take steps to build, maintain, and secure the infrastructure of the Platform and the Company's users' wallets and will work with experts as required in order to develop and employ best practices for network security; however, despite these measures, the

Platform structural foundation, the open-source protocol, the software application and other interfaces or applications built upon the Platform are still in an early development stage and are unproven, and there can be no assurances that the Platform and the creating, transfer or storage of the Tokens will be uninterrupted or fully secure which may result in a complete loss of the Company's users' Tokens or an unwillingness of the Company's users to access, adopt and utilize the Platform. Further, the Platform may also be the target of malicious attacks seeking to identify and exploit weaknesses in the software or the Platform which may result in the loss or theft of Tokens. In any such event, if the Network Launch does not occur or if the Platform is not widely adopted, Members may lose some or all of their investment.

9.    *The Purchasers may lose access to Tokens due to loss of private key(s).*

A private key, or a combination of private keys, is necessary to control and dispose of Tokens stored in your digital wallet or vault. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing Tokens will result in loss of such Tokens. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet service you use, may be able to misappropriate your Tokens.

10.    *There is a risk of mining attacks.*

As with other decentralized cryptographic tokens based on the Ethereum protocol, Tokens are susceptible to attacks by miners in the course of validating Token transactions on the Ethereum blockchain, including, but not limited, to double-spend attacks, majority mining power attacks, and selfish-mining attacks. Any successful attacks present a risk to the Platform and the Tokens, including, but not limited to, accurate execution and recording of transactions involving the Tokens.

11.    *There is a risk of hacking and security weaknesses.*

Hackers or other malicious groups or organizations may attempt to interfere with the Platform and the Tokens in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, because the Platform is based on open-source software, there is a risk that a third party or a member of the Company team may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Platform, which could negatively affect the Platform and the Tokens.

Many jurisdictions have data protection, security, privacy and other government- and industry-specific requirements, including those that require companies to notify individuals of data security incidents involving certain types of personal data. Security compromises and/or the Company's failure to comply with all applicable requirements could harm the Platform's reputation, erode user confidence in the effectiveness of its security measures, negatively impact its ability to attract new users, or cause existing users to stop using the Platform.

12.    *Tokens will be uninsured.*

Unlike bank accounts or accounts at some other financial institutions, Tokens are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer, such as the Federal Deposit Insurance Corporation, or private insurance arranged by us, to offer recourse to you.

### 13.    *The Purchasers will have no control over the Company.*

The Purchasers are not and will not be entitled, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything be construed to confer on the Purchasers any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

### 14.    *The Offering may be subject to registration under the Securities Exchange Act of 1934 (the "Exchange Act") if the Company has assets above $10 million and more than 2,000 purchasers participate in the SAFT offering.*

Companies with total assets above $10 million and more than 2,000 holders of record of its equity securities, or 500 holders of record of its equity securities who are not accredited investors, must register that class of equity securities with the Securities and Exchange Commission (the "SEC") under the Exchange Act. With the capital raised from the SAFT offering, the Company may surpass $10 million in assets as it builds out the Platform.

Furthermore, the SAFTs are likely considered a security under U.S. securities law and because there is the possibility that this SAFT offering may surpass 2,000 purchasers, the Company may have more than 2,000 holders of record of its equity securities following the SAFT offering, If these two conditions are met then the Company will have to register this SAFT offering with the SEC, which will be a laborious and expensive process. If such registration takes place, much of the information regarding this SAFT offering will be available to the public.

### 15.    *Uncertain regulations and enforcement actions present may have an adverse impact on the operation of the Platform and the Tokens.*

The regulatory status of tokens, distributed ledger blockchain technologies, token offerings such as this, cryptocurrencies, and cryptocurrency exchanges currently is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens. It is likewise difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications, including the Platform and the Tokens. Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are a regulated financial instrument that requires

registration or licensing. The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. Failure by the Company, the or certain users of the Platform to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

The regulation of non-currency use of blockchain assets is also uncertain. The CFTC has publicly taken the position that certain blockchain assets are commodities, and the SEC has issued a public report stating federal securities laws require treating some blockchain assets as securities. To the extent that a domestic government or quasi-governmental agency exerts regulatory authority over a blockchain network or asset, the Platform and the Tokens may be materially and adversely affected.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea, and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Platform. Such laws, regulations or directives may conflict with those of the United States or may directly and negatively impact our business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Platform and the adoption and utility of the Tokens.

16.     *Taxation of the Tokens is uncertain.*

The tax characterization of the Tokens is uncertain. You must seek your own tax advice in connection with purchasing the Tokens, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

17.     *There are risks arising from lack of governance rights.*

Because Tokens confer no governance rights of any kind with respect to the Platform or the Company or its corporate affiliates, all decisions involving the Platform or the Company will be made by the Company at its sole discretion, including, but not limited to, decisions to discontinue the Platform, to create and sell more Tokens for use in the Platform, or to sell or liquidate the Company. These decisions could adversely affect the value of the Tokens you will hold upon conversion of the SAFT instrument.

18.     *The further development and acceptance of blockchain networks, including the Platform, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of blockchain networks and blockchain assets would have an adverse material effect on the successful development and adoption of the Platform and the Tokens.*

The growth of the blockchain industry is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as blockchain networks, include, without limitation:

- Popularity and use of blockchain technologies and blockchain-based tokens;

- Regulation of blockchain assets and of their use;

- Changes in consumer demographics and public tastes and preferences; and

- The availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies or existing traditional networks.

19.   *Token price volatility may have a negative affect on the success of the Platform.*

As relatively new products and technologies, cryptocurrencies and other digital assets based on a computer-generated cryptographic protocol (***Digital Assets***) have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of demand for Digital Assets is generated by speculators and investors seeking to profit from the short- or long-term holding of such assets. Consequently, Digital Assets—including protocol tokens as well as "app coins"—have been subject to a high degree of price volatility. As usage of the Tokens is expected to be limited to the Platform, the Tokens, like other Digital Assets, may experience speculation and dramatic fluctuations in value, which could negatively affect the success of the Platform.

20.   **Unanticipated Risks.**

Cryptographic tokens such as Tokens are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your purchase, holding and use of Tokens, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit B**.

21.   *Fluctuation in the price of Bitcoin may materially adversely affect the value of your Investment.*

Bitcoin is a volatile currency subject to rapid conversion rate fluctuations due to developing rules, regulations, and legal actions taken by lawmakers and banking regulators in the United States and abroad. Such fluctuations in the exchange rate between the U.S. dollar and Bitcoin may result in a significant decline to the Discounted Purchase Amount upon a Dissolution Event. The Company cannot guarantee the full value of your investment as measured in BTC will be returned in case of a Dissolution Event. Bitcoin's price volatility may cause any return in U.S. dollars to be significantly lower than the initially invested value in Bitcoin.

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**NOTICE TO ALL NON-U.S. INVESTORS GENERALLY**

NO ACTION HAS BEEN OR WILL BE TAKEN IN ANY JURISDICTION OUTSIDE THE UNITED STATES OF AMERICA THAT WOULD PERMIT AN OFFERING OF THE INTERESTS, OR POSSESSION OR DISTRIBUTION OF OFFERING MATERIAL IN CONNECTION WITH THE ISSUE OF THE INTERESTS, IN ANY COUNTRY OR JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. IT IS THE RESPONSIBILITY OF ANY PERSON WISHING TO PURCHASE THE INTERESTS TO SATISFY HIMSELF, HERSELF, OR ITSELF AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES OF AMERICA IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

**XTRD TOKEN**, a product of **XTRADE DIGITAL HOLDINGS**

**SAFT**
**(Simple Agreement for Future Tokens)**

THIS CERTIFIES THAT in exchange for the payment by **ARIF LLC** (the "*Purchaser*") of **$75,000 USD** (the "*Purchase Amount*") on or about **1/19/2017** (the "*Effective Date*"), XTRADE Digital Holdings, a Cayman exempted company (the "*Company*"), hereby issues to the Purchaser the right (the "*Right*") to certain units of XTRD Token (the "*Token*"), subject to the terms set forth below.

The "*Token Price*" means one Token per $0.10 USD.

The "*Bonus Rate*" is fifty percent (50%).

See **Section 2** for certain additional defined terms.

**1.** *Events*

(a)  **Network Launch**. On the event of a Network Launch before the expiration or termination of this instrument, the Company will automatically issue to the Purchaser a number

of units of the Token equal to the Token Price multiplied by the Purchase Amount, calculated using the BTC Conversion Rate, divided by the Bonus Rate.

In connection with and prior to the issuance of Tokens by the Company to the Purchaser pursuant to this Section 1(a):

(i) The Purchaser will execute and deliver to the Company any and all other transaction documents related to this SAFT, including information regarding accredited investor status; and

(ii) The Purchaser will provide to the Company a network address for which to allocate Purchaser's Tokens upon the Network Launch.

(b) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount in USD, at the BTC Conversion Rate, equal to the Purchase Amount multiplied by the Bonus Rate (the "**Discounted Purchase Amount**"), due and payable to the Purchaser immediately prior to, or concurrent with, the consummation of the Dissolution Event, subject to the rights and preferences of the holders of the Company's preferred stock, as set forth in the Company's Certificate of Incorporation, as it may be amended from time to time. If immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Purchaser and all holders of all other SAFTs (the "**Dissolving Purchasers**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Purchasers of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for distribution, following all distributions to the holders of the Company's preferred stock, will be distributed with equal priority and pro rata among the Dissolving Purchasers in proportion to the Discounted Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(b).  Any distributed amounts shall be in U.S. Dollars.

(c) **Termination**.  This instrument will expire and terminate upon the earlier of (i) the issuance of Tokens to the Purchaser pursuant to Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b).

2. *Definitions*

"**BTC Conversion Rate**" means the conversion rate of BTC to USD effective on tradeblock.com at 5 p.m. New York City time on the Effective Date.

"**Dissolution Event**" means (i) a voluntary termination of operations of the Company, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency,

department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"***Network Launch***" means a *bona fide* transaction or series of transactions, pursuant to which the Company will sell the Tokens to the general public in a publicized product launch.

"***Person***" means individual or legal entity or person, including a government or political subdivision or an agency or instrumentality thereof.

"***Platform***" means the Xtrade Pro Trading Platform.  The Tokens will give holders the right to access and utilize the Platform.  See **Exhibit A** for a detailed description of the operational and technical aspects of the Platform.

"***SAFT***" means an instrument containing a future right to units of Tokens, similar in form and content to this instrument, purchased by Purchasers for the purpose of funding the development of the Platform.

3.   ***Company Representations***

(a)  The Company is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when Tokens are to be issued to the Purchaser, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company, or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)   To the knowledge of the Company, the performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)   To the knowledge of the Company, no consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; and (ii) any qualifications or filings under applicable securities laws.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  ***Purchaser Representations***

(a)  The Purchaser has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Purchaser is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Purchaser has been advised that this instrument is a security that has not been registered under the Securities Act, or any state or other country's securities laws and, therefore, cannot be resold unless registered under the Securities Act or applicable state or other country's securities laws or unless an exemption from such registration requirements is available. The Purchaser is purchasing this security instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

(c)  The Purchaser enters into this SAFT with the predominant expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of the Company and its employees to develop and market the Platform and the Network Launch and related sale of the Tokens.

(d) The Purchaser has read and understands the white paper attached as **Exhibit A** (the "***White Paper***") and the risk factors attached as **Exhibit B** to this instrument.  The Purchaser is aware of Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire this SAFT.  The Purchaser understands that the Tokens involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Platform will not function as intended; (ii) the Platform and Network Launch will not be completed; (iii) the Platform will fail to attract sufficient interest from key stakeholders; and (iv) the

Company and/or the Platform may be subject to investigation and punitive actions from Governmental Authorities.  The Purchaser understands and expressly accepts that the Tokens will be created and delivered to the Purchaser (at the sole risk of the Purchaser) on an "AS IS" basis.  See **Exhibit B** for additional risk factors.  The Purchaser understands and expressly accepts that the Purchaser has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

5.   *Miscellaneous*

(a)   This instrument sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral of written, between them. This instrument is one of a series of similar instruments entered into by the Company from time to time. Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the holders of a majority, in the aggregate, of the Purchase Amounts paid to the Company with respect to all SAFTs outstanding at the time of such amendment, waiver or modification.

(b)   Any notice required or permitted by this instrument will be deemed sufficient when sent by email to the relevant email address listed on the signature page, or as subsequently modified by written notice received by the appropriate party.

(c)   The Purchaser is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

(d)   Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Purchaser to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Purchaser, including, without limitation, any general partner, managing member, officer or director of the Purchaser, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Purchaser; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Purchaser, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(<em>Signature page follows</em>)

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**XTRADE DIGITAL HOLDINGS**

By:_____
Name:_____
Title:_____
Email:_____

**ARIF LLC:**

By:_____ President
Name:___Antheny Fasulo' President
Title:___President
Email:___AFasulo 17@Yahoo.con

7

**EXHIBIT A**

**WHITE PAPER**

**EXHIBIT B**

**RISK FACTORS**

**An investment in a SAFT involves a high degree of risk.  You should consider carefully the risks described below, together with all of the other information contained in this document and the White Paper before making an investment decision.  By purchasing the right to future Tokens, you expressly acknowledge and assume the following risks:**

*1.*      *The Platform has no operating history.*

The Platform will be newly formed and has no operating history.  Each SAFT should be evaluated on the basis that the Company's or any third party's assessment of the prospects of the Platform may not be accurate, and that the Purchaser may not achieve its investment objective.  Past performance of the Company, or any similar token or SAFT, is not predictive of future results.

*2.*      *The Company may fail to deploy the Platform.*

Development of the Platform is in its early stages and a production version has yet to be launched.  The Company will be relying on the proceeds of its SAFT sale to develop all required software, including, but not limited to the Platform's client software, user interfaces and apps, network infrastructure, and software required for third-party wallets.  Additionally, the Company will have to successfully carry out a Network Launch and deploy the Platform, as well as facilitate its growth to a large scale.  There is no guarantee that the Company will obtain sufficient funding to fully develop the Platform or that even if fully developed, the Platform will scale following a Network Launch.

*3.*      *There is a Risk of There Being No Network Launch or Dissolution Event.*

No public market currently exists for the Tokens and no assurance can be given that a Network Launch or Dissolution Event with respect to the Company will occur in the near future or at all.  In the event a Network Launch does not occur following the Purchaser's entry into this instrument, the Purchaser may not receive any Tokens and the Company may at that time no longer have enough assets to be able to fund a refund of the purchase price.  Moreover, any Tokens that the Purchaser does acquire may be virtually worthless, given the lack of a market on which they may be traded.  In such circumstances, a Dissolution Event may be the only means by which the Purchaser may generate any returns whatsoever, and given the Company is an early-stage company, the Purchaser would likely recoup only a portion (if any) of its investment as a result of a Dissolution Event.

*4.*      *The SAFTs may not be transferred.*

The terms of the SAFT prohibit transfer of the SAFT. As a result, Purchasers will be required to hold their SAFT until the earlier of the Platform launch and the delivery of all of the Tokens, or the termination of the SAFT pursuant to the provisions set forth therein. Consequently, the Purchaser must be prepared to bear the risk of an investment in the SAFT until the termination of the SAFT pursuant to the terms set forth therein.

5.      **The Platform may have limited users and competitors.**

It is possible that the Platform will not be used by a large number of individuals, companies and other entities or that there will be limited public interest in the development and operation of the Platform. Such a lack of use or interest could negatively impact the development of the Platform and therefore the potential utility of Tokens.

Further, it is possible that alternative networks could be established for the same or similar purposes as the Platform, and the Platform may be required to compete with such alternative networks, which could negatively impact the Platform and the Tokens.

6.      **The code underlying the Platform may change.**

The Platform is built on top of the Ethereum blockchain.  In addition to the aforementioned risks regarding development and acceptance of blockchain networks or the price of blockchain assets that may negatively affect the Ethereum network, other changes such as upgrades to Ethereum's blockchain, a "hard fork" in Ethereum, or a change in how transactions are confirmed on the Ethereum blockchain, may have unintended, adverse effects on the Platform.  Such a hard fork has already occurred on the Ethereum blockchain with the divergence of "Ethereum Classic" from the new Ethereum protocol developed in the wake of a $3.6 million hack of The DAO, a decentralized autonomous organization using the Ethereum network, in June 2016.  These changes may occur at any time prior to the development of the Platform and may cause delays in development or may completely foreclose the Company's ability to launch the Platform.

7.      **There are risks associated with the Ethereum protocol.**

Because the Tokens are based on the Ethereum protocol, any malfunction, breakdown or abandonment of the Ethereum protocol may have a material adverse effect on the Platform or Tokens. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the Tokens by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol.

8.      **There are risks of malicious cyberattacks or exploitable flaws in the underlying code of the Platform.**

The Company will take steps to build, maintain, and secure the infrastructure of the Platform and the Company's users' wallets and will work with experts as required in order to develop and employ best practices for network security; however, despite these measures, the

Platform structural foundation, the open-source protocol, the software application and other interfaces or applications built upon the Platform are still in an early development stage and are unproven, and there can be no assurances that the Platform and the creating, transfer or storage of the Tokens will be uninterrupted or fully secure which may result in a complete loss of the Company's users' Tokens or an unwillingness of the Company's users to access, adopt and utilize the Platform.  Further, the Platform may also be the target of malicious attacks seeking to identify and exploit weaknesses in the software or the Platform which may result in the loss or theft of Tokens.  In any such event, if the Network Launch does not occur or if the Platform is not widely adopted, Members may lose some or all of their investment.

9.      **The Purchasers may lose access to Tokens due to loss of private key(s).**

A private key, or a combination of private keys, is necessary to control and dispose of Tokens stored in your digital wallet or vault. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing Tokens will result in loss of such Tokens. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet service you use, may be able to misappropriate your Tokens.

10.     **There is a risk of mining attacks.**

As with other decentralized cryptographic tokens based on the Ethereum protocol, Tokens are susceptible to attacks by miners in the course of validating Token transactions on the Ethereum blockchain, including, but not limited, to double-spend attacks, majority mining power attacks, and selfish-mining attacks. Any successful attacks present a risk to the Platform and the Tokens, including, but not limited to, accurate execution and recording of transactions involving the Tokens.

11.     **There is a risk of hacking and security weaknesses.**

Hackers or other malicious groups or organizations may attempt to interfere with the Platform and the Tokens in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, because the Platform is based on open-source software, there is a risk that a third party or a member of the Company team may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Platform, which could negatively affect the Platform and the Tokens.

Many jurisdictions have data protection, security, privacy and other government- and industry-specific requirements, including those that require companies to notify individuals of data security incidents involving certain types of personal data. Security compromises and/or the Company's failure to comply with all applicable requirements could harm the Platform's reputation, erode user confidence in the effectiveness of its security measures, negatively impact its ability to attract new users, or cause existing users to stop using the Platform.

12.     **Tokens will be uninsured.**

Unlike bank accounts or accounts at some other financial institutions, Tokens are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer, such as the Federal Deposit Insurance Corporation, or private insurance arranged by us, to offer recourse to you.

*13.*     ***The Purchasers will have no control over the Company.***

The Purchasers are not and will not be entitled, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything be construed to confer on the Purchasers any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

*14.*     ***The Offering may be subject to registration under the Securities Exchange Act of 1934 (the "Exchange Act") if the Company has assets above $10 million and more than 2,000 purchasers participate in the SAFT offering.***

Companies with total assets above $10 million and more than 2,000 holders of record of its equity securities, or 500 holders of record of its equity securities who are not accredited investors, must register that class of equity securities with the Securities and Exchange Commission (the "**SEC**") under the Exchange Act. With the capital raised from the SAFT offering, the Company may surpass $10 million in assets as it builds out the Platform.

Furthermore, the SAFTs are likely considered a security under U.S. securities law and because there is the possibility that this SAFT offering may surpass 2,000 purchasers, the Company may have more than 2,000 holders of record of its equity securities following the SAFT offering. If these two conditions are met then the Company will have to register this SAFT offering with the SEC, which will be a laborious and expensive process. If such registration takes place, much of the information regarding this SAFT offering will be available to the public.

*15.*     ***Uncertain regulations and enforcement actions present may have an adverse impact on the operation of the Platform and the Tokens.***

The regulatory status of tokens, distributed ledger blockchain technologies, token offerings such as this, cryptocurrencies, and cryptocurrency exchanges currently is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens. It is likewise difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications, including the Platform and the Tokens. Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are a regulated financial instrument that requires

registration or licensing.  The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction.  Failure by the Company, the or certain users of the Platform to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

The regulation of non-currency use of blockchain assets is also uncertain. The CFTC has publicly taken the position that certain blockchain assets are commodities, and the SEC has issued a public report stating federal securities laws require treating some blockchain assets as securities. To the extent that a domestic government or quasi-governmental agency exerts regulatory authority over a blockchain network or asset, the Platform and the Tokens may be materially and adversely affected.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea, and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Platform. Such laws, regulations or directives may conflict with those of the United States or may directly and negatively impact our business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Platform and the adoption and utility of the Tokens.

### 16. *Taxation of the Tokens is uncertain.*

The tax characterization of the Tokens is uncertain. You must seek your own tax advice in connection with purchasing the Tokens, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

### 17. *There are risks arising from lack of governance rights.*

Because Tokens confer no governance rights of any kind with respect to the Platform or the Company or its corporate affiliates, all decisions involving the Platform or the Company will be made by the Company at its sole discretion, including, but not limited to, decisions to discontinue the Platform, to create and sell more Tokens for use in the Platform, or to sell or liquidate the Company. These decisions could adversely affect the value of the Tokens you will hold upon conversion of the SAFT instrument.

### 18. *The further development and acceptance of blockchain networks, including the Platform, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of blockchain networks and blockchain assets would have an adverse material effect on the successful development and adoption of the Platform and the Tokens.*

The growth of the blockchain industry is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as blockchain networks, include, without limitation:

- Popularity and use of blockchain technologies and blockchain-based tokens;

- Regulation of blockchain assets and of their use;

- Changes in consumer demographics and public tastes and preferences; and

- The availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies or existing traditional networks.

*19.*    ***Token price volatility may have a negative affect on the success of the Platform.***

As relatively new products and technologies, cryptocurrencies and other digital assets based on a computer-generated cryptographic protocol ("***Digital Assets***") have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of demand for Digital Assets is generated by speculators and investors seeking to profit from the short- or long-term holding of such assets.  Consequently, Digital Assets—including protocol tokens as well as "app coins"—have been subject to a high degree of price volatility.  As usage of the Tokens is expected to be limited to the Platform, the Tokens, like other Digital Assets, may experience speculation and dramatic fluctuations in value, which could negatively affect the success of the Platform.

*20.*    ***Unanticipated Risks.***

Cryptographic tokens such as Tokens are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your purchase, holding and use of Tokens, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit B**.

*21.*    ***Fluctuation in the price of Bitcoin may materially adversely affect the value of your investment.***

Bitcoin is a volatile currency subject to rapid conversion rate fluctuations due to developing rules, regulations, and legal actions taken by lawmakers and banking regulators in the United States and abroad. Such fluctuations in the exchange rate between the U.S. dollar and Bitcoin may result in a significant decline to the Discounted Purchase Amount upon a Dissolution Event. The Company cannot guarantee the full value of your investment as measured in BTC will be returned in case of a Dissolution Event.  Bitcoin's price volatility may cause any return in U.S. dollars to be significantly lower than the initially invested value in Bitcoin.

# **EXHIBIT D**

**NOTICE TO RESIDENTS OF THE UNITED STATES**

THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**NOTICE TO ALL NON-U.S. PURCHASERS GENERALLY**

NO ACTION HAS BEEN OR WILL BE TAKEN IN ANY JURISDICTION OUTSIDE THE UNITED STATES OF AMERICA THAT WOULD PERMIT AN OFFERING OF THE INTERESTS, OR POSSESSION OR DISTRIBUTION OF OFFERING MATERIAL IN CONNECTION WITH THE ISSUE OF THE INTERESTS, IN ANY COUNTRY OR JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. IT IS THE RESPONSIBILITY OF ANY PERSON WISHING TO PURCHASE THE INTERESTS TO SATISFY HIMSELF, HERSELF, OR ITSELF AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES OF AMERICA IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

**XTRD TOKEN**, a product of **XTRADE DIGITAL HOLDINGS**

**SAFT**
**(Simple Agreement for Future Tokens)**

THIS CERTIFIES THAT in exchange for the payment by **Gautam Balwant Desai** (the "*Purchaser*") of **$1,000,000 of BTC** (the "*Purchase Amount*") on or about 1/28/18, (the "*Effective Date*"), XTRADE Digital Holdings, a Cayman exempted company (the "*Company*"), hereby issues to the Purchaser the right (the "*Right*") to certain units of XTRD Token (the "*Token*"), subject to the terms set forth below.

The "*Token Price*" means one Token per **$0.10 USD**.

The "*Bonus Rate*" is **fifty percent (50%)**.

See **Section 2** for certain additional defined terms.

**1.** *Events*

     (a)  **Network Launch**. On the event of a Network Launch before the expiration or termination of this instrument, the Company will automatically issue to the Purchaser a number

1

of units of the Token equal to the Purchase Amount divided by the Token Price, plus an **additional** Bonus number of Tokens equal to the Purchase Amount divided by the Token Price and then multiplied by the Bonus Rate.

In connection with and prior to the issuance of Tokens by the Company to the Purchaser pursuant to this Section 1(a):

(i) The Purchaser will execute and deliver to the Company any and all other transaction documents related to this SAFT, including information regarding accredited investor status; and

(ii) The Purchaser will provide to the Company a network address for which to allocate Purchaser's Tokens upon the Network Launch.

(b) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount multiplied by the Bonus Rate (the "**Discounted Purchase Amount**"), due and payable to the Purchaser immediately prior to, or concurrent with, the consummation of the Dissolution Event, subject to the rights and preferences of the holders of the Company's preferred stock, as set forth in the Company's Certificate of Incorporation, as it may be amended from time to time. If immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Purchaser and all holders of all other SAFTs (the "**Dissolving Purchasers**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Purchasers of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for distribution, following all distributions to the holders of the Company's preferred stock, will be distributed with equal priority and pro rata among the Dissolving Purchasers in proportion to the Discounted Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(b).  Any distributed amounts shall be in U.S. Dollars.

(c) **Termination**.  This instrument will expire and terminate upon the earlier of (i) the issuance of Tokens to the Purchaser pursuant to Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b).

2. *Definitions*

"***Dissolution Event***" means (i) a voluntary termination of operations of the Company, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

"***Governmental Authority***" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

2

"**Network Launch**" means a *bona fide* transaction or series of transactions, pursuant to which the Company will sell the Tokens to the general public in a publicized product launch.

"**Person**" means individual or legal entity or person, including a government or political subdivision or an agency or instrumentality thereof.

"**Platform**" means the Xtrade Pro Trading Platform.  The Tokens will give holders the right to access and utilize the Platform.  See **Exhibit A** for a detailed description of the operational and technical aspects of the Platform.

"**SAFT**" means an instrument containing a future right to units of Tokens, similar in form and content to this instrument, purchased by Purchasers for the purpose of funding the development of the Platform.

3. ***Company Representations***

    (a)  The Company is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

    (b)  The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when Tokens are to be issued to the Purchaser, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company, or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

    (c)  To the knowledge of the Company, the performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

    (d)  To the knowledge of the Company, no consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; and (ii) any qualifications or filings under applicable securities laws.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4. **Purchaser Representations**

(a) The Purchaser has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Purchaser is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Purchaser has been advised that this instrument is a security that has not been registered under the Securities Act, or any state or other country's securities laws and, therefore, cannot be resold unless registered under the Securities Act or applicable state or other country's securities laws or unless an exemption from such registration requirements is available. The Purchaser is purchasing this security instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

(c) The Purchaser enters into this SAFT with the predominant expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of the Company and its employees to develop and market the Platform and the Network Launch and related sale of the Tokens.

(d) The Purchaser has read and understands the white paper attached as **Exhibit A** (the "**White Paper**") and the risk factors attached as **Exhibit B** to this instrument. The Purchaser is aware of Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire this SAFT. The Purchaser acknowledges and understands that the Company possesses material nonpublic information not known to the Purchaser that may impact the utility of the Tokens and that the Company is not disclosing this information to the Purchaser. The Purchaser is also aware and understands that other purchasers may have received a greater bonus or different terms than the Purchaser, due to a variety of factors such as priority and purchase amount, and that the Company is not required to disclose this information. The Purchaser understands that the Tokens involve risks, all of which the Purchaser fully and completely assumes, including, but not limited

to, the risk that (i) the technology associated with the Platform will not function as intended; (ii) the Platform and Network Launch will not be completed; (iii) the Platform will fail to attract sufficient interest from key stakeholders; and (iv) the Company and/or the Platform may be subject to investigation and punitive actions from Governmental Authorities.   The Purchaser understands and expressly accepts that the Tokens will be created and delivered to the Purchaser (at the sole risk of the Purchaser) on an "AS IS" basis.   See **Exhibit B** for additional risk factors.   The Purchaser understands and expressly accepts that the Purchaser has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS. THE PURCHASER ALSO AGREES THAT THE COMPANY, ITS AFFILIATES, PRINCIPALS, STOCKHOLDERS, PARTNERS, EMPLOYEES AND AGENTS SHALL HAVE NO LIABILITY TO THE PURCHASER, WHATSOEVER, DUE TO OR IN CONNECTION WITH THE COMPANY'S USE OR NON-DISCLOSURE OF NON-PUBLIC INFORMATION OR OTHERWISE AS A RESULT OF THE TRANSACTION, AND THE PURCHASER HEREBY IRREVOCABLY WAIVES ANY CLAIM THAT IT MIGHT HAVE BASED ON THE FAILURE OF THE COMPANY TO DISCLOSE SUCH INFORMATION.

5.   *Miscellaneous*

(a)   This instrument sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral or written, between them. This instrument is one of a series of similar instruments entered into by the Company from time to time. Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the holders of a majority, in the aggregate, of the Purchase Amounts paid to the Company with respect to all SAFTs outstanding at the time of such amendment, waiver or modification.

(b)   Any notice required or permitted by this instrument will be deemed sufficient when sent by email to the relevant email address listed on the signature page, or as subsequently modified by written notice received by the appropriate party.

(c)   The Purchaser is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

(d)   Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided,*

5

*however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Purchaser to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Purchaser, including, without limitation, any general partner, managing member, officer or director of the Purchaser, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Purchaser; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Purchaser, in connection with a reincorporation to change the Company's domicile.

(e) In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**XTRADE DIGITAL HOLDINGS**

By:_____
Name:_____
Title:_____
Email:_____

**Gautam Balwant Desai**

By:_____
Name:_____
Title:_____
Email:_____

7

**EXHIBIT A**

**WHITE PAPER**

**EXHIBIT B**

**RISK FACTORS**

**An investment in a SAFT involves a high degree of risk. You should consider carefully the risks described below, together with all of the other information contained in this document and the White Paper before making an investment decision. By purchasing the right to future Tokens, you expressly acknowledge and assume the following risks:**

*1.*      ***The Platform has no operating history.***

The Platform will be newly formed and has no operating history. Each SAFT should be evaluated on the basis that the Company's or any third party's assessment of the prospects of the Platform may not be accurate, and that the Purchaser may not achieve its investment objective. Past performance of the Company, or any similar token or SAFT, is not predictive of future results.

*2.*      ***The Company may fail to deploy the Platform.***

Development of the Platform is in its early stages and a production version has yet to be launched. The Company will be relying on the proceeds of its SAFT sale to develop all required software, including, but not limited to the Platform's client software, user interfaces and apps, network infrastructure, and software required for third-party wallets. Additionally, the Company will have to successfully carry out a Network Launch and deploy the Platform, as well as facilitate its growth to a large scale. There is no guarantee that the Company will obtain sufficient funding to fully develop the Platform or that even if fully developed, the Platform will scale following a Network Launch.

*3.*      ***There is a Risk of There Being No Network Launch or Dissolution Event.***

No public market currently exists for the Tokens and no assurance can be given that a Network Launch or Dissolution Event with respect to the Company will occur in the near future or at all. In the event a Network Launch does not occur following the Purchaser's entry into this instrument, the Purchaser may not receive any Tokens and the Company may at that time no longer have enough assets to be able to fund a refund of the purchase price. Moreover, any Tokens that the Purchaser does acquire may be virtually worthless, given the lack of a market on which they may be traded. In such circumstances, a Dissolution Event may be the only means by which the Purchaser may generate any returns whatsoever, and given the Company is an early-stage company, the Purchaser would likely recoup only a portion (if any) of its investment as a result of a Dissolution Event.

*4.*      ***The SAFTs may not be transferred.***

The terms of the SAFT prohibit transfer of the SAFT. As a result, Purchasers will be required to hold their SAFT until the earlier of the Platform launch and the delivery of all of the Tokens, or the termination of the SAFT pursuant to the provisions set forth therein. Consequently, the Purchaser must be prepared to bear the risk of an investment in the SAFT until the termination of the SAFT pursuant to the terms set forth therein.

5.      **The Platform may have limited users and competitors.**

It is possible that the Platform will not be used by a large number of individuals, companies and other entities or that there will be limited public interest in the development and operation of the Platform. Such a lack of use or interest could negatively impact the development of the Platform and therefore the potential utility of Tokens.

Further, it is possible that alternative networks could be established for the same or similar purposes as the Platform, and the Platform may be required to compete with such alternative networks, which could negatively impact the Platform and the Tokens.

6.      **The code underlying the Platform may change.**

The Platform is built on top of the Ethereum blockchain.  In addition to the aforementioned risks regarding development and acceptance of blockchain networks or the price of blockchain assets that may negatively affect the Ethereum network, other changes such as upgrades to Ethereum's blockchain, a "hard fork" in Ethereum, or a change in how transactions are confirmed on the Ethereum blockchain, may have unintended, adverse effects on the Platform.  Such a hard fork has already occurred on the Ethereum blockchain with the divergence of "Ethereum Classic" from the new Ethereum protocol developed in the wake of a $3.6 million hack of The DAO, a decentralized autonomous organization using the Ethereum network, in June 2016.  These changes may occur at any time prior to the development of the Platform and may cause delays in development or may completely foreclose the Company's ability to launch the Platform.

7.      **There are risks associated with the Ethereum protocol.**

Because the Tokens are based on the Ethereum protocol, any malfunction, breakdown or abandonment of the Ethereum protocol may have a material adverse effect on the Platform or Tokens. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the Tokens by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol.

8.      **There are risks of malicious cyberattacks or exploitable flaws in the underlying code of the Platform.**

The Company will take steps to build, maintain, and secure the infrastructure of the Platform and the Company's users' wallets and will work with experts as required in order to develop and employ best practices for network security; however, despite these measures, the

Platform structural foundation, the open-source protocol, the software application and other interfaces or applications built upon the Platform are still in an early development stage and are unproven, and there can be no assurances that the Platform and the creating, transfer or storage of the Tokens will be uninterrupted or fully secure which may result in a complete loss of the Company's users' Tokens or an unwillingness of the Company's users to access, adopt and utilize the Platform. Further, the Platform may also be the target of malicious attacks seeking to identify and exploit weaknesses in the software or the Platform which may result in the loss or theft of Tokens. In any such event, if the Network Launch does not occur or if the Platform is not widely adopted, Members may lose some or all of their investment.

9.    **The Purchasers may lose access to Tokens due to loss of private key(s).**

A private key, or a combination of private keys, is necessary to control and dispose of Tokens stored in your digital wallet or vault. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing Tokens will result in loss of such Tokens. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet service you use, may be able to misappropriate your Tokens.

10.   **There is a risk of mining attacks.**

As with other decentralized cryptographic tokens based on the Ethereum protocol, Tokens are susceptible to attacks by miners in the course of validating Token transactions on the Ethereum blockchain, including, but not limited, to double-spend attacks, majority mining power attacks, and selfish-mining attacks. Any successful attacks present a risk to the Platform and the Tokens, including, but not limited to, accurate execution and recording of transactions involving the Tokens.

11.   **There is a risk of hacking and security weaknesses.**

Hackers or other malicious groups or organizations may attempt to interfere with the Platform and the Tokens in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, because the Platform is based on open-source software, there is a risk that a third party or a member of the Company team may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Platform, which could negatively affect the Platform and the Tokens.

Many jurisdictions have data protection, security, privacy and other government- and industry-specific requirements, including those that require companies to notify individuals of data security incidents involving certain types of personal data. Security compromises and/or the Company's failure to comply with all applicable requirements could harm the Platform's reputation, erode user confidence in the effectiveness of its security measures, negatively impact its ability to attract new users, or cause existing users to stop using the Platform.

12.   **Tokens will be uninsured.**

Unlike bank accounts or accounts at some other financial institutions, Tokens are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer, such as the Federal Deposit Insurance Corporation, or private insurance arranged by us, to offer recourse to you.

**13.**     ***The Purchasers will have no control over the Company.***

The Purchasers are not and will not be entitled, to vote or receive dividends or be deemed the holder of capital stock of the Company for any purpose, nor will anything be construed to confer on the Purchasers any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**14.**     ***The Offering may be subject to registration under the Securities Exchange Act of 1934 (the "Exchange Act") if the Company has assets above $10 million and more than 2,000 purchasers participate in the SAFT offering.***

Companies with total assets above $10 million and more than 2,000 holders of record of its equity securities, or 500 holders of record of its equity securities who are not accredited investors, must register that class of equity securities with the Securities and Exchange Commission (the "**SEC**") under the Exchange Act. With the capital raised from the SAFT offering, the Company may surpass $10 million in assets as it builds out the Platform.

Furthermore, the SAFTs are likely considered a security under U.S. securities law and because there is the possibility that this SAFT offering may surpass 2,000 purchasers, the Company may have more than 2,000 holders of record of its equity securities following the SAFT offering. If these two conditions are met then the Company will have to register this SAFT offering with the SEC, which will be a laborious and expensive process. If such registration takes place, much of the information regarding this SAFT offering will be available to the public.

**15.**     ***Uncertain regulations and enforcement actions present may have an adverse impact on the operation of the Platform and the Tokens.***

The regulatory status of tokens, distributed ledger blockchain technologies, token offerings such as this, cryptocurrencies, and cryptocurrency exchanges currently is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens. It is likewise difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications, including the Platform and the Tokens. Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are a regulated financial instrument that requires

registration or licensing. The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. Failure by the Company, the or certain users of the Platform to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

The regulation of non-currency use of blockchain assets is also uncertain. The CFTC has publicly taken the position that certain blockchain assets are commodities, and the SEC has issued a public report stating federal securities laws require treating some blockchain assets as securities. To the extent that a domestic government or quasi-governmental agency exerts regulatory authority over a blockchain network or asset, the Platform and the Tokens may be materially and adversely affected.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea, and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Platform. Such laws, regulations or directives may conflict with those of the United States or may directly and negatively impact our business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Platform and the adoption and utility of the Tokens.

**16.**     ***Taxation of the Tokens is uncertain.***

The tax characterization of the Tokens is uncertain. You must seek your own tax advice in connection with purchasing the Tokens, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

**17.**     ***There are risks arising from lack of governance rights.***

Because Tokens confer no governance rights of any kind with respect to the Platform or the Company or its corporate affiliates, all decisions involving the Platform or the Company will be made by the Company at its sole discretion, including, but not limited to, decisions to discontinue the Platform, to create and sell more Tokens for use in the Platform, or to sell or liquidate the Company. These decisions could adversely affect the utility of the Tokens you will hold upon conversion of the SAFT instrument.

**18.**     ***The further development and acceptance of blockchain networks, including the Platform, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of blockchain networks and blockchain assets would have an adverse material effect on the successful development and adoption of the Platform and the Tokens.***

The growth of the blockchain industry is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as blockchain networks, include, without limitation:

- Popularity and use of blockchain technologies and blockchain-based tokens;

- Regulation of blockchain assets and of their use;

- Changes in consumer demographics and public tastes and preferences; and

- The availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies or existing traditional networks.

*19.* **Token price volatility may have a negative affect on the success of the Platform.**

As relatively new products and technologies, cryptocurrencies and other digital assets based on a computer-generated cryptographic protocol ("***Digital Assets***") have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of demand for Digital Assets is generated by speculators and investors seeking to profit from the short- or long-term holding of such assets. Consequently, Digital Assets—including protocol tokens as well as "app coins"—have been subject to a high degree of price volatility. As usage of the Tokens is expected to be limited to the Platform, the Tokens, like other Digital Assets, may experience speculation and dramatic fluctuations in value, which could negatively affect the success of the Platform.

*20.* **Unanticipated Risks.**

Cryptographic tokens such as Tokens are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your purchase, holding and use of Tokens, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit B**.

# EXHIBIT E

⚡ THE XTRADE.IO PRE-SALE IS NOW OPEN ⚡

Join the pre-sale here -> https://www.xtrade.io/kyc/

Telegram Announcement Channel - https://t.me/xtradeannoucements

Token Metrics

Token: XTRD, ERC20 Token
Hard cap: $45m
Purchasable via: BTC or ETH
Token Generation: 50% of XTRD tokens sold, 1 token generated on XTRADE.IO side for every 1 token created.
Price: $0.10 per token, calculated as the dollar value of ETH or BTC at time received, divided by $0.10, plus bonus tokens.

Pre-sale Terms

ETH Bonus
10 to 15 10%
15 to 25 15%
25 to 50 20%
50+ 25%

KYC/AML Information

For Individuals

1. ID — A high-quality colour copy of a current government-issued Passport or National Identity Card showing your photo.
2. Proof of Address — Utility bill or bank statement dated no later than last 3 months.
3. For US-residents only — Letter of accreditation from your CPA, Brokerage, or Attorney confirming your accreditation status under Rule 501 of Regulation D, or documents sufficient to provide proof of required income or assets.

For Companies

1. Certificate of Incorporation
2. Articles of Association or Constitution
3. Directors Register
4. Shareholders Register

5. Board Resolution and Proof of identity and address provided by a third party such as a bank statement or utility bill for each Director, Authorized person/s and for each Shareholder holding more than a 20% shareholding.
6. If a US Company, proof of accreditation for all principals as in Individual requirements above

Portal is now live - https://www.xtrade.io/kyc/

Minimum Contribution: 10ETH or equivalent in BTC.

⌞ LEARN ABOUT XTRADE.IO ⌟
Read the whitepaper -
https://xtrade1-9649.kxcdn.com/wp-content/uploads/2017/09/xtrade-whitepaper.pdf

Website: https://www.xtrade.io
Twitter: https://twitter.com/xtradeio
Blog: https://xtrade.ghost.io/
Medium: https://medium.com/xtradeio
Facebook: https://www.facebook.com/xtradeio/
Reddit: https://www.reddit.com/r/XtradeIO/

SCHEDULE
Token Generation Event: Date TBC but will follow once the public sale has closed.

WHAT IS THIS CHANNEL?
• This is the official Xtrade.io group for all community discussions surrounding the Xtrade.io project.

RULES 🦋🔥
• We cannot and will not discuss exchanges or secondary markets.
• Please keep all discussions relevant + use common sense.
• Keep chat surrounding the moon to a minimum.

FAQ

Q: Can I participate in the pre-sale?
A: Yes, we have opened the whitelist and will be processing KYC once this closes.

Q: Will it be listed on an exchange?
A: The XTRD token is a utility token created for use on the Xtrade.io platform.

Q: Do I have to be an accredited investor to participate in the pre-sale?
A: If you are based inside of the US, yes. If you are based outside of the US, no you do not need to be accredited.

# EXHIBIT F

4/1/18 - 📌 Hello XTRD community!

We would like to take this opportunity to thank the community and supporters. ⊓⊓The public presale has concluded! Whilst we process the final influx of KYC, we ask for your patience in updating the community with final figures.

• NOTE: The token generation event will follow, which will occur towards end of April - Stay tuned!

With Kind Regards,
The XTRD Team

4/25/18 - 📌 Update April 25 – Hello XTRD.IO Community!

The Token Generation Event (TGE) is scheduled to begin on 4/30/18. There will not be a crowd sale.

•  We have raised approximately 70% of the $45m hard cap at this time. That is sufficient to progress forward as planned.

• All that contributed will receive an email THIS WEEK confirming the amount contributed, the dollar peg to ETH/BTC, the respective bonus if applicable, the total number of XTRD tokens to be sent, and the receiving ERC20 wallet address that was provided to XTRD.IO.

• Please double check all the information in the email and contact us at info@xtrade.io if any issues.

• Bounty spreadsheet and payment info will be published post TGE in early May.

Thank you for participating in the XTRD token sale. Exciting times ahead!
The XTRD Team