UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ANTHONY FASULO and GAUTAM DESAI,

                Plaintiffs,

    vs.

XTRADE DIGITAL ASSETS INC., XTRADE DIGITAL
HOLDINGS, ALEXANDER KRAVETS, SERGII
GULKO, and JON GIACOBBE

                Defendants.
------------------------------------------------------------------------X

Case No. 19-cv-03741 (PKC)


**DEFENDANTS' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**


KAGEN & CASPERSEN PLLC
Joel M. Taylor, Esq.
Stuart Kagen, Esq.
757 Third Avenue, 20th Floor
New York, NY  10017
*Attorneys for Defendants*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 7

I.    PLAINTIFFS LACK ARTICLE III STANDING ........................................................ 7

II.    COUNT I ALLEGING VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
MUST BE DISMISSED ........................................................................................... 8

    A.   Statements About Whether The Tokens Would Be Securities ........................................ 8

        1.   Falsity Is Not Adequately Alleged ....................................................................... 9

           a.   The SAC does not adequately allege that the tokens are securities ......................... 9

              *(i)*   *The Tokens Are Currency* ..................................................................... 10

              *(ii)*   *The Tokens Are Not Investment Contracts* ...................................................... 12

           b.   The SAC does not plausibly allege that Risk Factor 15 was misleading ............... 13

        2.   A Strong Inference Of Scienter Is Not Raised ....................................................... 15

        3.   Reasonable Reliance Is Not Plausibly Alleged ....................................................... 16

        4.   Loss Causation Is Not Plausibly Alleged ................................................................ 18

    B.   Statements About Xtrade's Alleged Plans To Offer Market Making Services.............. 19

        1.   Falsity Is Not Adequately Pled ............................................................................... 19

        2.   The Statements Fall Within the PSLRA Safe Harbor For Forward Looking
Statements ........................................................................................................ 20

           a.   The statements are forward-looking ......................................................... 20

           b.   The statements were accompanied by meaningful cautionary statements.............. 21

           c.   Actual knowledge of falsity is not plausibly alleged ............................................ 22

        3.   Loss Causation Is Not Plausibly Alleged ................................................................ 23

C.    Statements about Xtrade's alleged plans to sell tokens to the general U.S. public........ 25

D.    Omission Of Xtrade's Alleged Plans To List Tokens On Idex And Coinsuper ........... 27

E.    Statements About Xtrade's Plans To Ensure Regulatory Compliance ......................... 29

F.    Statements About The SAFT's Compliance With The Securities Laws ...................... 30

G.    Statements About Kravets's Background ....................................................... 31

H.    Statements About The CME ....................................................... 32

III.    COUNT III ALLEGING VIOLATION OF SECTION 5 OF THE SECURITIES ACT SHOULD BE DISMISSED ........................................................... 32

A.    The Section 12(a)(1) Claim Is Time Barred................................................. 32

B.    Failed To Plead Facts Establishing A Right To Relief Under Section 12 .................... 33

IV.    COUNTS II AND IV ALLEGING CONTROL PERSON LIABILITY SHOULD BE DISMISSED.......................................................... 35

V.    THE COURT SHOULD DECLINE JURISDICTION OVER COUNT V FOR COMMON LAW FRAUD............................................................ 35

CONCLUSION.................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 37 & n.1(2d Cir. 2012) 5

*C.N.S. Enterprises, Inc. v. G & G. Enterprises, Inc.*, 508 F.2d 1354, 1363 (7th Cir. 1975) ........ 10

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ................................................................................................................................................ 36

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014)................................................................................................................................................ 18

*Carroll v. United States*, 326 F.2d 72, 85-86 (9th Cir. 1964)........................................................ 34

*CFTC v. McDonnell*, 287 F. Supp. 3d 213, 219 (E.D.N.Y. 2018) (Weinstein, J) .............. 5, 14, 26

*CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497 (D. Mass. 2018)............................... 14

*Chardan Capital Mkts., LLC v. Northwest Biotherapeutics, Inc.*, 2018 U.S. Dist. Lexis 131867, at *4 & n.1 (Aug. 6, 2018) (Castel, J) ....................................................................................... 2

*City of Westland Police and Fire Retirement System v. Metlife, Inc.*, 928 F.Supp. 2d 705, (S.D.N.Y. 2013) (Kaplan, J)............................................................................................... 24, 25

*Eriksson v. Galvin*, 484 F. Supp. 1108, 1119 (S.D.N.Y. 1980).................................................... 34

*Evergreen Fund, Ltd. v. McCoy*, 2000 WL 1693963, at *7 (N.D. Ill. 2000)................................ 35

*Federal Housing Finance Agency for Federal National Mortgage Assoc. v. Nomura Holding America, Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) ............................................................................ 35

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994)........................... 5

*Golden v. Garafalo*, 678 F.2d 1139, 1144-46 (2d Cir. 1982)......................................................... 9

*Gregory v. PorNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 412 (S.D.N.Y. 2018) (Engelmayer, J) ................................................................................................................................................ 17

*Grenadar v. Spitz*, 537 F.2d 612, 618 (2d Cir. 1976) .................................................................. 11

*Gross v. AT&T Inc.*, 2019 U.S. Dist. LEXIS 128615 at *6 (S.D.N.Y. July 31, 2019) (Caproni, J)7

*Harrell v. Primedia, Inc.*, 2003 U.S. Dist. LEXIS 13595 at *6 (S.D.N.Y. Aug. 6, 2003) (Martin, J) ................................................................................................................................................. 5

*Hunt v. Alliance North American Gov. Income Trust, Inc.*, 159 F.3d 723, (2d Cir. 1998).......... 17

*I.L.G.W.U. Nat'l Retirement Fund v. Cuddlecoat, Inc.*, 2004 WL 444071 at *3 (S.D.N.Y. 2004) 19

*Iconix Brand Group, Inc., v. Merrill Lynch, Pierce/Fenner & Smith Inc.*, 2012 U.S. Dist. LEXIS 77331, *9 (S.D.N.Y. June 4, 2013) (Preska, J) ........................................................................ 5

*In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, 381 F. Supp. 2d 192, 247 (S.D.N.Y. 2004) (Kram, J)....................................................................................................... 35

*In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp.3d 358, 374-75 (S.D.N.Y. 2018) ............. 20, 21

*In re China Mobile Games & Entertainment Group, Ltd.*, 2015 WL 922711 at *8 (S.D.N.Y. 2016).................................................................................................................... 15, 36

*In re Delcath Systems, Inc. Sec. Litlg.*, 36 F. Supp.3d 320, 333 (S.D.N.Y. 2014) ...................... 21

*In re Fyre Festival Litig.*, 2019 U.S. Dist. LEXIS 114687, at *10 (S.D.N.Y. July 10, 2019) (Castel, J)........................................................................................... 8, 23, 27, 31

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419-21 & n.6 (S.D.N.Y. 2003) (Pollack, J) ......................................................................................... 5

*In re New Energy Sys. Secs. Litig.,* 66 F. Supp. 3d 401, 406 & n.33 (S.D.N.Y. 2014) (Kaplan, J) .................................................................................................................... 28, 29

*In re Sanofi sec. Litig.*, 155 F. Supp.3d 386, 409 (S.D.N.Y. 2016) (Castel, J)...................... 18, 31

*Indemnity Ins. Co. of North America v. Expeditors Int'l of Washington, Inc.*, 382 F. Supp. 3d 302, 306 (S.D.N.Y.  2019) (Woods, J) ...................................................................... 6

*Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1054 & n. 7 (2d Cir. 1969) ...................................... 34

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F. Supp. 3d 161, 177 (2d Cir. 2005) .......................... 24

*Leykin v. AT&T Corp.*, 423 F. Supp.2d 229, 243-44 (S.D.N.Y. 2006).................................. 18, 25

*Libaire v. Kaplan*, 395 Fed.Appx. 732, 734-35 (2d Cir. 2010) .................................................. 13

*Lord Abbett Aff. Fund., Inc. v. Navient Corp.*, 363 F. Supp.3d 476, 487-88 (D. Del. 2019)....... 31

*Loyalty Conversion Systems Corp. v. American Airlines, Inc.*, 66 F. Supp.3d 829, 837 & n.2 (E.D.Texas 2014) ..................................................................................................... 11

*Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 379 (D.N.J. 1999)................................ 36

*NECA-IBEW Health & Wealth Fund v. Pitney Bowes, Inc.*, 2013 WL 1188050 at *17 (D.Conn. 2013)...................................................................................................................... 21

*Peralta v. Peralta*, 2018 U.S. Dist. LEXIS 43581, at *26-27 (S.D.N.Y. March 16, 2018) (Carter, J) ........................................................................................................................... 9

*Pines of Virginia, Inc. v. PLD, Ltd.*, 399 F. Supp. 708, 712 (M.D.Fla. 1975)............................ 10

*Poindexter v. EMI Record Group, Inc.*, 2012 U.S. Dist. LEXIS 42174 at *6 (S.D.N.Y. March 27, 2012) (Swain, J) ................................................................................................... 10, 27

*Proctor & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1280-81 & n.4 (S.D. Ohio 1996)...................................................................................................................... 10

*R. Rosenberg & Sons, Inc. v. St. James Sugar Co-op, Inc.*, 447 F. Supp. 1, 4 (E.D.La., 1976) ... 13

*Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d. Cir. 1989)... 17, 19

*Seagrave Corp. v. Vista Resources, Inc.*, 696 F.2d 227, 230 (2d Cir. 1982) .................................. 9

*SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) ........................................ 12

*SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 352-3 (1943) ............................................................ 12

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ..................................................................... passim

*Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ......................................... 20, 22

*Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 362 (S.D.N.Y. 2013) (Castel, J) ............................. 29

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) .................................................. 10

*Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016)..................................................................... 17

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975)............................... 11, 12

*United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993) ....................................................................................................................................... 6

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008).............................................................................................................................................. 7

*Warfield v. Alaniz*, 569 F.3d 1015, 1021-22 (9th Cir. 2009) ....................................................... 12

*Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 & n.5 (2d Cir. 1980) ..................................... 34, 35

*Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 472, 493 (S.D.N.Y. 2017) .............. 22

*Willis v. Morgan Keegan & Co.*, 2010 U.S. Dis. LEXIS 132902, at *36 (W.D. Tenn., Dec. 15, 2010).............................................................................................................................................. 7

*Wooden v. Norris*, 637 F. Supp. 543, 545 (M.D. Tenn. 1986) .................................................... 11

## Statutes

§ 2(1) of the 1933 Act ..................................................................................................................... 9

§ 3(a)(10) of the 1934 Act ............................................................................................................... 9

15 U.S.C. § 77e ............................................................................................................................... 33

15 U.S.C. § 77m .............................................................................................................................. 33

15 U.S.C. § 78c(a)(1) ........................................................................................................... 9, 10, 23

15 U.S.C. § 78u—4(b)(4) ............................................................................................................... 18

15 U.S.C. §78u-5(i)(1) ................................................................................................................... 20

## Other Authorities

https://en.wikipedia.org/wiki/2018_cryptocurrency_crash................................................................ 5

https://fortune.com/2018/11/23/cryptocurrency-crash-2018-bitcoin-price/ .................................... 5

https://www.bloomberg.com/news/articles/2018-09-12/crypto-s-crash-just-surpassed-dot-com-levels-as-losses-reach-80.................................................................................................................. 5

Webster's Third New International Dictionary (Philip Babcock Gove ed. 2002)........................ 10

## PRELIMINARY STATEMENT

In January 2018, Plaintiffs purchased from Xtrade instruments known as a Simple Agreement For Future Tokens ("SAFT") entitling them to receive digital tokens used to access and pay for services on a cryptocurrency trading platform being developed by Xtrade.  By their Second Amended Complaint, Plaintiffs seek to rescind these purchases, claiming that the tokens are unregistered securities and that Defendants fraudulently induced them to purchase the SAFTs.  The animating theme of the pleading is that Defendants knew all along that the SEC would view the tokens to be securities and that, after selling the SAFTs, to avoid regulatory scrutiny, Xtrade abandoned its advertised plans to hold a "crowd sale" of tokens directly to the general U.S. public and to provide market making services to its customers.  As a result, Plaintiffs' claim, the value of the tokens collapsed.

This yarn would have a ring of plausibility to it, were it not for the fact that it is in every relevant respect contradicted by the very documents that Plaintiffs allege induced them to purchase the SAFTs.  Plaintiffs allege, for instance, that they purchased the SAFTs in reliance on statements contained in a White Paper supposedly stating that Xtrade planned to provide market making services to its customers.  But, in actuality, the White Paper says no such thing.  It is a false pleading.  One that Plaintiffs try to pass off in the SAC by omitting, through use of ellipses, portions of block quoted text from the White Paper that would reveal that their allegations are untrue.  False too is the allegation that Xtrade cancelled a previously announced "crowd sale" of tokens to the general U.S. public.  In fact, what the White Paper says that a "crowd sale" will be held only "if necessary" and that only accredited investors would be allowed to participate.

What is really going on is that Plaintiffs (or their undisclosed clients) feel that they lost some money when the cryptocurrency market as a whole crashed, beginning in January 2018 –

the very month Plaintiffs' purchased the SAFTs – losing nearly 90% of its value in the 2018 calendar year.  They are looking to Defendants to insure them against that supposed loss.

We are firm in our view, which we think the Court will share, that the tokens are not securities, and no plausible inference that Defendants ever believed otherwise is raised by the SAC.  And in any event, Defendants knew full well what they were getting themselves into.  The risks associated with the SAFTs were fully disclosed to Plaintiffs, including the possibility that the tokens may be deemed to be securities and that Xtrade may cease operations for which regulatory approvals are deemed to be not commercially desirable.  In sum, this is a litigation shake down in its rawest form.

## **BACKGROUND**

### **Plaintiffs' Allegations**

Xtrade is an early stage startup blockchain technology company.  (SAC ¶¶ 1-2).  In January 2018, Anthony Fasulo ("Fasulo") and Gautam Desai ("Desai") each received an email from Xtrade's CEO, Alexander Kravets ("Kravets"), inviting them to buy digital tokens from Xtrade.  (Id. ¶91).  The email appended a "White Paper" describing the tokens, their functionality, and Xtrade's business model.  (Id. ¶93)  The tokens were marketed as a means of gaining access to and paying for services on a cryptocurrency trading platform being developed by Xtrade.  (Id. ¶2).

In January 2018, Fasulo and Desai both purchased instruments known as a Simple Agreement for Future Tokens ("SAFT") entitling them to receive tokens from Xtrade.  (Id. ¶¶94 & 101).  Fasulo purchased two SAFTs.  One, for which he paid bitcoin valued at $1,159,995.10. and another, for which he paid $75,000 in cash.  (Id. ¶ 95-96).  Desai purchased one SAFT, for which he paid bitcoin valued at $1,207,043.20.  (Id. ¶ 104).

Fasulo and Desai purchased the SAFTs in reliance on "the many promises" made in the White Paper.  (SAC ¶¶94 & 101).  In particular, "the reason" they purchased the SAFTs is that Xtrade had expressed an intention to offer market making services "for the use of which one would need to purchase tokens." (Id. ¶¶69 & 139).  In March 2018, Xtrade announced that it no longer intended to provide market making services and that it was cancelling plans to hold a public "crowd sale" of tokens to the general, unaccredited, U.S. public.  (Id. ¶¶ 69, 107).

The SAC alleges that Defendants knew all along that (i) the SEC viewed cryptocurrencies to be securities, and that (ii) Xtrade's contemplated market making services would be viewed by the SEC as that of an "exchange", requiring registration with the SEC as a national securities exchange or alternative trading system ("ATS") and broker dealer, and that its stated intention to provide market making services was "illusory".  (Id. ¶ 69).

In May 2018, Xtrade delivered to Fasulo and Desai the tokens to which they had purchased rights under the SAFTs.  (Id. ¶ 114).  In August 2018, Defendants caused or allowed the tokens to be listed on two foreign cryptocurrency exchanges, Idex and Coinsuper.  (Id. ¶ 110). The tokens began trading at less than $.01 per token and later declined to $.001 per token.  (Id. ¶ 144).  The SAC alleges that the loss in value of the tokens – from the contract price of $.10 to a trading price of less than $.001 – was caused by Xtrade's announcements that it did not intend to offer market making services to token holders and that it was terminating its planned "crowd sale" of tokens to the general, unaccredited, U.S. public.  (Id. ¶ 20).

**The White Paper**[1]

Contrary to Plaintiffs' allegations, the White Paper does <u>not</u> express an intention to sell

---

[1]     On a motion to dismiss, the Court may consider documents that are integral to a complaint.  *Chardan Capital Mkts., LLC v. Northwest Biotherapeutics, Inc.*, 2018 U.S. Dist. Lexis 131867, at *4 & n.1 (Aug. 6, 2018) (Castel, J). The White Paper is integral to and cited throughout the SAC and is alleged to contain misrepresentations on which Plaintiffs relied in deciding to purchase the SAFTs.  (SAC ¶¶ 94, 101, 139)

tokens to the general, unaccredited, U.S. public in a "crowd sale". It says the opposite: "if necessary, Xtrade will conduct a crowd sale of the XTRD token to accredited investors under Reg D and non-US investors under Reg S. Non-accredited US investors will not be allowed to participate in the Token Generation Event to ensure proactive compliance with current US securities laws and regulations." (Kravets Decl. Ex. A, at p. 31).

Contrary to Plaintiffs' allegations, the White Paper does not express an intention to offer market making services to token holders. The White Paper describes three products that Xtrade planned to launch in sequential stages. (Id. at pp. 7-9). First, it describes a financial information exchange application programing interface (the "FIX-API"). A FIX-API is a computer programming interface that provides a standard means of communication between cryptocurrency exchanges, enabling traders to access multiple markets by coding to a single exchange interface. (Id. at 9). Second, it describes a computer application, in the form of downloadable software, to be used as a trading platform across multiple cryptocurrency exchanges (the "Platform"). Third, it describes single point of access ("SPA") services, which entail Xtrade acting as a counterparty to client trades executed on a joint venture exchange, clearing balances from Xtrade's inventory accounts at other exchanges.

Market making is not included in the description of the products that Xtrade planned to offer. (Id.). Nor is it included in the description of fee-based services from which Xtrade anticipated generating revenue, which appears under the heading "Execution Fees." (Id. at p. 34). Instead, market making is described as a potential non-fee based source of revenue generated through proprietary trading, which appears under the separate heading "Marketing Material". (Id.).

The SAC is correct that the tokens are described in the White Paper as a means of gaining

access to and paying for services provided by Xtrade.  The White Paper states that the tokens are to be "used as a means of payment by trading participants for services provided by Xtrade" and that "The XTRD utility token will be utilized on the XTRADE network by market participants to pay for execution, VPS, market data, software licensing, and other fees."  (Id. at p. 30).  It also states that the value of the tokens is "derived purely from serving as a medium of payment for services by market participants in the XTRADe trading ecosystem".  (Id.).  It further states that the tokens are "not designed for speculation."  (Id.)

**The SAFTs[2]**

The SAFTs include an appended schedule of "Risk Factors", which Fasulo and Desai expressly acknowledged and assumed by purchasing the SAFTs.  (Kravets Decl. Ex. B).  Risk Factor 15 warns of various risks relating to, among other things, the regulatory status of the tokens.  Risk Factor 15 states in most-relevant part:

> The regulatory status of tokens, distributed ledger blockchain technologies, token offerings such as this, cryptocurrencies, and cryptocurrency exchanges currently is unclear or unsettled in many jurisdictions.  It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens. . . Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are regulated financial instruments that requires registration or licensing.  The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction.

**"The Great Crypto Crash Of 2018"[3]**

---

[2]    The SAFTs are integral to and extensively referenced in the SAC and the schedule of risk factors contained therein, which are quoted in part, are alleged to contain actionable misrepresentations.  (SAC ¶85-89, 94, 101)

[3]    The Court "is entitled to take judicial notice of market phenomena such as economic downturn or market collapse".  *Iconix Brand Group, Inc., v. Merrill Lynch, Pierce/Fenner & Smith Inc.*, 2012 U.S. Dist. LEXIS 77331, *9 (S.D.N.Y. June 4, 2013) (Preska, J) (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994).  In connection with the bursting of the internet bubble in 2000, this Court did so for purposes of

As of January 6, 2018, the combined market capitalization of all virtual currencies was roughly $795 billion.  *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 219 (E.D.N.Y. 2018) (Weinstein, J.).  By February 6, 2018, the total value had dropped to $329 billion.  *Id*.  By November 2018, the cryptocurrency market had suffered a peak-to-trough decline greater than the 78% decline after the dot com bubble burst in 2000, a phenomena Bloomberg dubbed "The Great Crypto Crash of 2018."  (Taylor Decl. Exs. A & B).  By year end, the cryptocurrency market had declined by nearly 90%.  (Id. Ex. C).



### Token Syndication

As discussed in the expert report of Steven McNew, subsequent to the transfer of tokens

---

evaluating the sufficiency of allegations of both loss causation and scienter.  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419-21 & n.6 (S.D.N.Y. 2003) (Pollack, J) (granting 12(b)(6) motion; "the Court may take judicial notice of the burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims.  The burst of the bubble and the attendant market chaos are not chargeable to the defendants and represent intervening causes for which defendants are not responsible in the sequence of responsible causation."); *Harrell v. Primedia, Inc.*, 2003 U.S. Dist. LEXIS 13595 at *6 (S.D.N.Y. Aug. 6, 2003) (Martin, J) (granting 12(b)(6) motion; "Viewed in the context of the well-publicized dot.com boom and bust that occurred during 1999 and 2000, the fact that Plaintiffs never received options for working in these dot.com companies does not support an inference that the Defendants engaged in the massive conspiracy to defraud which the Plaintiffs purport to allege.").  The Court may also take judicial notice of historic stock prices without converting a motion to dismiss into one for summary judgment.  *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 37 & n.1(2d Cir. 2012)

by Xtrade to Plaintiffs the tokens were transferred to a significant number of other accounts on the blockchain in a manner representative of the typical behavior of a syndication, wherein the true owners of the tokens are not Fasulo and Desai, but instead the members of their syndicate group.  (McNew Decl. Ex. A).

## ARGUMENT

When a defendant "moves for dismissal under Rule 12(b)(1), as well as other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined."  *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993).  If "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  *Indemnity Ins. Co. of North America v. Expeditors Int'l of Washington, Inc.*, 382 F. Supp. 3d 302, 306 (S.D.N.Y.  2019) (Woods, J).

## I.   PLAINTIFFS LACK ARTICLE III STANDING

The SAC alleges that Plaintiffs "own" the tokens and that they have been injured in an amount equal to the difference in value between the purchase price of the tokens, $.10 per token, and the price at which it is presently trading in the secondary market, approximately $.001 per token.  (SAC ¶¶ 144-45, 184).

A party has Article III standing to assert such a claim only if it has legal title the security on which the claim is based or if it otherwise has legal title to the claim.  *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (investment advisor lacked Article III standing to sue on behalf of clients who were the beneficial owners of security); *Gross v. AT&T Inc.*, 2019 U.S. Dist. LEXIS 128615 at *6 (S.D.N.Y. July 31, 2019)

(Caproni, J) (asset manager lacks Article III standing where right to sue belonged to funds holding legal title to securities); *Willis v. Morgan Keegan & Co.*, 2010 U.S. Dis. LEXIS 132902, at *36 (W.D. Tenn., Dec. 15, 2010) (father lacks Article III standing to assert claim in connection with security held in child's custodial account where father failed to submit evidence that child was still under 21 so custodial authority had not ended).

Here, as discussed, the blockchain ledger of transfers for the tokens indicates that Fasulo and Desai were acting as syndicators when they purchased the SAFTs and that the tokens have been distributed by them to the members of their respective syndicates.   As a result, they do not have Article III standing to assert claims on behalf of their syndicate members any more so than an investment advisor has standing to sue on behalf of its clients.

## II.     COUNT I ALLEGING VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT MUST BE DISMISSED

The SAC alleges that Defendants made misstatements relating to the following eight topics:  (a) whether the tokens would be securities; (b) Xtrade's alleged plans to offer market making services to its customers; (c) Xtrade's alleged plans to sell tokens to the general, unaccredited, U.S. public, (d) Xtrade's alleged plans to list the tokens on foreign exchanges, (e) Xtrade's intention to ensure compliance with applicable regulations; (f) the SAFTs conformity with the securities laws, (g) Kravet's work experience; and (h) Xtrade's relationship with the Chicago Mercantile Exchange ("CME").  Each is discussed below in turn.

### A.     Statements About Whether The Tokens Would Be Securities

The SAC alleges that "[i]n their advertising and information documents, Defendants claimed that their token would not be a security" and that this claim was false because the tokens "undoubtedly" are securities under the test established in *SEC v. W.J. Howey Co.*, 328 U.S. 293

(1946) (the "*Howey* test").[4]  (SAC ¶7).  It also alleges that the first two sentences of Risk Factor 15 were misleading.  Claims directed at these alleged statements fail to state a claim for the following four reasons:

### 1.      Falsity Is Not Adequately Alleged

The SAC does not adequately allege that the tokens are a securities or that Risk Factor 15 is misleading.

#### a.      The SAC does not adequately allege that the tokens are securities

Plaintiffs' assertion that the tokens "undoubtedly" are securities under the *Howey* test is a legal conclusion "not entitled to the presumption of truth".  *In re Fyre Festival Litig.*, 2019 U.S. Dist. LEXIS 114687, at *10 (S.D.N.Y. July 10, 2019) (Castel, J).  As support for that legal conclusion, the SAC alleges only that "the tokens bore all the characteristics of a security:  they represented an investment of money in a common enterprise, and purchasers would be led to expect profits solely from the efforts of Xtrade."  (SAC ¶51)  But this merely recites the standard applied under the *Howey* test, "which is insufficient to state a claim."  *Peralta v. Peralta*, 2018 U.S. Dist. LEXIS 43581, at *26-27 (S.D.N.Y. March 16, 2018) (Carter, J).

A "two-part, seriatim test" is used to determine if an instrument is a security.[5]  *Golden v.*

---

[4]    Other than the White Paper, the SAC does not plead with particularity any "advertising" or "information documents" that allegedly contain the challenged statements.

[5]    The definitions of "security" in § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act are "virtually identical" and are treated as such in "decisions dealing with the scope of the term." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n. 1 (1985).  It is defined in the Exchange Act as follows:  "The term 'security' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not

*Garafalo*, 678 F.2d 1139, 1144-46 (2d Cir. 1982).  The first part asks whether the instrument has the "characteristics usually associated with" one of the types of instruments listed in the definition of "security" (e.g. a "note" or "stock").  *Id.*  The second part asks whether the instrument falls within the "catch-all phrase 'investment contract'" by applying the *Howey* test.

If, in the first part of the test, it is determined that the instrument has the characteristics usually associated with of one of those listed in the definition of security, "the court need not resort to the 'economic realty' test set forth" in *Howey*.  *Seagrave Corp. v. Vista Resources, Inc.*, 696 F.2d 227, 230 (2d Cir. 1982).  As explained by the Supreme Court, "applying the *Howey* test to traditional stock and other types of instruments listed in the statutory definition would make the Act's enumeration of many types of instruments superfluous".  *Landreth,* 471 U.S. at 692 (citing *Golden*).  And, as explained by the Second Circuit, relying on "conventional commercial and legal criteria for classifying . . . instruments", rather than the "economic reality" test of *Howey*, "avoids the danger of allowing the application of the '33 and '34 Acts to turn on uncertain and slippery factors, case by case."  *Golden*, 678 F.2d at 1145.

It is evident from the White Paper that (a) the tokens are "currency", a type of instrument expressly excluded from the definition of "security", and that (b) the tokens are not "investment contracts" under the *Howey* test.  Where, as here, a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Poindexter v. EMI Record Group, Inc.*, 2012 U.S. Dist. LEXIS 42174 at *6 (S.D.N.Y. March 27, 2012) (Swain, J).

### (i)      The Tokens Are Currency

---

exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."  15 U.S.C. § 78c(a)(1).

Currency is expressly excluded from the definition of "security".  15 U.S.C. § 78c(a)(1) ("The term 'security' means any note, stock, treasury stock . . . but shall not include currency"). Instruments that are found to have the characteristics usually associated with currency have been held not to qualify as securities.  See e.g. *C.N.S. Enterprises, Inc. v. G & G. Enterprises, Inc.*, 508 F.2d 1354, 1363 (7th Cir. 1975) (note serving as cash substitute not a security; granting motion to dismiss under Rule 12(b)(1)); *Pines of Virginia, Inc. v. PLD, Ltd.*, 399 F. Supp. 708, 712 (M.D.Fla. 1975) (same); *Proctor & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1280-81 & n.4 (S.D. Ohio 1996) (swap not a security where value is based on foreign currency).

The term "currency" is not defined in either the Securities Act or the Exchange Act. When a term is not defined in a statute it is to be given its "ordinary meaning".  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  Webster's Third New International Dictionary defines "currency" as "something that is in circulation as a medium of exchange".  (Philip Babcock Gove ed. 2002).  Examples of instruments found to fall within this definition include vendor loyalty points and prison "script".  See *Loyalty Conversion Systems Corp. v. American Airlines, Inc.*, 66 F. Supp.3d 829, 837 & n.2 (E.D.Texas 2014) ("The term 'currency' . . . is not limited to money, but includes other credits that are exchangeable for things of value); *Wooden v. Norris*, 637 F. Supp. 543, 545 (M.D. Tenn. 1986) ("'Script' . . . was produced by TDOC as the medium of exchange for inmate purchases . . . to eliminate the flow of 'free world' money.").

Here, as is explained in the White Paper, the tokens are a medium of exchange used to purchase services from Xtrade.  The White Paper states:  "The XTRD utility tokens will be utilized on the XTRADE network by market participants to pay for execution, VPS, market data, software licensing, and other fees."  The White Paper further states:  "The value of XTRD is derived purely from serving as a medium of payment for services by market participants in the

XTRADE trading ecosystem."  (Kravets Decl. Ex. A at p. 30).

### (ii)     The Tokens Are Not Investment Contracts

An "investment contract" is a contract or scheme "where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." *Howey*, 328 U.S. at 298.  The *Howey* test "first requires that the investor be 'led to expect profits'". *Grenadar v. Spitz*, 537 F.2d 612, 618 (2d Cir. 1976).  "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds".  *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("*Forman*").  "In such cases, the investor is attracted solely by the prospects of a return on his investment.  By contrast, ***when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply***." *Id.* (emphasis added).

To determine if an offering is an investment contract "courts are to examine the offering from an objective perspective."  *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 584 (2d Cir. 1982).  "The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 352-3 (1943) ("*Joiner*").  When applying that test, courts examine the "promotional materials associated with an instrument or transaction".  *Warfield v. Alaniz*, 569 F.3d 1015, 1021-22 (9th Cir. 2009) (collecting cases; citing *Joiner*).  See e.g. *Forman,* 421 U.S. at 854 (District court properly dismissed securities law claims:  "Nowhere does the [offering document] seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties.").

Here, as in *Foreman*, the White Paper is barren of any representation or intimation of anticipated profits.  The White Paper states:  "tokens confer no . . . profit participation, equity . . . revenue sharing, [or] rights to dividends".  (Kravets Decl. Ex. A at p. 30).  It also states: "tokens are not designed for speculation."  (Id.).  Risk Factor 3 to the SAFT states:  "any Tokens that the Purchaser does acquire may be virtually worthless, given the lack of a market on which they may be traded".  (Id. Ex. B).

The only inducement to purchase a SAFT is use of the tokens to access and pay for services offered by Xtrade.  The White Paper states that value of the tokens "is derived purely from serving as a medium of payment for services".  (Id. Ex. A at 30).  Indeed, the SAC admits that the tokens were "sold for use and access to the platform" and that "the reason" they purchased tokens was to access and use Xtrade's alleged market-making services.  (SAC ¶¶ 2, 4, 139).

Where, as here, the inducement to purchase an instrument is gaining access to services, the instrument is not a security.  *R. Rosenberg & Sons, Inc. v. St. James Sugar Co-op, Inc.*, 447 F. Supp. 1, 4 (E.D.La., 1976) (stock in sugar cane cooperative not a security where "The inducement to purchase was membership in an association that would provide the sugar cane farmer with services he might not otherwise obtain -- that is, the assurance of a place to process and market the fruits of his labor."), *aff'd* 565 F.2d 1213 (5th Cir. 1977); *Libaire v. Kaplan*, 395 Fed.Appx. 732, 734-35 (2d Cir. 2010) (payment of membership dues not an investment contract where it "afforded . . . access to and use of . . . hunting preserve and related facilities").

> **b.    The SAC does not plausibly allege that Risk Factor 15 was misleading**

The first sentence of Risk Factor 15 states:    "The regulatory status of tokens . . .  is unclear or unsettled in many jurisdictions."  The SAC claims that this statement was misleading

because "it was quite clear" that it was the SEC's view that "tokens were securities". (SAC ¶88). The second sentence of Risk Factor 15 states: "It is difficult to predict how or whether regulatory agencies may apply existing regulation with respect to such technology and its applications, including the Platform and the Tokens." The SAC claims that this statement was misleading because it was "quite predictable how the SEC would view cryptocurrency offerings". (SAC ¶89). As support for both claims the SAC cites three public statements of the SEC: (a) a July 25, 2017, release titled "Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934. The DAO" (the "21(a) Report"); (b) an August 28, 2017, investor alert titled "Public Companies Making ICO-Related Claims" (the "Investor Alert"); and (c) a December 11, 2017, Public Statement on Cryptocurrencies and Initial Coin Offerings made by SEC Chairman Jay Clayton (the "Clayton Statement") (SAC ¶__).[6]

But none of those statements render Risk Disclosure 15 misleading. The 21(a) Report, on which the SAC foremost relies, left decidedly unclear and unpredictable whether any particular token is a security. To its credit, the 21(a) Report does <u>not</u> say, categorically, that all cryptocurrencies are "investment contracts" or that no cryptocurrencies are "currencies."[7] Instead, it used (to borrow the Second Circuits' words) the "uncertain and slippery" factors applied "case-by-case" under the *Howey* test to determine if the particular instrument at issue, a token issued by a German corporation called Slotck.it UG, was an investment contract.

---

[6]   The Clayton Statement directs the reader to consult the 21(a) Report for guidance on the applicability of the securities laws to cryptocurrencies and describes that report as applying "longstanding securities laws principles to demonstrate that a ***particular token*** constituted an investment contract and therefore was a security". It also advises that "This Statement is my own and does not reflect the views of any other Commissioner or the Commission. This statement is not, and should not be taken as, a definitive discussion of applicable law . . . or a statement of my position on any particular product." The Investor Alert, which warns of frauds involving publicly traded companies claiming to provide exposure to emerging technologies, contains no guidance about if or when cryptocurrencies may be deemed to be securities.

[7]   In contrast, the Commodities Futures Trading Commission has more than once stated its view that all virtual currencies are "commodities". *McDonnell*, 287 F. Supp. 3d at 226. It has prevailed in that view in at least one case. *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497 (D. Mass. 2018).

Emphasizing the fact-specific nature of this inquiry, the 21(a) Report twice notes that the applicability of the securities laws depends on "the particular facts and circumstances" of the transaction.  Id. at 10 & 17.

Moreover, even if in isolation one of the first two sentences of Risk Factor 15 was misleading, Risk Factor 15 as a whole clearly discloses the risk that the tokens may be deemed to be securities.  It states:  "Regulatory actions could negatively impact the Platform and the Tokens in various ways, including, for purposes of illustration only, through a determination that the Tokens are a regulated financial instrument that requires registration or licensing."

### 2.    A Strong Inference Of Scienter Is Not Raised

The SAC alleges that the SEC's public statements put the industry "on notice that token offerings would likely be considered securities offering" and that Defendants "knew full well" that the "disclosure of uncertainty" in Risk Factor 15 was false because "they had long experience in the brokerage business".  (SAC ¶46-47, 89).  These allegations do not raise the requisite "strong inference" of scienter.  *In re China Mobile Games & Entertainment Group, Ltd.*, 2016 WL 92271 at *6 (S.D.N.Y. 2016) (Castel, J) (to be "strong" an "inference of scienter must be more than merely plausible or reasonable – it must be at least as compelling as any opposing inference of nonfraudulent intent.")

Allegations of Defendants' "experience and expertise are not sufficient to raise an inference of scienter."  *Abely v. Aeterna Zentaris, Inc.*, 2013 WL 2399869 at *18 (S.D.N.Y. 2013) (Castel, J).  And the SAC does not allege that Defendants knew of either the Investor Alert or the Clayton Statement.  *Davidoff v. Farina*, 2005 U.S. Dist. LEXIS 17638 at 57 (S.D.N.Y. Aug. 22, 2005) (Buchwald, J) ("[T]o the extent plaintiffs claim that defendants had knowledge of specific facts that rendered their public statements misleading, they must supply some factual

basis for the allegation that the defendants [gained this knowledge] at some point during the time period alleged.").

It cannot be inferred from Defendants' knowledge of the 21(a) Report that Defendants knew that the tokens were securities (which they are not).  As discussed, the 21(a) Report used the "uncertain and slippery factors" applied "case-by-case" under the *Howie* test to determine if, in the particular facts and circumstances of the transaction, the Slock.it token was an investment contract.  But the facts and circumstances of that transaction differ significantly from the Xtrade transaction.  For instance, unlike Xtrade, Slock.it, touted in its promotional materials that token holders stood to share in potential profits from the projects that Slock.it funded from the proceeds of the token sale.  (Id. at 6).

Even if an inference of scienter were plausible, that inference is not as compelling as an inference that Defendants genuinely believed the tokens would not be securities.  As acknowledged in the SAC, an entire branch of the cryptocurrency industry responded to the 21(a) Report by, like Defendants, using the SAFT to sell rights to future tokens.  (SAC ¶48).  And Defendants' disclosure, in Risk Factor 15, of the risk that the tokens might be deemed to be securities is "inconsistent with a state of mind going toward 'deliberate illegal behavior' or 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care'".  *Graham v. Barriger*, 699 F. Supp.2d 612, 632 (S.D.N.Y. 2009) (Castel, J).

### 3.      Reasonable Reliance Is Not Plausibly Alleged

Any reliance by Plaintiffs on statements about whether the tokens would be securities (which is not specially pled) would not have been justified because through "minimal diligence" they could have discovered the alleged falsity of Defendants' statements.  *Gavin/Solmonese LLC,*

68 F. Supp.3d at 543, *aff'd* 639 Fed. Appx. 664, 669 (2d Cir. 2016) (affirming 12(b)(6) dismissal where plaintiff could have detected misstatements by "examining contemporaneous SEC filings" and where offering document "contained sufficient cautionary language about the risks associate with the venture to put the purchasers on notice that they might lose their investment altogether"); *Hunt v. Alliance North American Gov. Income Trust, Inc.*, 159 F.3d 723, (2d Cir. 1998) (affirming 12(b)(6) dismissal in relevant part where falsity of statement could be discovered by consulting prospectus and document containing allegedly false statement warned of the risk alleged to have materialized); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d. Cir. 1989) (affirming 12(b)(6) dismissal where it was defendant that brought statute to plaintiffs attention and all that plaintiff needed to do is consult the statute and draw his own conclusions).

As sophisticated investors (which they attest to in the SAFTs), Plaintiffs can be expected to keep themselves apprised of the SEC's public position on the status of cryptocurrencies.  See e.g. *Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) ("Especially where a complex financial instrument whose value is tied to FDA approval is involved, investors may be expected to keep themselves apprised of the FDA's public positions on testing methodology."); *Gregory v. PorNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 412 (S.D.N.Y. 2018) (Engelmayer, J) ("reasonable investors cannot be assumed to misunderstand the implications of publicly disclosed study-design information, including the implications of deviations from the FDA's publicly expressed views as to optimal study design.").

Here, Plaintiffs allee that it was "quite clear" from the SEC's public statements that it views tokens to be securities.  It that is true (which it is not), Plaintiffs could have discovered the same by reviewing the SEC's public statements.  Here, as in *Gavin/Solmonese* and *Hunt*, those

materials were freely available to Plaintiffs and Defendants clearly warned Defendants in Risk Factor 15 that the tokens could be deemed to be securities.  And, as in *Royal American*, the Defendants specifically brought the 21(a) Report to Plaintiffs attention in the White Papers, which states: "the SEC has confirmed that the federal securities laws apply to token sales per its' recent SEC investigative report on DAO Tokens".

### 4.    Loss Causation Is Not Plausibly Alleged

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u—4(b)(4).  Plaintiffs can meet that burden by alleging either "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the [] loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *In re Sanofi sec. Litig.*, 155 F. Supp.3d 386, 409 (S.D.N.Y. 2016) (Castel, J) (quoting *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).

Here, the SAC does not allege that Defendants made a "corrective disclosure".  To the contrary, the SAC criticizes Defendants for "continu[ing] to insist that the tokens are not securities".  (SAC ¶154).  Nor does the SAC allege that any loss in value of the token was caused by the materialization of the risk that the tokens would be deemed to be securities; which is the precise outcome that Plaintiffs are trying to accomplish by bringing this lawsuit.  Absent such allegations, Defendants' statements about whether the tokens would be securities are not actionable. *Leykin v. AT&T Corp.*, 423 F. Supp.2d 229, 243-44 (S.D.N.Y. 2006) (Stanton, J) (granting 12(b)(6) motion where neither a corrective disclosure or materialization of risk was

alleged).[8]

**B.      Statements About Xtrade's Alleged Plans To Offer Market Making Services**

The SAC alleges that Defendants represented in the White Paper that Xtrade planned to offer market making services to its customers, though they knew both that (i) it was impossible to do so because Xtrade would need to register as a national securities exchange or ATS and broker dealer, and that (ii) no such registration had ever been granted.  (SAC ¶¶ 59-66, 135). Claims directed at these alleged statements fail to state a claim for the following three reasons:

**1.      Falsity Is Not Adequately Pled**

Plaintiffs' claim rests on the allegation that the White Paper "emphasized the essential use of the Platform as a 'market maker' for XDA's customers."  (SAC ¶61).  That allegation is contradicted by the White Paper.  As discussed, market making is <u>not</u> among the three product offerings described in the White Paper.  (Kravets Decl. Ex. A at pp. 7-9).  Market making is <u>not</u> described in the White Paper as a fee-based source of revenue.  (<u>Id</u>. at p. 34).  Instead, market making is discussed as a possible non-fee based source of revenue generated through proprietary trading on Xtrade's own behalf.  (<u>Id</u>. at 34).

Through tactical use of ellipses, the SAC misleadingly conflates Xtrade's SPA service offering with market making.  Paragraph 59 of the SAC includes the following block quote: "Make markets in multiple crypto currencies to minimize spreads and increase liquidity for

---

[8]  On a related point, the SAC alleges that an opinion letter referenced in the White Paper was a "deception" devised to create the illusion that the tokens would not be securities.  (SAC ¶¶7-8).  This allegation fails to state a claim for the same reasons as allegations about whether the tokens would be securities.  In addition, the SAC does not allege that the statement contained in the White Paper – that Xtrade had obtained an opinion letter concurring that the tokens would not be securities  – was false.  To the contrary, the SAC effectively admits that Xtrade did obtain such a letter.  (SAC ¶125-26).  Nor does the SAC allege that Plaintiffs purchased the SAFTs in reliance on the statement, and any such reliance would not have been reasonable.   "It is a well-settled principle that neither a party nor his attorney may justifiably rely on the legal opinion or conclusions of his or her adversary's counsel."  *I.L.G.W.U. Nat'l Retirment Fund v. Cuddlecoat, Inc.*, 2004 WL 444071 at *3 (S.D.N.Y. 2004) (collecting cases) *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir.1989) (in Section 10(b) securities-misrepresentation case, unreasonable to rely on adversary's interpretation of New York statute).

market participants."  In the "Use of Funds" Section (at p.33), Xtrade states:  "70% - Balance Sheet . . . Xtrade will need to allocate funds across inventory accounts in a spectrum of crypto exchanges."  (SAC ¶ 59).  The quoted passage from page 33 of the White Paper actually states: 70% - Balance Sheet **for SPA:  In order to facilitate the SPA structure**, Xtrade will need to allocate funds across inventory accounts in a spectrum of crypto exchanges.  (Kravets Decl. Ex. A at p. 33) (emphasis added to show omitted text).

### 2.  The Statements Fall Within the PSLRA Safe Harbor For Forward Looking Statements

Under the PSLRA safe-harbor provision, "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with the actual knowledge that it was false or misleading."  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp.3d 358, 374-75 (S.D.N.Y. 2018) (quoting *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).  "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies."  *Id.*  Here the first and third prongs apply.

### a.  The statements are forward-looking

The PSLRA defines the term "forward-looking statement" to include "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. §78u-5(i)(1).  Use of "linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement."  *Slayton v. American Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010).  Moreover, the word "anticipate" is a

"familiar linguistic cue" denoting a forward-looking statement.  *NECA-IBEW Health & Wealth Fund v. Pitney Bowes, Inc.*, 2013 WL 1188050 at *17 (D.Conn. 2013).

Here, Xtrade used the linguist cue "anticipate" in describing its plan to act as a market maker.  (Kravets Decl. Ex. __ at 34:  "Xtrade anticipates acting in a market making capacity").  The White Paper includes an explanatory description of Xtrade's intention to thereby designate the statement as forward looking.  It states:  "Certain information contained in this document constitutes 'forward-looking statements,' which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology."  (Id. at 2)

### b.    The statements were accompanied by meaningful cautionary statements

"To determine whether cautionary language is meaningful, courts must first identify the allegedly undisclosed risk and then read the allegedly fraudulent materials – including the cautionary language – to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  *In re Delcath Systems, Inc. Sec. Litlg.*, 36 F. Supp.3d 320, 333 (S.D.N.Y. 2014).

Here, the SAC alleges that Defendants' statements concealed the risk that it would not be impossible for Xtrade to offer market making services because Xtrade would likely not receive necessary regulatory approvals.  But no reasonable investor could have been misled to think that there was no risk of that occurring.   Accepting as true the SAC's allegation that Xtrade abandoned its plans to offer market making services to avoid violating the securities laws, Risk Factor 15 expressly warns of such risk, stating:   "The Company may cease operations in a jurisdiction in the event that regulatory action . . . make it illegal to operate in such jurisdiction,

or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction." (Kravets Decl. Ex. B). The White Paper likewise put prospective purchasers on notice that Xtrade will take "proactive" steps to ensure regulatory compliance. (Id., Ex. A at pp. 10, 31).

### c.    Actual knowledge of falsity is not plausibly alleged

The "scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (internal quotations omitted).

Plaintiffs' allegation of knowing falsity is predicated on the assumption that Xtrade would have needed to register as a national securities exchange or as an ATS and broker dealer. That is a legal conclusion "not entitled to the presumption of truth". *In re Fyre Festival Litig.*, 2019 U.S. Dist. LEXIS 114687 at *10 (Castel, J). As support for that legal conclusion, the SAC alleges two things: first that Defendants "publicly stated their intention to run a cryptocurrency exchange" (SAC ¶ 134-35); and second that "The SEC had been clear in offering its guidance that token offerings were securities offerings, and because the cryptocurrencies that Xtrade advertised it would have available for trade on its system were thus securities, all requirements under federal securities law would have to be met." (SAC ¶66).

Neither of those allegations is pled with particularity. The SAC does not plead who, when or where Defendants supposedly expressed an "intention to run a cryptocurrency exchange," an allegation contradicted by the White Paper's description of Xtrade's anticipated product offering (i.e. FIX-API, the Platform, or SPA service), none of which are the activities of

an "exchange".[9]   Nor does the SAC plead who, when or where Defendants supposedly "advertised" what cryptocurrencies "it would have available for trade" such that one could infer, as the SAC does, that those currencies are "securities".

Nor does the SAC allege with particularity facts from which one could plausibly infer that Defendants had actual knowledge that either (i) Xtrade's alleged plan to act as a market making would have required it to register as a national securities exchange or ATS and broker dealer, or (ii) that no such registration had ever been granted.   The SAC alleges that such knowledge may be inferred from Defendants' "extensive brokerage experience."   (SAC ¶135). But, again, allegations of "experience and expertise are not sufficient to raise an inference of scienter." *Abely,* 2013 WL 2399869, at *18 (Castel, J).

### 3.   Loss Causation Is Not Plausibly Alleged

The SAC alleges that when Xtrade announced that it did not intend to act as a market maker the value of the token collapsed.  (SAC ¶ 141).

"'[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.   To survive a motion to dismiss under the Exchange Act, then, a plaintiff must disaggregate those losses caused by the unrelated events from disclosures of the truth behind the alleged misstatements.   In doing so, the plaintiff must allege facts that would allow a factfinder

---

[9]    As discussed in the White Paper, the SPA service offering contemplated Xtrade acting as a counterparty to close client trades *using its own inventory accounts* and its market making activities anticipated engaging in proprietary trading *on Xtrade's own behalf.*  (Kravets Decl. Ex. __ at ___& ___).  Section 3(a)(1) of the Exchange Act defines "exchange" as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood. . ." 15 U.S.C. § 78c(a)(1).

to ascribe some rough proportion of the whole loss to the alleged misstatements." *City of Westland Police and Fire Retirement System v. Metlife, Inc.*, 928 F.Supp. 2d 705, (S.D.N.Y. 2013) (Kaplan, J) (internal quotations and citations omitted).

Here, the SAC alleges no facts that would allow the court to disaggregate the losses in value caused by the crash of the cryptocurrency market as a whole from any losses allegedly caused by Xtrade's supposed announcement that it was abandoning it plans to offer market making services to its customers. The SAC alleges that Xtrade's announcement caused the value of a token to fall from its purchase price of $.10 to approximately $.01, the price at which a token is alleged to have traded when first listed on the Idex and Coinsuper exchanges in August 2018. (SAC ¶¶ 143-44). But, as discussed, that alleged loss in value of the tokens coincided with a market-wide crash of the cryptocurrency market, which resulted in nearly a 90% decline in the cryptocurrency market as a whole.

Instead, the SAC alleges that the entire alleged loss in value of the token was caused by Xtrade's supposed announcement. That allegation is not sufficiently plausible to withstand a motion to dismiss. *City of Westland Policy and Fire Retirement System v. MetLive, Inc*., 928 F. Supp. 2d 705, 715-16 (S.D.N.Y. 2013) (Kaplan, J) (Rule 12(b)(6) dismissal where "amended complaint fails even to acknowledge the U.S. credit downgrade and the accompanying upheaval in the marketplace" making allegation that entire loss was caused by alleged misstatement "insufficiently plausible to withstand a motion to dismiss"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (Stanton, J) (Rule 12(b)(6) dismissal, and denial of motion to amend, where proposed pleading "does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse, -- nor any way to separate the effect of the misstatements (if there was any) from the general

24

collapse or other causes").

Nor is it plausible, as the SAC suggests (at ¶ 22), that Xtrade's supposed announcement caused the cryptocurrency market to collapse. As noted by Judge Weinstein in *McDonnell*, the combined market capitalization of all virtual currencies as of January 6, 2018 was roughly $795 billion. 287 F. Supp. 3d at 219. Xtrade's SAFT sale, which the SAC alleges raised $31 million, is but a very tiny fraction of that market. The SAC includes no factual allegations that would support an inference that a sale of that size – even if fraudulent (which it wasn't) – could cause a $795 billion market to crash. Moreover, as alleged in the SAC, Xtrade's supposed announcement was made in April 2018. By that time the market had already lost more than half of its value. (Taylor Decl. Ex. __). Indeed, as noted in *McDonnell*, the market lost nearly half of its value in just the 30-day period between January 6, 2018 and February 6, 2018. *Id.*

### C.    Statements about Xtrade's alleged plans to sell tokens to the U.S. public

The SAC alleges that it was Defendants' "pitch" that "investors would purchase the tokens . . . at a substantial discount to an intended public issuance price, and be able to resell them at that issuance price or better." (SAC ¶3). It further alleges that on February 20, 2018, Xtrade announced that it was beginning a "public presale" of the tokens, and that on April 1, 2018, Xtrade announced that it "was cancelling its plans to hold a public 'crowd-sale' to the unaccredited public." (SAC ¶¶16-17, 107). Claims directed at these alleged statements fail to state a claim for the following five reasons:

*First*, the SAC does <u>not</u> allege who, when or where the alleged "pitch" was made. The lack of such allegations "dooms" the particularity of the claim under Rule 9(b). *In re Fyre Festival Litig.*, 2019 U.S. Dist. LEXIS 114687 at *15 (July 10, 2019) (Castel, J).

*Second*, the allegation that, on February 20, Xtrade announced that it was commencing a public sale of the tokens is contradicted by the text of the announcement.  (Kravets Decl. Ex. E)  The announcement did announce a "presale", but only to accredited investors.  Indeed, the announcement specifies the types of information that a prospective purchaser was required to submit to satisfy Xtade's "Know Your Customer" requirements.

*Third*, the allegation that, on April 1, 2018, Xtrade announced that it was "cancelling its plans to hold a public 'crowd-sale' to the unaccredited public" is also contradicted by the text of that announcement.  (Kravets Decl. Ex. F).  The announcement states only that "There will not be a crowd sale".  As discussed, the White Paper explained that (i) a "crowd sale" would be held only "if necessary", and that (ii) only "accredited investors under Reg D non-US investors under Reg S" would be allowed to participate.  The court need not accept as true the SAC's allegations to the contrary.  *Poindexter*, 2012 U.S. Dist. LEXIS 42174, at *6.

*Fourth*, the SAC does <u>not</u> allege that Plaintiffs purchased the tokens in reliance on Xtrade's alleged plan to sell tokens to the general, unaccredited, U.S. public.  The SAC only generally alleges that Defendants purchased the SAFTs in reliance on the "many promises" made in the White Paper.  (SAC ¶¶94 & 101).  Such conclusory and generalized allegations are not sufficient to plead actual reliance.  *In re Fyre Festival Litig.*, 2019 U.S. Dist. LEXIS 114687 at *21.

*Fifth*, The SAC does <u>not</u> plausibly allege loss causation.  That is so for four reasons:

(i)     The White Paper clearly stated that a "crowd sale" would be held only "if necessary," making well known the risk that it might not happen.  "Materialization of a known risk, rather than the disclosure of a concealed one, is not a plausible theory of loss causation."  *In re New Energy Sys. Secs. Litig.,* 66 F. Supp. 3d 401, 406 & n.33 (S.D.N.Y. 2014) (Kaplan, J).

26

(ii)    The SAC does not plead any facts that would allow the Court to ascribe some rough proportion of Plaintiffs' alleged loss to the cancellation of a "crowd sale" rather than either (a) the crash of the cryptocurrency market as a whole, or (b) the risks disclosed by Xtrade in the White Paper and schedule of Risks Factors.

(iii)    Plaintiffs' theory that canceling a sale to the general U.S. public caused the value of the tokens to collapse is directly at odds with Plaintiffs other theory of loss causation – namely, that Defendants "destroyed any remaining value of the Tokens" by allowing them to be sold on the Idex and Coinsuper exchanges.  (SAC ¶146)

(iv)    The SAC pleads no facts from which one may infer that anyone was interested in purchasing the tokens for any reason other than as a medium of exchange for purchasing services from Xtrade, such that the cancellation of a public sale would cause the value of the tokens to decline.  Xtrade's February announcement reiterated that the tokens were to be used to purchase services, not trading.  A Q&A concerning the tokens stated:  Q. "Will it be listed on an exchange?"  A. "The XTRD token is a utility token created for use on the Xtrade.io platform".  (Id. at Ex. E).  That statement is consistent with the White Paper's statements that the value of the tokens "is derived purely from serving as a medium of payment for services by market participants in the XTRADE trading ecosystem" and that they "are not designed for speculation." (Id. at Ex. A at p. 30).

*Fifth*, the alleged statement that Xtrade planned to sell tokens to the general U.S. public is forward looking and protected by the PSLRA safe harbor.  The supposed statement was accompanied by the meaningful cautionary statement that a "crowd sale" would be held only "if necessary".

**D.  Omission Of Xtrade's Alleged Plans To List Tokens On Idex And Coinsuper**

The SAC alleges, on information and belief, that Xtrade "actively participated" in having the tokens listed on Idex and Coinsuper "for the purpose of encouraging the purchase and sale of tokens."  (SAC ¶¶ 110, 143)  It also alleges, on information and belief, that Xtrade sold its own tokens on these exchanges and that doing so "destroyed any remaining value" of the tokens. (SAC ¶¶ 111, 145-46).  The SAC further alleges that neither the SAFT nor the White Paper disclosed the risk that Xtrade might allow the tokens to be listed for sale in a secondary market. (SAC ¶147).  Claims directed at this alleged omission fails to state a claim for the following five reasons:

*First*, the SAC does not specify any statement made by Defendants that was misleading as a result of Defendants' supposedly failing to disclose the risk that Xtrade might list or sell tokens on an exchange.  Absent such allegation, the alleged omission is not actionable.  *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 362 (S.D.N.Y. 2013) (Castel, J) ("the PSLRA, as it applies to a claim brought under Rule 10b-5(b), requires the pleader to specify a 'statement' that is alleged to be materially misleading because of the information it omits")

*Second*, the White Paper <u>does</u> in fact disclose that the "tokens . . . may also potentially trade on secondary markets at some point in the future".  (<u>Id</u>. at Ex. __ at 30).  There was no material omission and any alleged loss in value for the listing of the tokens resulted from a known risk, which is not actionable.  "Materialization of a known risk . . . is not a plausible theory of loss causation."  *In re New Energy Sys. Secs. Litig.,* 66 F. Supp. 3d at 406 & n.33.

*Third*, Defendants' disclosure that the tokens may "potentially trade on secondary markets at some point in the future" is inconsistent with an inference that they intended to deceive Plaintiffs.  *Graham,* 699 F. Supp. 2d at 632.

*Fourth*, the SAC does not allege that Plaintiffs would not have purchased the tokens if

they been told that the tokens might be listed on a foreign exchange.  The SAC alleges only that "Neither the SAFT nor the Whitepapers ever mentioned the risk that Xtrade might allow its tokens to be listed on these markets.  Indeed, no investor would ever have invested into the project with a requirement to accept the risk that Defendant would knowingly render their own offered business model worthless."  That is insufficient to plead reliance, particularly in light of the SAC's contrary allegation that Defendants' pitched the SAFT sale on the basis that Xtrade would sell tokens in an offering to the general U.S. public.

*Fifth*, the SAC does not allege facts that would allow the Court to apportion any part of the alleged decline in value of the tokens to Xtrade supposedly listing and then selling the tokens on Idex and Coinsuper, as opposed to either (a) the crash of the cryptocurrency market as a whole, or to (b) the many risks associated with the tokens that Defendants disclosed in the SAFTS an White Paper.

### E.   <u>Statements About Xtrade's Plans To Ensure Regulatory Compliance</u>

The SAC challenges the statement in the White Paper that "Xtrade will . . . Employ legal and compliance teams to ensure regulatory compliance and proactively engage with regulators". (SAC ¶¶ 77-78; Kravets Decl. Ex. A at p. 10).  The SAC acknowledges that Defendants did in fact employ legal counsel but alleges that the statement was nonetheless misleading because Xtrade did not actually ensure regulatory compliance when it allowed "its token to be traded on secondary markets at a time that Defendants knew it would be treated as a security, not a 'utility token'."  (SAC ¶78).  These allegations fail to state a claim for four reasons:

*First*, the statements are inactionable puffery "too general to cause a reasonable person to rely upon them."  *In re Sanofi Sec. Litig.*, 155 F. Supp at 401-2; *Lord Abbett Aff. Fund., Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 487-88 (D. Del. 2019) (collecting cases; "statements

regarding [defendant's] compliance with legal and regulatory requirements" are "inactionable puffery")

*Second*, the statement is forward-looking, designated as such by use of the word "will", and falls within the PSLRA safe harbor both because (i) Risk Factor 15 contains meaningful cautionary language making prospective purchases aware of the "unclear" and "unpredictable" regulatory environment into which the SAFTs were being sold, and because (ii) the SAC does not allege that Defendants actually knew that its statement of intent to ensure regulatory compliance was false.  See Points III(A)(1) & (2).

*Third*, the SAC does not allege that Plaintiffs purchased the tokens in reliance on the statements. It only generally alleges that Defendants purchased the SAFTs in reliance on the "many promises" made in the White Paper.  (SAC ¶¶94 & 101).   Such conclusory and generalized allegations are not sufficient to plead actual reliance.  *In re Fyre Festival*, 2019 U.S. Dist. LEXIS 114687 at *21.

*Fourth*, the SAC does not allege that any portion of the alleged loss of value of the tokens was caused by any corrective disclosure or by the materialization of the risk that the Xtrade would not ensure regulatory compliance.  To the contrary, the SAC pleads exactly the opposite – namely, that, in order not to violate the securities laws, Xtrade allegedly abandoned its plans to provide making services to customers and to sell tokens to the general U.S. public; and that it is those decisions – not any failure of compliance – that cause the supposed loss of value of the tokens.

### F.  Statements About The SAFT's Compliance With The Securities Laws

The SAC challenges the following statement in the White Paper:  "The SAFT . . . when used properly is fully compliant with the Securities Act of 1933 and Regulation D promulgated

thereunder" is misleading because "the SEC has never 'blessed' use of a SAFT".  (SAC ¶ 76).
Claims directed at this statement fail for the following five reasons:

*First*, the White Paper does not say that the SEC "blessed" use of the SAFT, and the SAC
does <u>not</u> allege that statement actually made – that when properly used the SAFT is compliant
with the securities laws – is false.

*Second*, the SAC does <u>not</u> allege that Defendants knew or should have known that the
statement was false or that Defendants made the statement with an intention to deceive.  As
discussed, a more compelling inference of non-culpable intent may be drawn from the fact,
among others, that, as alleged by the SAC, an entire segment of the cryptocurrency industry
adopted the SAFT form of agreement.

*Third*, the SAC does <u>not</u> specifically allege that Plaintiffs purchased the tokens in reliance
on the statement.  It only generally alleges that Defendants purchased the SAFTs in reliance on
the "many promises" made in the White Paper.  (SAC ¶¶94 & 101).

*Fourth*, the SAC does <u>not</u> allege that the supposed loss in value of the token was caused
by a corrective disclosure or the materialization of the risk that that the SAFT is not compliant
with the securities laws.  To the contrary, the very purpose of Plaintiffs suit is to obtain a ruling
that the sale of tokens pursuant to the SAFT does not comply with the securities laws.

### G.   Statements About Kravets's Background

The SAC alleges that the White Paper falsely represented that Kravets helped launch
Sogotrade, when in fact Kravets had never worked for Sogotrade and that Kravets had only
helped his employer, Genesis, become a customer of Sogotrade.  (SAC ¶142).  But the SAC does
not allege that Plaintiffs relied on the statement in purchasing the SAFTs, that any risk concealed
by the statement caused any loss in value of the tokens, or that the statement is material or was

made with an intent to deceive.

### H.      Statements About The CME

The SAC alleges that the White Paper claimed that XDA had partnered with the CME, that a "true partnership" with CME "was a significant draw for investors in a start-up cryptocurrency trading platform", and that there never was any partnership with the CME.  (SAC ¶ 79).  But the SAC does not allege that Plaintiffs relied on the statement in purchasing the SAFTs, that any risk concealed by the statement caused any loss in value of the tokens, or that the statement was made with an intention to deceive.

## III.    COUNT III ALLEGING VIOLATION OF SECTION 5 OF THE SECURITIES ACT SHOULD BE DISMISSED

In Count III of the SAC Plaintiffs claim that Defendants violated Sections 5(a) and (c) of the Securities Act, which generally prohibit use of interstate means to offer, sell or deliver unregistered securities.  15 U.S.C. § 77e.  The claim is brought pursuant to Section 12(a)(1) of the Securities Act, which creates a private right of action as against "Any person who . . . offers or sells a security in violation of" Section 5.  The claim should be dismissed for two reasons.

### A.      The Section 12(a)(1) Claim Is Time Barred

Claims brought under section 12(a)(1) are governed by a one year statute of limitations. *Mori v. Saito*, 2013 WL 1736527, at *3 (S.D.N.Y. 2013) (citing 15 U.S.C. § 77m: "No action shall be maintained to enforce . . . any liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based.").  The party bringing a section 12 claim bears the burden to plead and proves facts showing compliance with the limitations period.  *Id.*  Compliance with the statute of limitations in section 12 action is a "prerequisite of jurisdiction." *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033  n.5 (2d Cir. 1980)

Each of the acts prohibited by Section 5 – the "offer," "sale," and "delivery after sale" of

an unregistered security – is a "distinct violation" for statute of limitations purposes.  *Eriksson v. Galvin*, 484 F. Supp. 1108, 1119 (S.D.N.Y. 1980) (Section 12(a)(1) claim based on sale of unregistered security in violation of section 5(a)(2) dismissed as time barred, though "delivery after sale" occurred within one year limitations period); *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1054 & n. 7 (2d Cir. 1969) ("since the claim against appellees is for offering rather than selling, the date which the appellant acquired full dominion over the stock is scarcely relevant").

Here, the SAC admits that Defendants offered the tokens for sale to Plaintiffs in "early January 2018" and that Defendants sold the tokens to Plaintiffs in "mid to late January 2018". (SAC ¶¶ 57 & 91).  Thus Plaintiffs' alleged violation of Section 5, which is based on the offer and sale of the tokens, is time barred because the alleged violations occurred more than one year before Plaintiffs filed their original complaint on April 26, 2019.

Plaintiffs attempt to bring their Section 12 claim within the one-year limitations period by alleging that the tokens were delivered to them in May 2018.  (SAC ¶10).  But as just stated, their claim accrued, and the one-year limitations period began to run, upon "offer" or "sale," regardless of when "delivery after sale" occurred.  Any delay in the delivery of a security does not extend the limitations period for a claim based on the offer or sale of an unregistered security.  *Katz*, 411 F.2d at 1054 & n. 7 (rejecting argument that "use of the mails to deliver an unregistered security is itself a violation of §5(a)(2)").  *Accord*, *Carroll v. United States*, 326 F.2d 72, 85-86 (9th Cir. 1964) (cited in *Katz*:  though for jurisdictional purposes mailing is part of the offense, it is not the essence of the offense and is merely incidental where the sale of security has been completed by offer, acceptance and payment).

## B.    Failed To Plead Facts Establishing A Right To Relief Under Section 12

"Section 12 authorizes two types of mutually-exclusive recovery.  If the plaintiff owned

the security when the complaint was filed, Section 12 authorizes rescission – the plaintiff returns the security to the defendant and the defendant refunds the plaintiff the purchase price with adjustments for interest and income.  If the plaintiff no longer owned the security when the complaint was filed, Section 12(a)(2) permits the plaintiff to recover 'damages'."  *Federal Housing Finance Agency for Federal National Mortgage Assoc. v. Nomura Holding America, Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) ("Nomura").  "The proper time for the plaintiff to choose between damages and rescission "'is at the time the complaint is filed.'"  *In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, 381 F. Supp. 2d 192, 247 (S.D.N.Y. 2004) (Kram, J) ("*In re AOL Time Warner*") (quoting *Wigand*, 609 F.2d at 1035 (2d Cir. 1979)).  If a complaint fails to adequately allege either damages or rescission, it must be dismissed for failure to state a claim.  *Id.*; *see also Evergreen Fund, Ltd. v. McCoy*, 2000 WL 1693963, at *7 (N.D. Ill. 2000) (to withstand a motion to dismiss a complaint must make a proper allegation of either tender or sale of the security at issue; collecting cases).

Here, the SAC fails to state a claim for damages because it does not allege that Plaintiffs sold the tokens for a loss.  *In re AOL Time Warner* 381 F. Supp. 2d at 247 ("Because plaintiff fails to allege that it no longer owns the bonds, let alone that it actually sold the bonds for a loss, it has not stated a claim for damages under Section 12(a)(2)).

The SAC also fails to state a claim for rescission because it improperly seeks both rescission and damages.  (SAC ¶85:  "all Defendants . . . are liable to Plaintiffs for rescission and/or compensatory damages").  An equivocal statement of this kind, which attempts to preserve a claim for damages, is not an adequate demand for rescission under Section 12.  *Metz v. United Counties Bancorp*,  61 F. Supp. 2d 364, 379 (D.N.J. 1999) (no adequate demand for rescission made where complaint stated "[a]ll of the defendants are liable to plaintiffs who, as a

result, are entitled either to rescind their purchases . . . and recover the consideration paid for such securities . . . , or to receive payment from defendant for sustained").

## IV.     COUNTS II AND IV ALLEGING CONTROL PERSON LIABILITY SHOULD BE DISMISSED

Claims for control person liability must be dismissed where the underlying claims on which they are based are subject to dismissal.  *In re China Mobile Games & Entertainment Group, Ltd.*, 2015 WL 922711 at *8 (S.D.N.Y. 2016) (dismissing claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act where the underlying claims were dismissed).

## V.      THE COURT SHOULD DECLINE JURISDICTION OVER COUNT V FOR COMMON LAW FRAUD

Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the SAC be dismissed in its entirety with prejudice.

Dated: New York, New York
          August 22, 2019

                                        KAGEN & CASPERSEN PLLC


                                        By: _____s/ Joel Taylor_____
                                             Joel M. Taylor, Esq.
                                             Stuart Kagen, Esq.
                                             757 Third Avenue, 20th Floor
                                             New York, NY  10017
                                             *Attorneys for Defendants*