UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------   x

ANTHONY FASULO and GAUTAM DESAI

                                Plaintiffs,              No. 19 cv 3741  (KPC)

     v.

XTRADE DIGITAL ASSETS INC.,
XTRADE DIGITAL HOLDINGS,
ALEXANDER KRAVETS,
SERGII GULKO, and
JON GIACOBBE

                            Defendants.    X

---------------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**KIRSH LLC**

Zeev Kirsh Esq.
347 West 57th street 31a
New York, NY 10019
212-586-7517
Attorney for the Defendant

## <u>PRELIMINARY STATEMENT</u>

In 2017, Defendants had a business idea: they would create a business to provide "market-making" services for cryptocurrency trading.  To fund their idea, they would sell tokens, called "XTrade Tokens."  Those tokens would have the extra added benefit, defendants claimed, of having some "utility" in their market-making system.

Like so much else in the cryptocurrency markets in late 2017, this was all a lie. Defendants knew at the time that the tokens they were offering were securities.  The SEC had been shouting from the rooftops for months that such token offerings were unregistered securities offerings.  But, to convince investors otherwise (most of whom, like plaintiffs, were not "accredited investors"), Defendants claimed to have a legal opinion saying that the tokens were not securities – although they never shared that opinion publicly.  Further, the tokens had all the hallmarks of a security:  it was an investment of money in a common enterprise (XTrade), in which the Plaintiffs had an expectation of profits, due solely from the efforts of Defendants to build their market-making company.  That's literally the Supreme Court definition of a security. Thus, the Second Amended Complaint (SAC) amply alleges that the XTrade sale was an unregistered securities offering.

But it was also a fraudulent offering.  Defendants knew at the time that they could not offer market-making services.  They were sophisticated businesspeople, with broker-dealer expertise, and were being advised by securities counsel. And yet they promised it anyway.

Defendants answer now is to rely, bizarrely, on the very fibs they told.  They point to their White Papers (like a prospectus in the cryptocurrency world) to argue that "the White Paper does not express an intention to offer market making services to token holders."  Moving Brief 4.  But on that same page, Defendants literally concede that their White Papers describe market

making as a "potential non-fee based source of revenue generated through proprietary trading." Id.  That is the point.

Defendants now try to dress up their market-making services with alternate, more "techie" sounding phrases – "a computer programming interface that provides a standard means of communication between cryptocurrency exchanges, enabling traders to access multiple markets by coding to a single exchange interface," and "downloadable software, to be used as a trading platform across multiple cryptocurrency exchanges."  Moving Brief 4.  That is like trying to argue that Defendants were not offering to sell "elephants," they were only offering to sell "gray, four-legged, land mammals weighing several tons, and bearing floppy ears and a long prehensile trunk," and then being shocked when accused of lying about selling elephants.

Defendants also try to blend together the January 2018 signing of the SAFTs – a "Simple Agreement for Future Tokens" (which itself is an investment contract), with the issuance of the tokens in May 2018.  The issuance of the tokens was itself a securities offering. And as the initial Complaint was filed on April 26, 2019, that claim is well within the one-year statute of limitations of Section 12 of the Securities Act.  And even if the timing was keyed to the SAFTs only, the Defendants have been engaged in a continuous offering ever since.

Finally, Defendants try to blame general market conditions for the losses.  While it is true that the cryptocurrency markets generally declined from its December 2017 peak into the early months of 2018, it has since recovered reasonably well.  But the XTrade token remains virtually worthless.  Indeed, as alleged in the SAC (¶¶ 20-21, 140-41), the largest decline in the value of the XTrade token was not linked to the so-called "crypto winter" of early 2018, but

came later, from September 2018 and after, when XTrade abandoned its earlier "market making" model and sold its tokens on public exchanges:[1]



As the SAC alleges, Defendants' fraudulent actions and omissions led to the obliteration of the value of Xtrade securities. Defendants were not some innocent bystander in the cryptocurrency market collapse of late 2018. The collapse in the value of Defendants' security token was not just occasioned by a wider public turn against cryptocurrency values. It was occasioned by a public abandonment of the core business model that Defendants always knew was impossible.  While Xtrade claims to be a victim of the cryptocurrency industry's bubble bursting, the revelations of so many fraudulent cryptocurrency projects helped drive that

---

[1]     The Court may take judicial notice of the publicly available information such as publicly listed market prices; this chart is from <https://coinmarketcap.com/currencies/xtrd/>.

downturn in the first place. Xtrade is not a victim of the collapse of the cryptocurrency market. It is one of the perpetrators.

## STATEMENT OF FACTS

In October 2017, aiming to capitalize on a burgeoning market for cryptocurrency offerings, Xtrade and its officers presented an investment offering to the general public, including the Plaintiffs, involving the purchase of "tokens," which could be purchased by cash or by means of various cryptocurrencies. SAC ¶ 1.

The tokens were marketed by Defendants (the "Offering") as a way the general public could access an online trading "platform" that they planned to build.  The pitch was that investors would purchase the tokens (the "Xtrade Tokens") at a substantial discount to an intended public issuance price, and be able to resell them at that issuance price or better. Defendants claimed that this for-profit issuance did not exclude the ability to use the tokens as on the Defendants future platform as marketed in their Offering.  SAC ¶¶ 2-3.

In their advertising and information documents, Defendants claimed that their token would not be a security, since the tokens were being sold for use and access to the platform by the general public at large, and not for speculative trading alone. SAC ¶ 4.

Each of the versions of the Whitepapers issued on and after October 2017 stated that Xtrade Digital Assets had obtained a "qualified opinion" letter that the Tokens were not to be considered securities and did not need to be registered.  SAC ¶ 73.  That "qualified legal opinion" was never made public. But the assurances Xtrade provided in that Whitepaper were false: the Xtrade token was a security, as later evidenced by (1) Xtrade's abandonment of its business model in which the tokens could possibly have any utility, and (2) Xtrade's direct sales of those security tokens on trading markets  SAC ¶¶ 72-73.

The SEC raised alarms early about schemes involving virtual currencies in July 2013, and cautioning investors about bitcoin and other virtual currency investments in May 2014. Nevertheless, companies like Xtrade continued to offer cryptocurrency into the general marketplace. SAC ¶ 45.

XDA publicized its business plan in a series of "whitepapers," and other marketing materials, from October 1, 2017 through March 8, 2018 (together, the "Whitepapers"), which were distributed through social media and upon its website Xtrd.io.  SAC ¶ 55.

The initial versions of the Whitepapers explained that XDA's ultimate mission, and the purpose of the Offering, was to help cryptocurrency traders access multiple cryptocurrency exchanges more quickly, cheaply, and knowledgeably than the traders could do on their own. XDA stated that it would do this through the "Xtrade Platform" (the "Platform"), basically a computer program, with a "market-making" function.  SAC ¶ 58.

Xtrade promised in its Whitepapers to use 70% of the funds it would raise for maintaining balance sheet deposit accounts at multiple exchanges.  In Xtrade's October and January and March Whitepapers (p. 10), Xtrade stated that large portions of investor funds would be used to "Make markets in multiple crypto currencies to minimize spreads and increase liquidity for market participants".  SAC ¶ 59.  Both the October and January Whitepapers (at p. 34), in a section labeled "Revenue Generation Model," Xtrade states: "Given Xtrade's balance sheet and a presence at multiple cryptocurrency exchanges, Xtrade anticipates acting in a market-making capacity across numerous crypto currency pairs in different markets.  SAC ¶ 60.

But the entire model was fictitious. It was impossible at the time, and Xtrade was later forced to abandon it (likely in order to avoid SEC scrutiny).  SAC ¶ 62.  The Whitepapers

advertised a core business model that the Defendants knew, at the time, was then impossible, and would be unlikely for the foreseeable future.   SAC ¶ 66.

Defendants issued some risk factors, to be sure.  But those "disclosures failed to disclose what they expected would change to allow the business model to exist; what were the expected timeframes that investors (who were ostensibly buying tokens that would have a utility within this business model) would have to wait; what were the costs of getting to that point; what were the regulatory risks of not achieving those registrations; what were the regulatory risks of proceeding down that path if such registrations were not accomplished; and what was the likely impact to the value of the security Defendants were offering if all of their hopes and dreams did not pan out.  SAC ¶ 90.

The Whitepapers also claimed that XDA had partners, in particular the Chicago Mercantile Exchange ("CME"). A true partnership with the CME, a well-established and well-respected trading platform organization, was a significant draw for investors in a start-up cryptocurrency trading platform. However, Defendants never produced any further documentation of these alleged partners. In truth, there was never any partnership with the CME. That, too, was a misrepresentation, which Defendants knew at the time.   SAC ¶ 79.

There were other lies. The White Paper falsely represented that Kravets helped launch a company called Sogotrade, when in fact Kravets had never worked for Sogotrade and that Kravets had only helped his employer, Genesis, become a customer of Sogotrade. SAC ¶ 142. And the White Paper claimed that XTrade had partnered with the CME, that a "true partnership" with CME "was a significant draw for investors in a start-up cryptocurrency trading platform", and that there never was any partnership with the CME.  SAC ¶ 79.

Based on these frauds, plaintiffs purchased what, unbeknownst to them, was an unregistered security. They each signed a "Simple Agreement for Future Tokens," ("SAFT") in January 2018.  Kravets was granted the Xtrade tokens themselves on or after May 1, 2018; Desai received his tokens on or about May 23, 2018.  SAC ¶¶ 94-104.  The tokens had no functionality when issued.  SAC ¶¶ 115-16.

Defendants used some of the money received in exchange for the tokens for corporate development, SAC ¶ 59 (a classic manifestation of an equity offering), although some was shifted to offshore wallets at locations like "mydicewallet.com," an offshore cryptocurrency exchange whose terms of service specifically require customers to confirm they are not residing in, nor a citizen of, the United States of America, a transparent attempt to move money offshore. SAC ¶ 153.

Later, in the summer of 2018 and through August 2018, Defendants marketed their XTrade Tokens for sale to the general public, including "bounty" programs.  SAC 109.  And in August 2018, Defendants gave up on their "utility token" sham entirely, listing the tokens to be sold on foreign exchanges as if they were securities under the ticker "XTRD".  SAC ¶¶ 143-147.

As a result of the abandonment of the promises that Defendants made regarding marketing making and offering nothing more than a "utility token," the value of the tokens plummeted, severely damaging Plaintiffs, who continue to hold XTRD tokens for themselves, personally.

In short, the SAC amply alleges securities fraud, common law fraud, an unregistered securities offering (timely alleged), and control person liability. It also amply alleges Article III standing for the plaintiffs, but in any event, the affidavits (submitted herewith) from the plaintiffs

confirming that they bought and own XTrade tokens for themselves is more than sufficient to deny this motion to dismiss.

## ARGUMENT

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Other than the securities fraud claim (which must be plead with particularity under Rule 9(b), such a statement need not include "detailed factual allegations" but must be sufficient to "give the defendant fair  notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted).

On a motion to dismiss, the Court must assume that all of the facts alleged in the Amended Complaint are true, construe those facts in the light most favorable to Plaintiffs, and draw all reasonable inferences in favor of Plaintiffs.  *See Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 169 (2d Cir. 2009); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co*., 517 F.3d 104, 115 (2d Cir. 2008).

## I.    PLAINTIFFS HAVE ARTICLE III STANDING

Contrary to Defendants' claims ( Moving Brief 7), Plaintiffs have Article III standing to bring the claims set forth in the SAC.  Standing requires (1) an "injury in fact," that is concrete, particularized, and actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.  *Port Washington Teachers' Assn. v. Board of Educ. Of Port Washington*, 478 F.3d 494, 498 (2d Cir. 2007) (citation omitted).

As the Second Circuit repeatedly has explained, it is a low threshold to plead injury-in-fact, and one will only be unsuccessful if the "allegation of injury is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to

involve a federal controversy." *Harry v. Total Gas & Power N. Am., Inc*., 889 F.3d 104, 110 (2d Cir. 2018) (internal citations omitted); *see also Ross v. Bank of Am., N.A.* (USA), 524 F.3d 217, 222 (2d Cir. 2008) ("Injury in fact is a low threshold"). Even if the alleged manipulation is not "plausible," if it is "within the realm of possibility … that is enough" for standing purposes. *Harry*, 889 F.3d at 111.

Defendants claim that a blockchain ledger of transfers "indicates" that Fasulo and Desai were "acting as syndicators when they purchased the SAFTs and that the tokens have been distributed by them to the members of their respective syndicates."   Moving Brief 8.

The blockchain ledger exhibited in the McNew Expert Report submitted by Defendants does not conclude that the securities in question were syndicated.  The furthest it goes is to say that there were a series of transactions that "is representative of the typical behavioral patterns of a syndication."  McNew Exhibit p. 7.   With respect to Mr. McNew, his opinion is based on nothing more than the fact that the XTrade tokens were moved to different accounts – pretty thin gruel for any conclusion.

Furthermore, The SAFT ( which the plaintiffs, via the SAC, implicitly argue is either invalid, unconscionable, or rendered meaningless) does contain, under provision 5 subsection D , an explicit recognition by Xtrade that common owners of the SAFT may exist, and are permitted to exist. It is therefor bizarre that Xtrade is arguing the plaintiffs lack standing for having common ownership. The SAFT, itself written by XTRADE, acknowledges the right to common ownership by multiple plaintiffs. Nonetheless, Contrary to Mr. McNew's report, the Defendants presently own all of the XTrade tokens subject to the SAFT(s).  See September 16, 2019 Affidavit of Anthony Fasulo and September 16, 2019 Affidavit of Gautam Desai.

All that is necessary for each Plaintiff to have standing is that they purchased a number of their own XTrade security tokens for themselves, with their own funds, never sold them, sustained losses and still own them.  That condition, too, is satisfied.  The Plaintiff investors here have unquestionably suffered an injury-in-fact, as they remain in possession of their Xtrade Tokens, they have sustained direct losses, and Defendants have refused to refund to Plaintiffs the amounts invested in return for the tokens.  (*See* SAC ¶ 23).  The SAC contains numerous allegations of direct injury to the Plaintiffs distinct from injury to any third party.  *See ED Capital, LLC v. Bloomfield Inv. Resources Corp.*, 660 F App'x 27, 28-29 (2d Cir 2016) (reversing district court's decision that plaintiff's complaint alleged only "derivative" or "indirect" injuries "flowing to" it as a result of defendant's actions, and citing four substantive claims asserted by plaintiff against defendant in the complaint).

## II.   DEFENDANTS ARE LIABLE UNDER SECTION 10(b) OF THE EXCHANGE ACT

When giving meaning to the phrase "'in connection with the purchase or sale of securities'" in the context of §10(b) and Rule 10b-5, the Supreme Court has consistently "espoused a broad interpretation."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,  547 U.S. 71, 84-85 (2006).  The Court rejected a "narrow construction" of the phrase, and held that "[u]nder our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction–whether by the plaintiff or by someone else."  *Id.* at 85.  Thus, "[t]he requisite showing … is 'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.'"  *Id.*  This broader interpretation of the statutory language also comports with the longstanding views of the SEC.  *Id.*

### A.   Defendants Made False Claims

i.      Defendants Falsely Claimed Their Tokens Were Not Securities

The SAC alleges that Defendants marketed their XTrade Tokens (and the SAFT under which they were sold) as not being securities, and thus, they claimed no registration was required.  SAC ¶¶ 6-8, 71-77.  Defendants argue that Plaintiff's Section 10(b) claim cannot lie, in part, because the Xtrade tokens are not adequately alleged to be securities (but, instead, "currency,"  Moving Brief 9-11) and, thus, statements that they were not securities were not false.

Like the Defendants here, many token issuers have claimed their tokens were not securities.  Every court to have considered this argument by an issuer of digital tokens has rejected it.  *See, e.g., Balestra v. ATBCOIN LLC*, No. 17-CV-10001 (VSB), 2019 U.S. Dist. LEXIS 55972, at *17–18 (S.D.N.Y. Mar. 31, 2019) ("Plaintiff plausibly alleges that the 'potential profits stemming from the future valuation of the ATB Coins [] w[ere] entirely reliant on the success of Defendants' new blockchain.'") (citing *Rensel v. Centra Tech, Inc*., No. 17-24500-CIV, 2018 U.S. Dist. LEXIS 106642, 2018 WL 4410126, at *5 (S.D. Fla. June 25, 2018) (finding a common enterprise where "'the fortunes of individual investors in [defendants'] ICO were directly tied to the failure or success of the products the Defendants purported to develop'"), report and recommendation adopted, 2018 U.S. Dist. LEXIS 220985 (S.D. Fla. Sept. 25, 2018); *United States v Zaslavskiy*, 2018 US Dist LEXIS 156574, at *14 (E.D.N.Y. Sep. 11, 2018, No. 17CR647(RJD) (concluding that the "elements of a profit-seeking business venture" are sufficiently alleged in the Indictment, such that, if proven at trial, a reasonable jury could conclude that "investors provide[d] the capital and share[d] in the earnings and profits; [and] the promoters manage[d], control[led] and operate[d] the enterprise.").

The same result holds here.  The venerable *Howey* test defines an investment contract as a "contract, transaction, or scheme whereby a person [1] invests his money [2] in a common

enterprise and [3] is led to expect profits solely from the efforts of the promoter or third party." 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244.  The SAC alleges that Defendants unlawfully offered and sold for money to Plaintiffs and the public unregistered investment contract securities in the form of Xtrade Tokens. SAC ¶¶ 8-11; 15, 18-19, 145, 168-185.  That sale raised money for XTrade, the common enterprise.  The tokens were offered and sold and traded on a public exchange. SAC ¶¶ 109-110, 114.  And the tokens did not provide access to any functioning platform, meaning that they had no purpose, other than speculation.  *Id.* ¶¶ 116.  Like in *Balestra*, the potential profits stemming from any future valuation of the ATB Coins were reliant on the success of Defendants' new blockchain or other corporate endeavors.  The XTrade tokens are a classic security, dressed up in digital garb.

Indeed, if the XTrade tokens were a currency, as XTrade now claims, then Defendants were operating an unlicensed money transfer business, in violation of 18 U.S.C. § 1960, a violation that has resulted in criminal convictions, such as in *U.S. v. Campos*, 18-cr-3554 (S.D.Ca.) (sentence of two years on a guilty plea to operating an unlicensed money transmitting business); *U.S. v. Murgio, Lebedev, and Gross*, 15-cr-769 (S.D.N.Y.); and others.

For support, Defendants point to their White Paper, which states that "The XTRD utility tokens will be utilized on the XTRADE network by market participants to pay for execution, VPS, market data, software licensing, and other fees," and "The value of XTRD is derived purely from serving as a medium of payment for services by market participants in the XTRADE trading ecosystem."  Moving Brief 11-12.  Defendants fail to see the problem:  that these statements were false when made.  SEC ¶¶ 115-16; *see also* SAC ¶¶ 73-79, 87-89, 154.  Pointing to them as evidence of what was "really" happening is simply doubling down on the lie.

ii.     Defendants Falsely Claimed They Would Provide Market Making
        Services, and Omitted That They Could Not Do So

The Whitepapers explained that XDA's ultimate mission was to help cryptocurrency traders access multiple cryptocurrency exchanges, by offering the "Xtrade Platform" (the "Platform"), basically a computer program with a "market-making" function.  SAC ¶ 58.  In Xtrade's October and January and March Whitepapers (p. 10), Xtrade stated that large portions of investor funds would be used to "Make markets in multiple crypto currencies to minimize spreads and increase liquidity for market participants".  SAC ¶ 59.  Both the October and January Whitepapers (at p. 34), in a section labeled "Revenue Generation Model," Xtrade states: "Given Xtrade's balance sheet and a presence at multiple cryptocurrency exchanges, Xtrade anticipates acting in a market-making capacity across numerous crypto currency pairs in different markets. SAC ¶ 60.

Defendants argue that first, these statements were only forward-looking, because it was accompanied by the usual language saying that the statements were forward-looking.  Moving Brief 20-21.  Those statements cannot save Defendants.  "[M]ere boilerplate … does not meet the statutory standard," because it is too "general and ubiquitous" and "not tailored to the specific circumstances of a business operation." *In re Harman Int'l Indus., Inc. Sec. Litig*., 791 F.3d 90, 102 (D.C. Cir. 2015).  Further, the Defendants "omitted a major risk that [they] knew about at the time [they] made the statement," *Slayton v. Am. Express Co*., 604 F.3d 758, 772 (2d Cir. 2010), notably that there was absolutely no regulatory path at the time to becoming a market-maker for cryptocurrency.  The Whitepapers never disclosed that Xtrade would certainly have to register with FINRA as a broker-dealer to operate its stated business. The Whitepapers also never disclosed that in order to allow its core "market-making" functions, Xtrade would have to become a national securities exchange or an alternative trading system ("ATS"). SAC

¶ 63.  And they fail to disclose that at that point, not a single entity had been granted a license to become a national securities exchange or an ATS by the SEC, or even granted a broker-dealer license for cryptocurrency trading by FINRA.  SAC ¶ 64.

In short, Defendants advertised a core business model that the Defendants knew, at the time, was then impossible, and would be unlikely for the foreseeable future, and omitted to state the facts that would have made clear that they could not have accomplished their goals.

        iii.    <u>Defendants Fraudulently Omitted They Would List their XTrade Tokens on Foreign Exchanges</u>

When a party makes a disclosure, it assumes a duty to disclose all information necessary to make its statement not misleading, including information the party would not otherwise have been required to disclose had it not made the initial disclosure. See, e.g., In re Hi-Crush Partners L.P. Sec. Litig., 2013 WL 6233561, at *18 (S.D.N.Y. Dec. 2, 2013) ("The fact that a corporation has no affirmative legal obligation to disclose information under applicable SEC regulations 'does not mark the end of our inquiry;' the corporation may still have a duty to disclose that information in order to avoid misleading investors." (*quoting In re Morgan Stanley Info. Fund Sec. Litig*., 592 F.3d 347, 365 (2d Cir. 2010)).

The SAC alleges that Xtrade "actively participated" in having the tokens listed on Idex and Coinsuper "for the purpose of encouraging the purchase and sale of tokens." SAC ¶¶ 110, 143.   It also alleges that Xtrade sold its own tokens on these exchanges and that doing so "destroyed any remaining value" of the tokens.  SAC ¶¶ 111, 145-46. The SAC further alleges that neither the SAFT nor the White Paper disclosed the risk that Xtrade might allow the tokens to be listed for sale in a secondary market prior to having a functioning product made available to the public. SAC ¶ 147.

Defendants protest that the SAC does not specify any statement made by Defendants that was misleading as a result of Defendants' failing to disclose the risk that Xtrade might list or sell tokens on an exchange.  Moving Brief 28.  But the very statements that the Xtrade token was not a security, and was only a utility (or, apparently now, a "currency") are those statements that are rendered misleading.  Defendants can't advertise that their token isn't a security, and then list it on exchanges meant for trading digital securities.

Defendants also claim that the White Paper does disclose that tokens may also trade on secondary markets in the future.   Moving Brief 28.  What the White Paper does not disclose is that Defendants would do so only after abandoning their entire "market maker" business model, prior to having any other functioning platform at all ,  and turn to foreign equity markets as a way of raising more money.

> iv.   Defendants' Other False Claims

The White Paper falsely represented that Kravets helped launch a company called Sogotrade, when in fact Kravets had never worked for Sogotrade and that Kravets had only helped his employer, Genesis, become a customer of Sogotrade.  SAC ¶ 142.  And the White Paper claimed that XTrade had partnered with the CME, that a "true partnership" with CME "was a significant draw for investors in a start-up cryptocurrency trading platform", and that there never was any partnership with the CME.  SAC ¶ 79.  Defendants argue that the SAC does not adequately allege reliance on these misrepresentations, or that they were made with intent to deceive.  Moving Brief 31-32.  Nonsense.  Defendants do not even contest that these statements were lies.  And these self-aggrandizing lies could only have been told to induce reliance on a model that had executives with a history of success, and tie-ups with big brand-name companies in the space. Plaintiffs relied on all of the materials issued by Defendants in making their investments.

### B.    Scienter is Properly Alleged

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To plead scienter, a complaint must allege a "strong inference of scienter" that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.  In determining whether a complaint has alleged a strong inference of scienter, a court should not "scrutinize each allegation" separately.  *Id.* at 326.  Rather, it should "assess all the allegations holistically" and ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id*.

Additionally, "at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  In the end, "the tie … goes to the plaintiff."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 464, 473 n.82 (S.D.N.Y. 2014).

The Complaint pleads the requisite strong inference of scienter by alleging facts to show (1) "that the defendants had both the motive and opportunity to commit the fraud" and (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  A complaint successfully pleads scienter under the "motive and opportunity" theory if it alleges facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud."  *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).

It is entirely implausible that sophisticated business people, with motive and opportunity to lie in order to make money, unwittingly orchestrated an unregistered token offering in a

regulatory environment in which the SEC was warning against precisely such offerings (SAC ¶ 46), and accidentally made repeated false statements about that offering.

The story set forth in the SAC is far more plausible: Defendants knew or had reason to know that they could make money by offering tokens, and emphasizing that they could be a trading platform, and that none of that expensive and bothersome SEC registration was necessary. The SAC makes numerous specific references to "circumstances indicating conscious or reckless behavior by the [D]efendant[s]." *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d at 239; SAC ¶¶ 13, 15, 21, 66, 77-79, 86, 89, 135-37.

Defendants simultaneously argue that "allegations of Defendants' experience and expertise are not sufficient to raise an inference of scienter," Moving Brief 15; and that Defendants were "sophisticated investors" and thus should have kept themselves apprised of the SEC's views on cryptocurrencies, Moving Brief 17. In other words, Defendants argue that their expertise should not imply that Defendants knew they were lying, when at the same time Defendants argue that Plaintiffs' expertise implies that Plaintiffs <u>should have known</u> Defendants were lying. Quite a double standard, and too clever by half – particularly where Defendants knew in far greater detail what product they were developing, and how they thought it could be employed – and yet misstated those facts anyway.

### C.     Reliance is Properly Alleged

Defendants contend that if there were misstatements, Plaintiffs were "sophisticated investors" that "could have discovered the[ir] alleged falsity" through "minimal diligence". Moving Brief 17. In essence, Defendants place the burden on Plaintiffs to 'spot the fraud' based on Public SEC filings and cautionary language.

In *Affiliated Ute v. United States*, the Supreme Court held that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that

is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. Th[e] obligation to disclose and th[e] withholding of a material fact establish the requisite element of [reliance]." 406 U.S. 128, 153-54 (1972) (internal citations omitted).

Even sophisticated institutional investors are entitled to a presumption of reliance based on the fraud on the market theory. *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 431-432 (S.D.N.Y. 2015) (citing *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013)); *see also Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 268 (2014)   ("certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation. The Court based that presumption on what is known as the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'").

Here, Defendants traded on their expertise.  They held the Company out as having a CEO who was an expert in the field, and claimed that their legal counsel had certified the tokens were not securities. Plaintiffs had every right to rely upon Xtrade to be diligent in complying with the law, and reliance in the SAC is properly alleged.  Moreover, Defendants have not rebutted the presumption of reliance because they have failed to show that "the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that [Plaintiffs] would have bought or sold the [tokens] even had he been aware that the token's price was tainted by fraud." *Halliburton*, 573 U.S. at 269.

### D.    Loss Causation is Properly Alleged

A valid securities fraud claim requires that defendants' "misrepresentation[s] (or other fraudulent conduct) proximately caused the plaintiff[s'] economic loss." *Dura Pharm., Inc. v.*

*Broudo*, 544 U.S. 336, 346 (2005).  Notably, while plaintiffs eventually must sort out the "tangle of factors" affecting proof of loss causation, *id.* at 343, at the pleading stage plaintiffs need only provide defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between" their loss and the alleged misconduct.  *Id.* at 347.  The Supreme Court observed that this is not a difficult exercise: plaintiffs must allege "some indication of the loss and the causal connection that the plaintiff has in mind."  *Id.; see also Sharette,* 127 F. Supp. 3d at 102-03 ("Loss causation need not be pled with particularity. A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient.") (*citing In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010).

Defendants argue that the crash of the cryptocurrency markets in 2018 explains the entire loss of value in Plaintiffs' investment, and thus, that Plaintiffs failed to adequately plead loss causation.  Moving Brief 18-19.

To begin with, a large part of the cryptocurrency market has substantially recovered in the ensuing period of 2019.  While the price of Bitcoin (often considered a bellwether for the cryptocurrency markets) dived from a brief all-time high of $17,000 down to below $4,000 in the "crypto winter" of 2018, it has since risen back to $10,000 per Bitcoin.[2]  However, the XTrade tokens remain worthless, trading at near zero values.

This simple fact aside, loss causation is amply plead.  As set forth in SAC ¶¶ 139-141, when XTrade publicly abandoned the "market making" model it had earlier advertised in conjunction with its sales, the price of the token collapsed.  And Defendants themselves caused a drop in the value of the token by selling, or allowing their tokens to be sold, on public exchanges, after first claiming that their token was not going to be traded on an exchange.  SAC

---

[2]    See https://www.coindesk.com/price/bitcoin.

¶¶ 143-147.  The truth came out "events constructively disclosing the fraud," as in *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016), and it is easy to conclude that "the damage suffered was a foreseeable consequence of the misrepresentation." Rothman v. Gregor, 220 F.3d 81, 95 (2d Cir. 2000) (emphasis omitted).

Loss causation pleadings have been found to be sufficient where the plaintiffs "specifically asserted a causal connection between the concealed information … and the ultimate failure of the venture," *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc*., 343 F.3d 189, 198 (2d Cir. 2003), and where the alleged misstatements  were "the reason the transaction turned out to be a losing one," *First Nationwide Bank v. Gelt Funding Corp*., 27 F.3d 763, 769 (2d Cir. 1994) (citing cases).  This case is no different.

## III.   DEFENDANTS ARE LIABLE UNDER SECTION 12(A)(1) OF THE SECURITIES ACT

Under § 12(a)(1), any person who offers or sells a security required to be registered under the Securities Act but not registered is liable to the person purchasing the security. Section 12(a)(1) creates a right of action for the solicitation or sale of securities in violation of § 5. *Pinter v. Dahl*, 486 U.S. 622, 641-47 (1988).  Under § 12(a)(1), there is no requirement that a plaintiff prove scienter or even negligence: a person who sells securities in violation of the registration provisions of the Securities Act is strictly liable.  *See Pinter*, 486 U.S. at 638.  A plaintiff does not need to establish any form of reliance to recover under § 12(a)(1).  *Akerman v. Oryx Commc'ns, Inc*., 810 F.2d 336, 344 (2d Cir. 1987).  The primary remedy provided by § 12 is rescission (with interest). *See Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994); *Fed. Hous. Fin. Agency v. Merrill Lynch & Co*., 903 F. Supp. 2d 274, 280 (S.D.N.Y. 2012).

### A.    Plaintiffs' Section 12(a)(1) Claim is Timely

Actions under § 12(a)(1) must be brought within the shorter of one year of the date of the violation, or three years from the date the security was first offered to the public.  *See Pollack v. Laidlaw Holdings, Inc*., 1995 WL 261518, at \*16 (S.D.N.Y. May 2, 1995).  Each of the acts prohibited by Section 5 – the "offer," "sale," and "delivery after sale" of an unregistered security – is a "distinct violation" for statute of limitations purposes. *Eriksson v. Galvin*, 484 F. Supp. 1108, 1119 (S.D.N.Y. 1980).

Defendants argue that Plaintiffs' Securities Act Claim is untimely because their offer and sale of the tokens was more than one year before Plaintiffs' filed the SAC. Moving Brief 32-33. But, as alleged in the SAC, there are separate violations:  the offer, the sale, and the delivery. And the delivery to the Plaintiffs of the tokens – the unregistered securities – occurred in May 2018.  SAC ¶¶ 94-104.  The delivery of the tokens was itself a securities offering.  And as the initial Complaint was filed on April 26, 2019, that claim is well within the one-year statute of limitations.  This is particularly true as the SAC alleges that Plaintiffs were forced to leap additional hurdles to receive their tokens, namely (at the request of the Defendants) finding foreign nationals to sign papers to substitute on the SAFTs.  In both Plaintiffs' cases, until the tokens were actually delivered, it was unclear whether the transaction was complete.

Further, the Defendants have been engaged in a continuous offering ever since. SAC ¶¶ 108-11.  Ordinarily in making this argument, plaintiffs would turn to an analysis under the SEC's "shelf registration" provisions, and the documents offered by the defendants thereunder. *See, e.g.*, 17 C.F.R. § 230.430B(f)(2) (expanding the meaning of the "initial bona fide offering date" from the date of a post-effective registration statement amendment, to the date of a post-effective registration statement supplement, with regard to issuer and underwriter liability); *Footbridge Ltd. Tr. v. Countrywide Finan. Corp.* , 770 F.Supp.2d 618, 623 (S.D.N.Y. 2011)

("For issuers and underwriters[,] ... Rule 430B of the Securities Offering Reform ('SOR')

changed the bona fide offering date for shelf offerings issued pursuant to registration statements

filed on or after December 1, 2005 to the date of the prospectus supplement."); *In re*

*Countrywide Finan. Corp. Sec. Litig.*, No. CV-07-05295-MRP, 2009 WL 943271, at *7 (C.D.

Cal. Apr. 6, 2009) ("The Rule states that some types of post-effective amendments will create a

new effective date and initial bona fide offering date only for the issuer and for a person that is at

the time an underwriter." (internal quotation marks and citations omitted)); *see also Gaynor v.*

*Miller*, 273 F. Supp. 3d 848, 866 (E.D. Tenn. 2017).

Here, however, the whole point is that the Defendants were ignoring niceties like SEC

regulation, and instead openly offering securities to Americans and foreigners – and listing those

securities on foreign exchanges – as part of one long continuous offering (stretching at least up to

and through the time the tokens were initially listed on Idex and Coinsuper Exchanges).  As a

result, and under the generous standards of Rule 8(a), Plaintiffs should receive every benefit of

the doubt at this point in the litigation on the timeliness of their claims.

### B.    Plaintiffs Have Sufficiently Pled Facts Establishing Their Right to Relief Under Section 12

Defendants claim that Plaintiffs failed to "choose between damages and rescission" on

this claim, and failed to allege that Plaintiffs sold the tokens for a loss.  Moving Brief 34.  This is

nonsensical; Plaintiffs are alleging fraud under Section 10(b) of the 1934 Act and common law

fraud, which is a claim for damages; and issuance of an unregistered security under Section

12(a)(1) of the 1933 Act, which is a claim for rescission.  These causes of action are amply

alleged in the SAC.

## IV.    CONTROL PERSON LIABILITY IS SUFFICIENT ALLEGED

A Section 20(a) claim is adequately alleged where plaintiff pleads (1) a primary violation by a con-trolled person, and (2) control of the primary violator by the defendant.  *See, e.g., In re Parmalat*, 375 F. Supp. 2d at 278.   Each individual defendant was listed as a co-founder and officer of XTrade, which thus held them out to have control over the corporate defendants.  SAC ¶ 36.  And the primary violations are amply alleged, as set out above.  Thus, Counts II and IV for control person liability should stand.

## <u>CONCLUSION</u>

For the reasons above, Plaintiffs respectfully urge this court to deny the motion to dismiss.

Dated:  New York, New York
            September 21, 2019

                                            KIRSH LLC
                                            Attorneys for Plaintiffs


                                            /s/ Zeev Kirsh
                                            By: Zeev Kirsh, Esq., #4597985
                                            Kirsh LLC
                                            347 West 57th Street 31a,
                                            New York, NY 10019
                                            212-586-7517